*United States v. LoCascio,* **No. 90-cr-1051 (ILG)**

PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION
TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO
28 U.S.C. § 2255 AND REQUEST FOR EVIDENTIARY HEARING

# Exhibit 3

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 19-2743

FRANK LOCASCIO,

Petitioner,

-against-

UNITED STATES OF AMERICA,

Respondent.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

THE GOVERNMENT'S SUPPLEMENTAL RESPONSE TO LOCASCIO'S
MOTION TO FILE A SECOND OR SUCCESSIVE PETITION PURSUANT
TO 28 U.S.C. § 2255 AND APPENDIX

RICHARD P. DONOGHUE,
United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

DAVID C. JAMES,
KEVIN TROWEL,
Assistant United States Attorneys,
    (Of Counsel).

# TABLE OF CONTENTS

Page

Excerpt from Government's Appellate Brief,
 United States v. Locasio, 90-CR-1051
 Dated Mar. 26, 1993 ................................................................ SGA 1

Government Exhibits,
 United States v. Locasio, 90-CR-1051

 GX 304.1A(T) ................................................................... SGA 63

 GX 300.1B(T) ................................................................... SGA 138

Trial Transcript Excerpts,
 United States v. Locasio, 90-CR-1051

 February 20, 1993 ........................................................... SGA 141

 March 2, 1993 ................................................................... SGA 143

 March 3, 1993 ................................................................... SGA 145

 March 5, 1993 ................................................................... SGA 162

 March 31, 1993 ................................................................. SGA 165

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 92-1382 (L), 92-1384 and 92-1671

---

UNITED STATES OF AMERICA,

Appellee,

– against –

FRANK LOCASCIO and JOHN GOTTI,

Defendants-Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

BRIEF FOR THE UNITED STATES

---

PRELIMINARY STATEMENT

Frank Locascio and John Gotti appeal from judgments of conviction entered on June 23, 1992 in the United States District Court for the Eastern District of New York (Glasser, J.). The same appellants also appeal from the district court's order of October 30, 1992, denying their motion for a new trial.

On July 18, 1991, a grand jury returned a 13-count superseding indictment against Gotti, Locascio and two other defendants, Salvatore Gravano and Thomas Gambino.[1] Counts One and Two charged all four defendants with substantive and conspiracy violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). The charged enterprise was the Gambino Family of La Cosa Nostra.

---

[1] Gravano later pleaded guilty to a superseding racketeering charge and testified at trial. The trial of Gambino was severed.

2

Gotti was charged with being its boss. Locascio and Gravano were charged
with being its acting underboss and consigliere, respectively, and
Gambino was charged with being a captain in the Family. (AA 3-4).[2/]

Many of the crimes charged as racketeering acts in the RICO
counts -- which included murders (Gotti was charged with five; Locascio
with one), murder conspiracies, gambling, loansharking and obstructions
of justice -- were also the basis of separate counts in the indictment.
The Addendum to this brief summarizes the charges against Gotti and
Locascio.

On April 2, 1992, following a six-week jury trial, Gotti was
found guilty of all charges in the indictment. Locascio was found guilty
of all of the charges against him except for Count 10.[3/] Each defendant
was sentenced to life in prison on the RICO and murder counts, and the
statutory maximum prison terms on all remaining counts, with all senten-
ces to run concurrently. The court also imposed five years of supervised
release and a $250,000 fine on each defendant, as well as mandatory spe-
cial assessments of $650 for Gotti and $350 for Locascio. (AA 1433-42).
Both defendants are incarcerated.

On appeal, Gotti and Locascio raise numerous challenges to
their convictions and the subsequent denial of their motion for a new
trial. Regarding the conduct of the trial, they claim that the court
abused its discretion in rulings relating to expert opinion testimony,
evidence of crimes committed by the defendants not specifically charged

---

[2/]    The following abbreviations are used herein:   "AA" refers to the
appellants' appendix; "GA" refers to the government's appendix submitted
herewith; "T" refers to the trial transcript.   Where the context makes
it obvious which appellate brief is being cited, "Br." is used;
otherwise, "Gotti Br." and "Locascio Br." refer to the briefs submitted
by Gotti and Locascio, respectively, in appealing their convictions, and
"R33 Br." refers to the appellants' joint brief in the appeal of the
order denying a new trial.   "R33 App." refers to the appendix to that
brief.

[3/]    Although Locascio was acquitted of this count, the corresponding
racketeering act charged in the RICO and RICO conspiracy counts was found
to have been proven against both defendants.

in the indictment, and testimony about particular details relating to
crimes committed by an accomplice witness. Locascio claims that the evi-
dence was insufficient to support any of the verdicts against him, and
also asserts that the court abused its discretion in declining to sever
his trial from Gotti's and in refusing to order the government to provide
a bill of particulars. The appellants argue that the court further erred
in disqualifying certain attorneys from participating in the trial, by
failing to take adequate measures in explaining to the jury the need for
anonymity and sequestration and in its final instructions to the jury.
Gotti and Locascio also accuse the government of failing to disclose ex-
culpatory evidence and of engaging in misconduct during the summations.
Finally, the appellants challenge the denial of their new trial motion.

For the reasons stated below, all of the appellants' arguments
lack merit and should be rejected.

STATEMENT OF FACTS

A.    Overview -- The Sources of Evidence

The most striking aspect of the appellants' briefs is their
failure to set forth the facts of this case. The most overwhelming evi-
dence came not from expert witnesses, as they suggest (see Gotti Br. at
8-12, Locascio Br. at 51-53), or from the testimony of their former co-
defendant Salvatore Gravano, but from tape-recorded conversations of the
defendants themselves. In these conversations, Gotti and Locascio expli-
citly admitted, or were caught actually committing, virtually every crime
charged in this case.

Although the government offered tape recordings from four dif-
ferent locations over an eight-year period,[4/] the most significant evi-

_____

[4/]    The locations and approximate dates of these electronic sur-
veillances were:  (1) the home of Angelo Ruggiero (April-June 1982); (2)
the house of Aniello Dellacroce (June 1985); (3) the Bergin Hunt and Fish
Club in Queens, New York (August-October 1985 and January-May 1986); and
(4) 247 Mulberry Street, New York, New York (September 1989-March 1990).

4

dence consisted of conversations intercepted at 247 Mulberry Street in New York during the period from late 1989 until early 1990. The FBI had installed three "bugs" in that building. One was in the Ravenite Social Club on the first floor, which was the Gambino Family's headquarters. Since thirty to fifty men were in that club on an average night (GA 618-19, 1659-60), and Family members suspected that the club was bugged (GA 1260-61), these tapes included few audible conversations and even fewer criminal ones. The second bug was in a hallway behind the club's rear door (the "Ravenite Hallway"). Gotti would occasionally step out of the club into the hallway to hold criminal conversations. (GA 615-16).

The third and most significant bug was in an apartment two stories above the club (the "Ravenite Apartment"). Because it was the residence of the 80-year-old widow of a Gambino soldier, Gotti, Locascio and Gravano felt safe talking there. (GA 1261). Moreover, since the apartment was accessible by an internal stairwell in the Ravenite Hallway, Gotti, Locascio and Gravano could go there without being surveilled by law enforcement personnel outside the club. (GA 617).

Gotti, Locascio and Gravano had most of their criminal conversations outdoors to avoid interception. (GA 1261). However, on five nights during the winter of 1989-90, bad weather and their own fatigue prompted them to use the Ravenite Apartment. (GA 1261-62, 1548). Gotti and Locascio were present for all five conversations; Gravano was present for four of them. Although the total running time of the five conversations in the Ravenite Apartment was only six hours, it was six hours of intense criminality. Gotti, Locascio and Gravano went to that apartment solely to discuss the affairs of their criminal enterprise. Their conversations there included discussions of whom they had murdered and why; whom they were going to murder and why; whom they would propose to become "made" members; whether those candidates had earned admission into the Family by committing murders; how to exert the Family's control

5

over various New York City industries and labor unions; and how to obstruct law enforcement's efforts to bring Family members to justice.

In short, the Ravenite Apartment was the indoor boardroom of the Gambino Family administration. Gotti, Locascio and Gravano would climb the two flights of stairs from the social club, take additional steps to make sure that no one could overhear their conversations,[5/] and proceed to manage a sprawling crime family. On three of the five nights they conducted their business in the Ravenite Apartment, others were summoned to appear before them. Each time, the visitor was allowed to remain only long enough to perform his role in committing or facilitating one of the crimes on the administration's agenda.[6/]

Gotti simply ignores the overwhelming evidence of his own tape-recorded statements. Locascio makes only brief references to the tapes in support of his novel claim, which the jury rejected, that he was a "merely present" underboss. As set forth below, the tapes alone proved virtually all of the crimes charged in the indictment.

The second principal source of evidence was the testimony of Salvatore "Sammy" Gravano, who entered into a cooperation agreement with the government shortly before the trial. Although Gravano's cooperation revealed that he and the other defendants had committed many more crimes than were charged in the indictment, no further charges were brought against Gotti and Locascio. Rather, they were tried on the same charges that the tapes and other evidence had sufficed to prove even before Gravano agreed to testify. Especially when viewed in the light most

---

[5/]    See, e.g., GA 80-81 (Locascio suggesting that they check outside the door to make sure no one was attempting to listen and that they turn up the radio to deter eavesdropping).

[6/]    See GA 514-31 (John D'Amato brought up to discuss murdering Gaetano "Corky" Vastola); GA 378-403 (Joseph Corrao and George Helbig brought up to report information from a bribed detective); GA 322-53 (Michael Coiro brought up to discuss bribing a separate law enforcement source); GA 79-86 (Daniel Marino brought up to report on focus of grand jury investigation defendants were obstructing).

6

favorable to the government, as it must be on appeal, Gravano's testimony
only added to an already overwhelming case.

B.    The Gambino Family -- Its Leaders And Its Rules

         During the five Ravenite Apartment conversations, John Gotti
explicitly confirmed the existence of the Gambino Family and identified
himself as its boss and Locascio and Gravano as the other members of his
administration.  Although the examples are too numerous to mention here,
some are set forth below:[1/]

| Subject | Gotti's Statement |
|---------|-------------------|
| Locascio's Role | . . . but I told him [Gravano], . . . Frankie's my Acting Underboss. . . . [A]m I out of order here? Correct me! You're my fuckin' Underboss. Correct me, Frankie. (AA 1647-48). |
| Gravano's Role | Tomorrow I wanna call all our Skippers in, I'm gonna tell them. I'm the Representante 'til I say different. Soon as anything happens to me, I'm off the streets, Sammy is the Acting Boss. . . . So I'm asking you how you feel. You wanna stay as Consigliere? Or you want me to make you official Underboss? Acting Boss? How do you feel?[8/] (GA 6). |
| Stepping Down If Jailed | I'm gonna make our Skippers understand that. (Coughs) This is my wishes that if, if I'm in the fuckin can, this Family is gonna be run by Sammy. I'm still the Boss. If I get fifty years, I know what I gotta do. But when I'm in the can, Sammy's in charge. (GA 9). |
| House Counsel's Fees | Gambino Crime Family? This is the Shargel, Cutler and whattaya call it Crime Family. (GA 69). |
| The Importance Of "Making" The Right People | I'm not in the mood for clans. I'm not in the mood for gangs, I'm not in the mood for none a that stuff there. And this is gonna be a Cosa Nostra 'til I die. Be it an hour from now, or be it tonight, or a hundred years from now when I'm in jail. It's gonna be a Cosa Nostra. . . . It's gonna be the way I say it's gonna be, and a Cosa Nostra. A Cosa Nostra! (GA 94). |

_____

[1/]    Given these tapes, the appellants' claims that their roles as the
Gambino Family's leaders were established by expert testimony, rather
than Gotti's own words (Gotti Br. at 11, Locascio Br. at 8, 52-53), are
particularly disingenuous.

[8/]    Gravano testified that after this January 4, 1990 conversation, he
accepted the position of official underboss. Locascio, who had been
acting underboss, was switched to the position of acting consigliere.
(GA 1133).

| Another Family | Our worst soldier's better than their best soldier. (GA 54). |
|---|---|
| His Success Unifying The Gambino Family | Joe Arcuri came to me one day, crying. He's a fuckin' pain in the ass old-timer. . . . He's an old time Captain. They thought they were in trouble when we first took over. They so comfortable now. (AA 1662). |
| His Success In Unifying The New York Families | You know what JoJo told me outside, in the car, today? . . . He says to me, "You know, John," he says, "let me tell you," (IA) he says, "I never was so proud, so happy in my whole life," he says. "I knew," he said, "I was talking with a few Skippers from another Family." He says, "Since youse are here, this is the first time that they could remember, in years, that the Families ain't arguing." Nobody's arguing. . . . I was thinking about it. I says, "Ya know, he's right, the fuck." (GA 120-21). |

In a lengthy discussion of potential inductees on January 4, 1990, Gotti, Locascio and Gravano identified the requirements for membership in the Family. One was that the potential soldier must have participated in a murder, often referred to as doing "a piece of work" or "whacking" someone. (GA 915). This requirement ensured that they did not "make" an undercover agent (who would never be allowed to participate in a murder), and also enabled the administration to see how a man reacted under pressure. (GA 1129). Indeed, Gotti, Locascio and Gravano discussed the fact that one of the candidates for membership -- "Tony with Danny Marino" -- had not yet been used in a murder, and thus could not yet be made. (GA 30, 1128-31).[9]

Committing murder was necessary, but not sufficient. As Gotti explicitly stated: "I want guys that done more than killing." (GA 4). The other qualifications he discussed with Locascio and Gravano sounded some of the basic themes of the trial. For example, Locascio noted that they needed to "make" people who were "loyal" and "faithful" to the administration. (GA 22; see also GA 1131). As set forth below, Robert DiBernardo and Louie Milito were killed for their disloyalty.

---

[9] "Tony" finally got "used" in October 1990, when he was the getaway driver for the DiBono murder. (See pp. 21-24, infra; GA 1128-29).

8

Locascio also stressed the importance of members immediately "coming in" to the administration when called to do so. (GA 21-22). As set forth below, the administration murdered Louis DiBono for refusing to "come in" when John Gotti called, and agreed to murder a DeCavalcante soldier, Gaetano "Corky" Vastola, in part because he had refused to "come in" to his administration.

Finally, in addition to being loyal, faithful, punctual and a killer, a candidate for membership had to be an "earner" -- "somebody who's capable of going out, putting things together, controlling unions or businesses for the Family." (GA 1131). This too reflected one of the trial's central themes, because when the administration's discussions in the Ravenite Apartment did not focus on murder or obstructing justice, they related to the Gambino Family's illegal grip on various industries in the New York area.[10]/

The Gambino Family, like all Cosa Nostra Families, had various rules. Several of them -- such as the prohibition of dealing in drugs, the oath of omerta and the requirement of obedience to the boss -- had a central role in some of the racketeering acts described below. Even more important was the rule that the murder of a Family member or associate required the approval of the boss. In addition to Gotti's tape-recorded statements that he had ordered the murders of DiBernardo, Milito and DiBono (see pp. 16-24, infra), and the testimony of Gravano that such approval was routinely sought and obtained (see, e.g., GA 1081-82, 1096-99, 1105, 1199-1200, 1242, 1383-84, 1396), the tapes were replete with references by Gotti to other instances in which such

---

[10]/ See, e.g., AA 1668-69, GA 1246-47 (carting industry); AA 1649, 1652, 1658, 1663-64, 1687, 1704-05, 1716, GA 919-22, 1026, 1045 (construction industry); AA 1712, GA 1256-57 (garment center); AA 1651, GA 745 (Local 23 of Mason Tenders union); AA 1658, GA 746-47 (window replacement industry); AA 1668, GA 1254-56 (shipping industry); AA 1696, GA 1257-59 (bootleg gasoline business); AA 1646, GA 744 (a carpet business); AA 1698 (discussion of "Family companies"); GA 101-07, 695-98 (produce business). See also AA 1679-80, GA 749-50 (Gotti's reference to a heroin business); GA 157-79, 1223-25 (concrete industry).

approval was sought.[11]/   They were also laden with references by Gotti
to people he had killed or was considering killing.[12]/

     In addition to proving the existence of the charged enterprise
and the defendants' roles in it, the tapes were also overwhelming proof
of the defendants' guilt as to virtually all of the charged crimes.

C.    The Murders of Paul Castellano and Thomas Bilotti
      (Racketeering Acts One and Two)

     On December 16, 1985, Paul Castellano and Thomas Bilotti were
murdered on a busy street in mid-town Manhattan.   The murders culminated
John Gotti's three-year fall from grace in the Gambino Family.   The
evidence established that in the spring of 1982, Gotti was a "powerhouse"
in the Gambino Family, and was being groomed to replace Castellano as
boss of the Family.   By December 1985, however, Castellano had stripped
Gotti of his power and was about to murder him.   Instead, Gotti struck
first and took over as boss of the Family.

    1.   Background:  Gotti's Reasons For Killing Castellano

     Gotti murdered Castellano for a number of reasons.   Even
before Gotti came to fear that Castellano was about to kill him, Gotti
hated Castellano for being a bad boss.   For example, Gotti shared the
widespread belief that Castellano had sold out the Gambino Family for his
own personal business interests.   Specifically, he had allowed a Genovese

---

[11]/    See, e.g., AA 1646 (complaining that every time Gravano has a
business partner he does not like, he comes to "the Boss, and [the] Boss
kills him"); AA 1690 (reminiscing about his refusal to let Gravano kill
"Frankie Fap"); AA 1689 (telling Locascio about how Gravano and DiBono
had each asked Castellano's permission to kill the other); GA 501-03, 545
(on the "Cardinal Rule" that a boss must be informed if one of his
soldiers is to be used in a murder); GA 514 (ensuring that DeCavalcante
Boss John Riggi had officially ordered the Vastola murder).

[12]/    See pp. 16-28, infra; see also GA 300 (reminiscing about "a piece
of work" Carlo Gambino had "sent me to do"); AA 1660-61 (if people
challenge him the way he challenged Castellano, "I'll kill their fuckin'
mothers, their fathers"); GA 113 (if attorney James LaRossa refuses to
represent him, "I'll kill him").

Family soldier, rather than Gambino Family members, to "handle" the Gambino Family interests in the concrete business, which enriched Castellano and the Genovese Family, but no one else. (GA 924-28).[13]/ Similarly indicative of Castellano's tendency to turn to the Genovese Family for assistance was his use of Genovese soldiers in the early 1980s to murder Frank Piccolo, a Gambino captain. Although a boss has the right to kill anyone in his own Family, the Piccolo murder further alienated Castellano's soldiers, because "[y]ou just don't let another family kill a captain within your own family." (GA 928).

As Gotti put it in late 1985, "absolutely nobody [was] happy with" Castellano's handling of the Gambino Family. (GA 269, 779, 929). Indeed, Castellano's tactics created rival factions within the Family, and his willingness to divide the Family against itself further fanned Gotti's hatred of him. More importantly, as Locascio later observed, Castellano's creation of factions made him vulnerable. (AA 1686 ("That's what made him weak"); GA 751). This volatile situation was exacerbated when, as the result of a bug placed in the home of one of Gotti's crew members, Gotti got into a direct conflict with his boss in late 1985.

In the spring of 1982, the FBI monitored conversations occurring in the home of Angelo Ruggiero. The tape recordings included conversations between Ruggiero, Gene Gotti (the defendant's brother) and John Carneglia, which revealed that they were partners in a heroin business that was responsible for the distribution of 46 kilograms of heroin in the first six months of 1982. (See, e.g., GA 2337, 2338). The conversations further revealed that Ruggiero, Gene Gotti and Carneglia were all in the crew of John Gotti, a "powerhouse" acting captain who was

---

[13]/ The animosity this created was so strong that Gotti was still stewing in it four years after he murdered Castellano: ". . . I don't believe in that fuckin' bulldozin.' That's what made me hate, really, fuckin' Paul. You, ya, you couldn't get a fuckin' ham sandwich. Everyone is right. He sold the 'borgata' out for a fuckin' construction company." (GA 250-52).

being "groomed" by Paul Castellano to become the Family's future boss. (GA 199, 219-22, 224, 766, 770, 907-11).

The heroin trafficking by Gotti's crew was flatly prohibited by the Gambino Family. The Family's prohibition was not civic-minded; rather, it stemmed from a recognition that the long prison sentences imposed on drug dealers give them a greater incentive to cooperate with the government -- to "rat" on other members of the Gambino Family. As a result, Castellano and Vincent "Chin" Gigante, the boss of the Genovese Family, agreed that anyone in either Family who was caught dealing narcotics would be killed. (GA 194; see also GA 764-65, 904).

The Ruggiero tapes resulted in indictments of Ruggiero, Gene Gotti, John Carneglia and various others in Gotti's crew.[14] By 1985, the tapes that revealed the Gotti crew's drug-dealing had been provided to Ruggiero and his co-defendants, but had not yet been made publicly available. Castellano wanted them so that he could decide for himself whether Gotti and his crew had violated the Family's drug-trafficking prohibition. (GA 773, 903-04, 930). Gotti did not want Castellano to get the tapes because he knew they proved the heroin trafficking of his brother Gene, Ruggiero and other members of his crew. (GA 202, 206, 777-80).

Aniello Dellacroce, Castellano's underboss, protected Gotti and Ruggiero from having to disclose the tapes to Castellano. On June 9, 1985, in a recorded conversation in Dellacroce's home, Dellacroce spoke to both Ruggiero and John Gotti about Castellano's demand for the tapes. Dellacroce warned them that continued defiance of Castellano's

---

[14] See, e.g., United States v. Ruggiero, 934 F.2d 440 (2d Cir. 1991) (affirming convictions of Caesar and Anthony Gurino); United States v. Ruggiero, 928 F.2d 1289 (2d Cir.) (affirming convictions of Gene Gotti and John Carneglia), cert. denied, 112 S.Ct. 372 (1991); United States v. Coiro, 922 F.2d 1008 (2d Cir.) (affirming conviction of Michael Coiro), cert. denied, 111 S.Ct. 2826 (1991); United States v. Squitieri, 688 F. Supp. 163 (D.N.J. 1988) (use of Ruggiero bug against Arnold Squitieri and Alphonse Sisca), aff'd mem., 879 F.2d 959 (3d Cir.) (affirming convictions of both), cert. denied, 493 U.S. 954 (1989). Angelo Ruggiero died in 1989 before his case was resolved.

demand for the tapes would lead to a fratricidal "war" within the Gambino Family. (GA 251, 255, 774-75).

This tension simmered for the next several months. In August 1985, Gotti complained bitterly about Castellano's continued insistence on getting the Ruggiero tapes: "We're sick of this fuck. . . . He wants Genie's tapes. He can go fuck himself. Paul, mind your fuckin' business. You got your own fuckin' tapes." (GA 202, 777; see also GA 206, 779-80).[15]

Two developments caused the situation to come to a head in late 1985. First, Castellano finally received the Ruggiero tapes. (GA 781-82, 1316). Second, on December 2, 1985, Dellacroce, Gotti's mentor and protector, died of natural causes. (GA 780).

Shortly after Dellacroce died, Castellano made it clear that he was planning to destroy Gotti. He announced that he would close down the Ravenite Social Club, break up John Gotti's crew and assign Gotti's soldiers to another captain, either Bilotti or Joe "Butch" Corrao. (GA 308-11, 941-42, 1012-19). As Gotti described the situation four years later: "I was hot as a bastard. . . . I was bent. Was like outright fuckin' war." (GA 308, 311).

With Dellacroce dead and the tapes in Castellano's possession, John Gotti firmly believed that Castellano was about to murder not just Ruggiero and the other heroin traffickers in Gotti's crew, but also Gotti himself:

> GOTTI: . . . you know what we heard, he felt he hadda hit me first. But, if he hits me first, he blows the guy who really led the ring, Angelo [Ruggiero] and them. Supposedly. That's the guys on the tapes.
>
> GRAVANO: I think he would've hit Angelo and not you.

_____

[15] This mention of Castellano's "own . . . tapes" apparently referred to the fact that Castellano's home had been "bugged" by the FBI in 1983. (GA 613-14).

        GOTTI:    Nah!

(GA 282-83, 995-97).

On December 16, 1985, 14 days after Dellacroce's death, Castellano and Bilotti were murdered in front of Sparks Steak House on East 46th Street in Manhattan.

    2.    <u>The Murder Plot</u>

In early 1985, Gotti and Ruggiero solicited support for their plan to murder Castellano. Gravano and his mentor, Frank DeCicco, who were also dissatisfied with Castellano, "decided to back their play," and joined the conspiracy. (GA 931-35).

As time passed, the conspirators considered and rejected as impractical a number of options for killing Castellano. (GA 936-38). Gotti's hatred of Castellano made him impatient to get on with the murder. Years later, Gotti related how, during a 1985 meeting in which Castellano and Bilotti argued with Dellacroce, Gotti wanted to kill Castellano and Bilotti on the spot:

> Tommy [Bilotti] was like this, "Wait a minute, Neil." "Shut up! Shut up, you! Shut up!" Neil said to him. So, Paul says, "Well, then if you don't want your job, I don't want my job." Ah, you fuckin' faggot! I was gonna say, "Let's take 'em right now, these two cocksuckers! And end it right now."

(GA 306, 1011-12).

Their opportunity came shortly after Dellacroce's death, when Frank DeCicco was invited to a meeting at Sparks with Castellano and several other prominent members of the Gambino Family. When DeCicco disclosed this fact to his fellow conspirators, they decided that Castellano and Bilotti would be murdered upon their arrival at Sparks. (GA 936-38, 942).

14

On December 15, 1985, Gotti, Gravano and DeCicco met at Gravano's construction company office in Brooklyn. Also present were the additional people Gotti and Ruggiero had recruited to participate in the murders. They included four "shooters" -- John Carneglia, Eddie Lino, Sal Scala and Vinnie Artuso -- and a back-up shooter, Anthony "Tony Roach" Rampino. (GA 943-46).

On the following evening, the four shooters, who waited directly in front of Sparks for Castellano to arrive, were dressed distinctively in white trench coats and black Russian hats. (GA 957).[16]/ Rampino waited directly across 46th Street as a backup shooter, and three other backup shooters -- Ruggiero, Joe Watts and Iggy Alogna -- were down 46th Street toward Second Avenue. (GA 953-54, 962-64). Gotti and Gravano were in a car on the north side of 46th Street just west of Third Avenue, diagonally across the intersection nearest the front of Sparks. Gravano had a handgun and was responsible for shooting Castellano and Bilotti if they fled westward from the restaurant. (GA 949-50, 688-90).

When Bilotti and Castellano pulled up in front of Sparks in a car driven by Bilotti, the shooters stepped through the rush hour pedestrian traffic and murdered them both. Gravano testified that three of the four shooters actually shot the victims while the fourth, Artuso,

---

[16]/     Although Gravano had not known in advance that they would dress this way, he thought it was a good idea because it would likely cause any eyewitnesses to recall the shooters' clothing rather than their faces. (GA 1304-06). This tactic was only partially successful. Eyewitness Jeffrey Davidson was able to identify John Carneglia as the man he saw shooting Bilotti, although Davidson recalled Carneglia and two other men (whom he could not identify) as having been dressed in long, dark coats. (GA 793-806). Another eyewitness, Angel Rodriguez, was able to identify Anthony Rampino as one of the two men he saw rushing away from the scene with something hidden under their coats, which he also recalled as being dark.     (GA 813-23).     The tactic did work with at least one witness. Jeffrey Matlin, who heard the shooting from Third Avenue and ran to the scene, was only able to recall having seen several men running away wearing long coats (some or all of which he recalled were light in color and one of which he later thought may have been dark) and a cap.     (GA 844-50, 855, 858-59).

later explained that his gun had jammed.[17]  The shooters and their back-ups then walked away down 46th Street toward Second Avenue.  Gravano and Gotti followed in the car, and Gravano looked out the window as they passed to confirm that the victims "were gone."  (GA 967-73).

Within weeks of the murders, during the early morning hours of January 16, 1986 (see GA 163, 173, 755), the Gambino Family captains elected Gotti as boss.  Gotti then promoted other members of the conspiracy:  DeCicco was made underboss, and Gravano and Ruggiero were made captains.  (GA 985-96).

The conspirators knew that they could never discuss, even among themselves, the fact that they had violated the Mafia's rule against killing their own boss lest they themselves be killed.  (GA 980-82).  Although Gotti was careful to observe this rule in form, he occasionally violated its spirit.  For example, the day after he became boss, Gotti had a conversation with Gambino soldier George Remini in which he demonstrated his knowledge of the reasons for Bilotti's murder.  Gotti told Remini that Tommy DeBrizzi, the soldier in charge of the Family's Connecticut operations, was not reporting to his captain, Tommy Gambino.  DeBrizzi had justified his failure to "come in" by saying that Bilotti had told him he could refuse to meet with his captain if he thought he was under surveillance.  According to Gotti, telling a soldier to ignore orders from his own captain was "why [Tommy Bilotti] got sick." (GA 476, 1544-45).

Several years later, during the Ravenite Apartment conversation of November 30, 1989, Gotti reminisced about the many reasons he hated Castellano.  Realizing that his remarks came close to violating the prohibition against admitting his knowledge about the murder, Gotti ended the conversation by smirking and saying that "we had nothin' to do with it; no reason to do it" and suggesting that "the cops" had killed

---

[17]  Ballistics expert George Simmons confirmed that Castellano had been shot by at least three different guns.  (GA 787-92).

Castellano. Laughing at Gotti's joke, Gravano told Locascio, "I love it when he does that." (GA 314-16, 1021-25).

D.    The Murders of DiBernardo, Milito and DiBono

1.    Introduction: The December 12, 1989 Conversation

On December 12, 1989, Gotti and Locascio had a private, hour-long conversation in the Ravenite Apartment. Most of the conversation was about Gravano, who at that time was Gotti's consigliere and was also responsible for managing the Family's control over unions and companies in the construction industry.

Gotti stated that he had visited earlier that day with Bosko Radonjich, the leader of the Westies, an Irish gang affiliated with the Gambino Family. Radonjich controlled Marine Concrete Company, which was paying Gotti $2,000 per week in cash in return for work that the Gambino Family, through its control of corrupt union officials, steered to Marine. Gotti had been embarrassed when he learned from Radonjich that a concrete job that Marine had expected to get had been awarded to Marathon Concrete, a company controlled by Gravano. (AA 1646, 1652-53, 1665; see also GA 757, 758, 922, 1058, 1339).

Gotti's embarrassment produced a diatribe against Gravano. In essence, Gotti complained that by authorizing the murders of other Gambino Family members involved in construction businesses with Gravano, Gotti had consolidated too much power in Gravano's hands, and that Gravano was taking advantage of Gotti to make money for himself and his close associates.

> Every fucking time I turn around there's a new
> company popping up. Rebars, Building, Consulting,
> Concrete. And every time we got a partner that
> don't agree with us, we kill him. You [referring
> to Gravano] go to the Boss, and your Boss kills
> him. He kills 'em. He okays it. Say it's
> alright, good. Where are we going here, Frankie?

(AA 1646). In talking about the partners whose murders he had authorized, Gotti explicitly admitted that he had ordered the 1986 murder of Robert DiBernardo and the 1988 murder of Liborio "Louie" Milito. The same conversation included a truly chilling discussion between Gotti and Locascio about the fact that Louis DiBono, a Gambino soldier, was marked for death simply because he had failed to "come in" when Gotti called. (AA 1674).

Although there was considerable additional evidence relating to all three of these murders, including other taped conversations and the testimony of Gravano, the defendants' secret conversation of December 12, 1989 was the centerpiece of these charges.

### 2. The Murder of Robert DiBernardo (Racketeering Act Three; Counts Three and Four)

When he and his co-conspirators murdered Paul Castellano, John Gotti was under indictment and awaiting trial in both state and federal court. His concern about going to jail, combined with the fact that he himself had just betrayed and murdered his boss, made him especially sensitive to the loyalty of those around him. (See GA 175-76).

Gotti specifically doubted the loyalty of Robert "DiB" DiBernardo, the Gambino Family soldier who had handled the construction unions -- and, in particular, Bobby Sasso, the corrupt President of Teamsters Local 282 -- for Paul Castellano. (GA 1026). In a recorded conversation at the Bergin Hunt and Fish Club on January 18, 1986, just two days after he was elected boss, Gotti stated:

> We suspect a man ain't loyal I break 'em, close 'em and break 'em. Means nothin', he's a nothin' that ain't loyal. . .
>
> A guy like Frank Lo [Locascio] and Tommy (IA) . . . You know, guys like this. Frankie DeCicco will always be loyal, guys like this. Forget these fuckin' assholes like DiB . . .

18

(GA 176-77). On February 22, 1986, in a conversation between Gotti and Ruggiero, DiBernardo was again singled out as being disloyal. (GA 180-81).

During this same period, Gotti successfully "defended" his state assault case by intimidating the complaining witness into a state of amnesia. (GA 632-33, 637). As a result, his bail in the federal RICO case was revoked in an attempt to inhibit the intimidation of witnesses in that case. Gotti went to jail on May 19, 1986. (GA 743). See also United States v. Gotti, 794 F.2d 733 (2d Cir. 1986).

Shortly before Gotti reported to jail, the position of underboss became vacant when Frank DeCicco was murdered. Ruggiero wanted Gotti to appoint him to be the new underboss. DiBernardo favored Gravano for that position. Ruggiero had an advantage, because he was the Family's liaison to Gotti in jail. Knowing that Gotti already suspected DiBernardo of being disloyal, Ruggiero reported to him that DiBernardo was talking "behind his back." Ruggiero also falsely told Gotti that Gravano himself had confirmed that DiBernardo was bad-mouthing Gotti. (GA 1029-31, 1043-44, 1303).

Gotti ordered Ruggiero to murder DiBernardo. Ruggiero conveyed the order to Gravano, and the two of them carried it out. Since Gravano and DiBernardo jointly controlled the Gambino Family construction interests, Gravano could easily lure DiBernardo to a meeting where he could be killed. He did so on June 5, 1986, and when DiBernardo arrived, Gravano and his "crew" murdered him. (GA 1032-36). Ruggiero's job was to arrange for the disposal of the body and DiBernardo's car. He got John Carneglia to dispose of the car while Frank Locascio dumped the body, which was never found. (GA 1036-41).

Three years later, on December 12, 1989, Gotti explicitly admitted that he had "whacked" DiBernardo by ordering his murder from jail:

> When "DiB" got "whacked," they told me a story. I
> was in jail when I "whacked" him. I knew why it

> was being done. I done it, anyway. I allowed it
> to be done, anyway.

(AA 1644-45). As Gotti explained to Locascio, he had relied on Gravano's
word that DiBernardo had been "subversive" when Gotti ordered the murder:

> GOTTI:      "DiB," did he ever talk subversive to
>             you?
>
> LOCASCIO:   Never.
>
> GOTTI:      Never talked it to Angelo, and he never
>             talked to "Joe Piney." I took Sammy's
>             word that he talked about me behind my
>             back.

(AA 1673-74). Gotti also explained that by ordering the murder, he had
given Gravano exclusive control of Sasso, the corrupt Teamster official:
". . . you [Gravano] told me DiB cried behind my back. Now you got all
that! And you got, uh, Bobby Sasso." (AA 1649).

### 3.  The Murder of Liborio "Louie" Milito
####     (Racketeering Act Four; Counts Five and Six)

When Castellano and Bilotti were murdered in December 1985,
Gambino soldier Louie Milito was in jail. Together with Gravano, Milito
had managed the Family's interest in a construction company, Atlas Gem
Steel. When Gotti assumed control of the Family in early 1986, he had
Frank DeCicco and others find out exactly what financial interests Gotti
had inherited. Among other things, DeCicco told Gotti how much money the
Family was receiving from Gem Steel, and said that Milito was receiving
one-third of that amount while he was "in the can." (GA 186; see also
GA 756, 1073). DeCicco also learned that Milito and Tommy Bilotti had
secretly been partners in a loansharking business. (GA 1075-76). This
was regarded as a betrayal, and DeCicco intended to murder Milito the
moment he got out of jail. Fortunately for Milito, DeCicco himself was
murdered before Milito's release from prison in late 1986. (GA 1076-77).

When Milito was released, Gravano was his captain.  Gravano
told him that if he minded his business, stayed in Staten Island and kept
a low profile, he would not be murdered for his betrayal.  (GA 1078-79).
Milito did not take this advice.   In 1987, he went into another
loansharking business with Bilotti's brother, Joseph Bilotti, who had
also been instructed to keep a low profile.  Milito erred further when
Gravano was elevated to consigliere and "Big Lou" Vallario replaced
Gravano as the captain of Milito's crew.  Milito -- who felt that he
should have been made the captain -- "badmouthed" Gotti, Gravano and
Vallario and was constantly trying to find out what Gravano was thinking
and saying about him.  (GA 1079-82).

By March 1988, Gravano had decided that Milito, a "dangerous"
man with whom Gravano had committed multiple murders, should die.  (GA
1079-80).  John Gotti agreed, and told Gravano to use Gene Gotti and his
crew to murder Milito.  (GA 1082).

Gravano lured Milito to his death by having him summoned to a
meeting at Vallario's social club in Brooklyn.  Milito was told that the
purpose of the meeting was to plan the murder of another Gambino Family
member.  When Milito arrived, Gravano, Gene Gotti, John Carneglia and
Arnold Squitieri were waiting for him.  Carneglia shot Milito twice in
the head.  Carneglia and Squitieri then disposed of the body, which has
never been found.  (GA 1082-85).

Gravano testified that the murder was planned for a Tuesday
night because that was the night Gravano's associates regularly convened
at his club, Tali's, and the murderers -- including Gene Gotti and John
Carneglia -- knew that the club would be under surveillance.
Accordingly, on the Tuesday evening they killed Milito, they went to
Tali's so that "when we walked in about 8:00, 8:30, we looked normal and
we would have the government as our witness."  (GA 1088; see also GA 386-
87).  This tactic backfired because it provided strong corroboration of
Gravano's testimony.  Investigator Kenneth McCabe, who had conducted many

21

surveillances at Tali's, testified that he saw Gene Gotti and John Carneglia there only once -- on Tuesday, March 8, 1988, the night Milito was murdered. (GA 1599, 1600-01).

Gravano's testimony, however, simply corroborated the evidence that came from Gotti himself. In the December 12, 1989 conversation with Locascio, Gotti admitted that he had authorized Milito's murder because Gravano reported that Milito, like DiBernardo, had been "subversive":

> GOTTI:      . . . Frankie, where the hell did all
>             these new companies come from? Where
>             did five new companies come from? Ah,
>             I   mean,   when,   when   Nasabeak
>             [Castellano] died, you [referring to
>             Gravano] were nothing. Louie had Gem
>             Steel. You, you told me that the guy
>             talked behind my back. Now you got Gem
>             Steel.

>      *          *          *          *

> GOTTI:      . . . "DiB," did he ever talk subver-
>             sive to you?

> LOCASCIO:  Never.

> GOTTI:      Never talked it to Angelo, and he never
>             talked to "Joe Piney." I took Sammy's
>             word that he talked about me behind my
>             back. Louie, did he ever talk to any
>             of you guys?

> LOCASCIO:  No.

> GOTTI:      I took Sammy's word.

(AA 1648-49, 1673-74).

4.    The Murder of Louis DiBono
      (Racketeering Act Six; Counts Seven and Eight)

On this appeal, Gotti describes the murder of Louis DiBono as "primarily a matter of business disputes between DiBono and Gravano," and suggests that it happened because Gravano believed that DiBono had "robbed" him. (Br. at 48). In fact, during the December 12, 1989 conversation, which Gotti has ignored on appeal, he explicitly stated otherwise:

| GOTTI: | Louie DiBono. And I sat with this guy. I saw the papers and everything. <u>He didn't rob nothin'. You know why he's dying?</u> <u>He's gonna die because he refused to come in when I called.</u> He didn't do nothing else wrong. |
|---|---|
| LOCASCIO: | You have that meeting yet? |
| GOTTI: | No. Gonna have it tomorrow. |
| LOCASCIO: | Because at that meeting, I predict he's gonna bring you fifty. . . . |
| GOTTI: | . . . I wouldn't take nothing from him. <u>He's gonna get killed because he, he disobeyed coming. . . .</u> |

(AA 1674-75 (emphasis added)).[18]/

DiBono was a Gambino soldier who owned a large drywall business. In the early 1980s, he and Gravano had been in business together. After a financial dispute, DiBono and Gravano each asked Castellano for permission to kill the other. Their requests were denied, and they were told to stop doing business together. (GA 1096-1100).

In 1986, while Gotti was in jail, Joe "Piney" Armone, who succeeded DeCicco as the Gambino Family underboss, suggested that Gravano go back into business with DiBono in order to make money for Gotti. (GA 1100). Gravano complied, and as Gotti later described it to Locascio, they sent word to Gotti in jail that Gotti had a hidden ten percent interest in DiBono's company. (AA 1689-90; GA 752-53, 1102-03).

Once again, Gravano and DiBono had problems. DiBono disappeared to Atlantic City, failed to remit substantial withholding taxes for the company, and refused to "come in" when Gravano called. By early 1989, these problems prompted Gravano to ask Gotti for permission

---

[18]/ Locascio similarly misrepresents the record when he asserts that "Gravano attributed DiBono's murder to problems DiBono had caused Gravano in their joint business ventures. . . ." (Br. at 8). In fact, Gravano explicitly testified that while their business dealings had caused him to want to kill DiBono, Gotti had denied him permission to do so. (GA 1103-05). Gravano further testified that when DiBono finally was murdered, it was because Gotti had decided DiBono should die for failing to come in when called. (GA 1111).

to kill DiBono. Gotti denied the request and said that he would handle DiBono's business interests himself. (GA 1103-07).

DiBono did not treat Gotti any better than he had treated Gravano, particularly with respect to missing appointments. This culminated by December 12, 1989 in the decision, quoted above, to kill DiBono for refusing to come in when Gotti called. The job was given to DiBono's captain, Patsy Conte. (GA 1111-12, 1353-55).

Not surprisingly, Conte's ability to do the job was impeded because DiBono, unlike DiBernardo and Milito, would not show up at appointments that were arranged in order to murder him. (GA 1115). Indeed, at the end of a secret meeting with Locascio and Gravano in the Ravenite Apartment on January 4, 1990, Gotti expressed his frustration at Patsy Conte's inability to murder DiBono:

> GOTTI: Tomorrow's Friday. . . . Patsy wants to see me. He says it's pretty important. I don't know what the hell it's about. Tomorrow, Patsy Conte (IA) tomorrow. It's gotta be that guy. I already tell ya exactly (whispers) (IA) and now.
>
> GRAVANO: Did you?
>
> GOTTI: . . . A casa (The house). Until then I gotta hit him coming out of the fuckin door. I don't give a fuck! (IA).
>
> (Steps)
>
> GOTTI: Right coming out of the door. But uh, but uh, what the fuck. What are you gonna do? They blame everything else on us, anyway. They'll blame that one on us.

(GA 151-52). Gotti was not seriously considering having DiBono murdered at his house; he was merely sharing his frustration at the status of the "hit." [19]/

---

[19]/ Locascio's suggestion on appeal that he may not have been present for this conversation (Locascio Br. at 9) is ridiculous. He was present in the Ravenite Apartment for the lengthy conversation preceding it about "making" new members. Moreover, he spoke the words immediately preceding the portion quoted above. (GA 152; see also GA 14-77). Indeed, at

During a later trip to the Ravenite Apartment, on January 24, 1990, Gotti, Locascio and Gravano -- the Gambino Family administration -- again referred to their plan to kill DiBono. Although the reference was brief, it was telling; it made it clear that "Jelly Belly" DiBono's refusal to "come in" was the type of "challenge" to the administration that warranted a death sentence.[20] Gotti made this observation while the administration was discussing the need to "whack" the "liaison guy" between captain John Gambino's crew and the crew of Sicilian drug dealers who were "ratting" on Gambino in his pending case:

> . . . . the liaison, the liaison guy's getting whacked. Because . . . that's not, that don't belong to us. That's their fucking crew. And he's gotta get whacked! Because he's getting the same, for the same reason that "Jelly Belly's" getting it. You wanna, you wanna challenge the administration, we'll, we'll, you will meet the challenge. And you're going, you motherfucker!

(GA 156).[21]

Frustrated by Conte's inability to murder DiBono, Gotti added three more people to the job. However, DiBono still could not be lured to a place where he could be murdered. Finally, through his contacts in the construction field, Gravano learned that DiBono was working on a large job in the World Trade Center. Soon after he passed that information along to Gotti, DiBono was murdered in his car in an underground parking lot below the World Trade Center. (GA 1121-25).

---

trial, Locascio's attorney never suggested that Locascio was not present; rather, he incorrectly suggested that Gravano was not present. (GA 1356-58).

[20] Gravano testified that "Jelly Belly," an obvious allusion to DiBono's obesity (see GA 2394), was the code name that the administration used for DiBono once the decision was made to kill him. (GA 1120).

[21] Locascio again ignores the record in suggesting (Br. at 9) that he may not have been present for this conversation. (See GA 102, 103 (Locascio present for portions of January 24, 1990 conversation immediately before and after quoted passage); GA 1236 (Gravano's testimony that Locascio was present)).

25

E.    The Conspiracy to Murder Gaetano "Corky" Vastola
      (Racketeering Act Seven; Count Nine)

        The conspiracy to murder "Corky" Vastola was a primer in mafia murder protocol.    Vastola was a soldier in the New Jersey-based DeCavalcante Family.  Because Vastola, like DiBono, was not "coming in" when his administration sent for him, and also because people were concerned that he might be cooperating with the government,22/ the DeCavalcante administration decided to kill him.  (GA 1228, 1239, 1587-88).  In trying to commit the murder, however, the DeCavalcante Family ran into a thorny protocol problem because Vastola, who knew he was in trouble, would meet only with Genovese associate Barry Nicholo, with whom he had business interests.  Thus, the DeCavalcante Family wanted to kill one of its own soldiers, but could not get the job done using its own people.  The Genovese associate, who was willing and able to do it, could not be used to commit the murder without the permission of the Genovese boss.  However, the DeCavalcante boss, John Riggi, had poor relations with the Genovese boss, Chin Gigante.    Enter the Gambino Family administration -- Gotti, Locascio and Gravano -- which, as described below, was more than willing to help get Vastola murdered.

        The DeCavalcante Family had been trying to kill Vastola for two years.    (GA 523, 1403).    In January 1990, Virgil Alessi, a DeCavalcante soldier, approached Nicholo and asked him to commit the murder.  Nicholo told Alessi that he was willing to do it and could lure Vastola to a farm in New Jersey, where Nicholo would murder him.    (GA 499, 1229-31, 1381-83, 1590-98).

        Nicholo, who was close to Gravano, told him of Alessi's approach and request.  Gravano then told Alessi that by using Nicholo for a murder without the permission of Chin Gigante, Alessi would get Nicholo

_____

22/    As John Gotti put it:  ". . . I don't know if he's a rat now.    Is he gonna be a rat someday?  Yeah. . . . The object is that, this guy gotta get hurt."  (GA 527-28).

killed as well. (GA 499-500, 1382-83). Gravano advised Alessi to have his underboss, John D'Amato, come to the Ravenite Social Club that evening to make a formal request for the Gambino Family's help in murdering Vastola. (GA 500, 1233, 1383).

D'Amato went to the Ravenite that evening, January 24, 1990. Before he met with the Gambino Family administration in the Ravenite Apartment, the administration met privately to decide how to deal with the situation. Gravano briefed Gotti and Locascio on Alessi's approach to Nicholo. (GA 495-501). Gotti agreed that the DeCavalcante Family obviously could not use Nicholo without Chin Gigante's permission: ". . . So he's with the 'Chin's' people. . . . [T]hey can't go to his men without asking, you know, that's not right. . . . Imagine if a guy told us you wanna use one of our guys without telling us? Can't do that." (GA 501-02, 1383-84).

Gotti's initial response was to solve the problem without involving the Genovese Family. He proposed that "[w]e 'whack' this fucking kid." (GA 517, 1375-76, 1384-85). Gravano explained that Vastola "won't come in to nobody" except Barry Nicholo, and that the only way to help in getting Vastola killed was to ask the Genovese Family for permission to use Nicholo. (GA 503-10, 1385-87).

The administration realized, however, that Chin Gigante did not like John Riggi, the DeCavalcante Boss, and thus would be disinclined to grant this "favor." (GA 517, 1237, 1375). Thus, Gotti, Locascio and Gravano devised the following plan: Gravano would approach his counterpart, Genovese underboss "Benny Eggs" Mangano, and ask for permission to use Nicholo to kill Vastola. However, Mangano would be told that using Nicholo was the Gambino Family's idea and that the favor would be strictly for the Gambino Family; the DeCavalcante Family would never know that Nicholo was used or that the Genovese Family helped in any way. (GA 503-10, 1377, 1389-93).

After Gotti, Locascio and Gravano formulated their plan, John
D'Amato was brought up to join them in the Ravenite Apartment so that the
DeCavalcante underboss could formally request the Gambino Family's
assistance in murdering Vastola. (GA 1237). As soon as D'Amato arrived,
Gotti continued to observe mafia protocol by making sure that the Vastola
murder had been properly ordered by D'Amato's boss, John Riggi. (GA 514-
15, 1396). He then told D'Amato of their plan to approach the Genovese
Family in a way that would make it appear to be a favor for the Gambino
Family. (GA 516-20, 1396-99).

All four then discussed why Vastola "deserves to go;" the
reasons included his inability to do jail time and his failure to "come
in" for two years. (GA 521-27, 1401). In addition, Gotti recounted a
recent meeting he and Locascio had had with Riggi, the DeCavalcante boss,
about killing Vastola. The conversation left Gotti and Locascio with the
impression that Riggi was not trying hard enough to kill Vastola and that
by doing so, Riggi was jeopardizing not only his own Family, but Gotti's
as well.

> . . . That night, I remember when we got outta the
> car I thought I said, "Frank I don't like the way
> he answered that." If you think the guy's a rat,
> or he's weak, you jeopardizing a whole, Borgata, a
> whole, ah, Cosa Nostra for this guy. . . . if I
> know a guy's weak and I let him go running around
> the street, get you locked up, I'm a fucking rat,
> too.

(GA 522-23, 1401-03).

Pursuant to the plan devised during this conversation, Gravano
went to Benny Eggs Mangano and asked for permission to use Nicholo to
kill Vastola. Mangano said he had to check with Gigante. Mangano later
reported back to Gravano that although the Genovese Family was willing
to help the Gambino Family, they were "not interested in getting involved
with the Jersey people in any way." Since the intended murder victim was

28

a soldier with the "Jersey people," Chin Gigante denied the request. (GA 1240; see also GA 1407-08).

F.   The Obstructions of Justice

    1.   Gotti's Obstruction of the Trial of Thomas Gambino
         (Racketeering Act Eleven; Count Twelve)

        In early 1989, Thomas Gambino was indicted in the Eastern District of New York for perjury and obstruction of justice. In November of 1989, the government served trial subpoenas on John Gotti, Joe "Butch" Corrao and George Remini and told their attorneys that the witnesses might be compelled to testify through the use of immunity orders. (GA 427, 1526-28). This posed a problem, because the oath of omerta precluded them from testifying. As Gotti put it: "Now, it's automatic, we gotta go to jail now. We can't take the stand." (GA 439, 1529).

        By November 10, 1989, the subpoenas for Gotti and Corrao had been withdrawn, but "Fat Georgie" Remini was still scheduled to testify. (GA 448, 1532-33). On that day, Gotti was intercepted in the Ravenite Club persuading Remini to commit contempt:

> Georgie, please!  . . . listen to your brother.  I wouldn't steer you wrong. . . . [Y]ou're gonna go sit, God forbid, hopefully, you won't have to. . . . You're gonna sit for six, seven days, that's not a "pinch." It's only a violation.  But the minute . . . the case is over . . . open Georgie's cell, "Out!  Get the fuck outta here!"

(GA 456-57, 1535).

        On November 15, 1989, Remini's attorney, Gerald Shargel, unsuccessfully attempted to quash the Remini subpoena.  (GA 1536-36). In a whispered conversation in the Ravenite Hallway less than two hours later, Gotti was told about the Remini "problem" and delivered his instructions:  Shargel was to tell the court that Remini would testify, but "when it comes time, he don't testify."  (GA 460, 1537).

        Gotti had previously instructed Shargel that Remini could not
be permitted to say anything in court -- as a witness or a defendant --
that might "jeopardize other people," i.e., John Gotti. As Gotti related
it to Locascio and others, he told Shargel:

> Who you working for? . . . if Georgie's on a case
> alone, you on a case by yourself, it's a malicious
> mopery, drunken driving case, you'll get 60 days,
> you wanna take a plea. There ain't nothin' wrong
> with that. Take a plea. . . . You got no right
> and jeopardize other people. Who the fuck are
> youse?

(GA 437).

        On November 28, 1989, Remini took the witness stand in the
Gambino trial. With Shargel at his side, Remini refused to testify
despite a lawful order of the court directing him to do so. (GA 1538-
39). Two days later Gambino was acquitted. (GA 1539).

    2.    The Bribery of a Public Servant
          (Racketeering Act Thirteen)

        Joe "Butch" Corrao, a captain in the Gambino Family, had
access to confidential law enforcement information. His source was
William Peist, a corrupt detective in the New York City Police
Department. Peist worked in the Intelligence Division, a repository of
information relating to organized crime investigations. Peist would
relay confidential information to his cousin, Peter Mavis. Mavis would
relay it to George Helbig, Corrao's close associate. Helbig and Corrao
would relay the information to Gotti, who paid Peist for the information.
(GA 1149-52, 1171-72, 1442-45, 1450).

        Peist provided information on a number of investigations,
including the Castellano-Bilotti murder investigation and the electronic
surveillance of Gravano's construction office in Brooklyn. (GA 1152).
On January 17, 1990, Corrao and Helbig were brought to the Ravenite
Apartment to report about the electronic surveillance directed at

Gravano.[23] After doing so, Helbig was instructed to give Peist more money in exchange for further "specifics," such as when Gravano would be arrested and whether there were any "rats" assisting the investigation. (GA 395, 400, 407-08).

At the end of their conversation that evening, Gotti complained to Locascio and Gravano that Corrao had too many "cops" and "ex-cops" around him. However, Gotti reluctantly admitted that Corrao's indirect relationship with Peist would have to be tolerated: "Alright in this case we need the motherfucker, to milk him." (GA 420, 1524-25).

### 3. The Obstruction of The Grand Jury Investigations (Racketeering Act Twelve; Count Eleven)

During late 1989, separate grand jury investigations were under way in the Southern and Eastern Districts of New York. The Southern District investigation concerned the Castellano-Bilotti murders; the Eastern District investigation focused on the broad array of Gambino Family activity that produced the remainder of the indictment in this case and six additional indictments. (GA 626-29). In addition to their bribery of Detective Peist and their plan to murder Corky Vastola, whom they believed might be a witness against them (see pp. 25-28, supra), the defendants obstructed the investigations in the following ways.

#### a. The Bribery of Michael Coiro's Corrupt Source

Among John Gotti's sources of confidential law enforcement information was Michael Coiro. For many years, Coiro had been an attorney for John Gotti and his crew. The Ruggiero tapes revealed that, beginning at least as early as 1982, Coiro was used by the crew to to (a)

---

[23] The events on the night of January 17, 1990, revealed how the administration worked. Video surveillance revealed that Corrao and Helbig arrived together and walked around the block with Gravano. Gravano then walked around the block with Locascio. (GA 1400-01). Later, in the Ravenite Apartment, after tending to another Family matter, the administration directed that Corrao and Helbig (whom Gotti called the "Grim Reaper") be sent up to brief the boss. (GA 85, 96, 378-403).

31

pay bribes to a law enforcement officer for confidential information; (b)
hold and launder the proceeds of their heroin business; and (c) obstruct
grand jury investigations. (GA 768-71, 1497-1504, 1626-27).

On November 29, 1989, Corrao and Helbig reported to Gotti in
the Ravenite Hallway that their corrupt source -- Detective Peist -- had
discovered that Gotti would be indicted in the Southern District for
committing murder for the purpose of "enhancing position." (GA 358, 362-
66, 1516-18). Having received information about the Castellano murder
investigation from one corrupt source, Gotti wanted to test it by con-
tacting another. Accordingly, Gotti sent for Coiro the next day,
November 30, 1989. Ironically, Coiro's racketeering trial -- which was
based on the Ruggiero tapes -- had just ended that day with a conviction
for, among other things, obstructing justice. His counsel, Bruce Cutler,
then brought Coiro to the Ravenite Social Club at Gotti's behest. (GA
1489, 1504-06, 1631, 1654-55). By 7:38 p.m., Coiro was in the Ravenite
Apartment with the Gambino Family administration obstructing justice
again. (GA 321-53, 1515).

Gotti told Coiro that he had received information the night
before about the Castellano murder investigation. Specifically, he told
Coiro that he had been provided with a list of people who would be
arrested, and told Coiro: "Ya gotta find out the rest of these fuckin'
names now. Supposed to be a group of Skippers . . . ." (GA 327-29,
1507-08). Gotti explicitly told Coiro that some of the targets of the
investigation might flee based on the corruptly-obtained information.
(GA 333, 1510-11). Coiro agreed to meet his corrupt source immediately,
and then to meet Gotti in "some sneaky place" to report back as to who
would be arrested and when the arrests would happen. (GA 340-41, 1514).

b.  Coiro's Grand Jury Perjury

During the November 30, 1989 conversation in the Ravenite
Apartment, as Gotti was starting to tell Coiro what he had learned about

the Castellano-Bilotti murder investigation, he warned Coiro: "I get told something. Mike, what I get told, you forget here, you know what I mean?" (GA 327). Later during the same conversation, Coiro declared his intention to lie to the probation officer who would prepare his presentence report. Specifically, Coiro was determined to hide information about Scorpio Marketing, the bogus zipper company of which he and Gotti were co-owners. (GA 337-38, 1511-13).

After receiving a 15-year sentence in March 1990 for his racketeering conviction, Coiro was subpoenaed to appear before the Eastern District grand jury. Before his first appearance, Coiro met with Gotti about the fact that Coiro would be immunized before the grand jury. They spoke outdoors in order to avoid electronic surveillance. (GA 1632-33). On the following day and on two subsequent appearances, Coiro, who was represented by Shargel, told a series of lies to the grand jury to protect Gotti and Locascio. (See GA 2411-36). When called at the trial of this case, Coiro did the same thing. (GA 1634-50).

c.   The Coaching of Anthony Rampino

On June 26, 1987, Anthony Rampino, one of the participants in the Castellano-Bilotti murders, was arrested and charged with heroin trafficking. (GA 827-28). Gotti and Gravano learned that upon his arrest, Rampino implicated himself in the murders, stated that he knew who the other participants were, and for a short time expressed an interest in cooperating. Had Rampino made bail in that case, he would have been killed. (GA 1178). He did not, and was later convicted and sentenced to a lengthy prison term.

In late March of 1990, Rampino was subpoenaed to testify before the Eastern District grand jury. Gotti had learned from Rampino's attorney, David DePetris, that Rampino would be compelled to testify pursuant to a grant of immunity. (GA 274, 1180-82). Accordingly, Gotti summoned Bruce Cutler to the Ravenite Hallway. They discussed whether

Rampino should commit contempt as a "favor for John." (GA 274). As an alternative to committing contempt, they also discussed whether Rampino should simply lie in the grand jury and, if he did, whether his post-arrest statements in 1987 could expose him to a charge of perjury. (GA 274-75).[24/] Gotti left the decision whether Rampino should lie or commit contempt up to Cutler and directed him to see DePetris. Gotti gave Cutler a final instruction:

> GOTTI: Tell him [DePetris] we don't need another phony junkie rattin' against us. Okay?
>
> CUTLER: I understand.

(GA 275-76).

Five days later, on April 3, Rampino appeared before the Eastern District grand jury, represented by DePetris. He refused a lawful order to answer questions and was held in contempt. (GA 1664).

## G. The Gambling and Loansharking Operations

As of November 1991, when Gravano began cooperating, the Gambino Family had 21 captains. Many of them ran gambling and loansharking operations. (GA 1212). They all answered to the administration and "turned in" some of their illegal profits. (GA 1215; see also AA 1706-07). At trial, the government presented detailed evidence of two such operations -- a "chemin de fer" game in Queens and an extensive gambling and loansharking operation in Connecticut.

### 1. The Queens Gambling Business (Racketeering Act Eight; Count Ten)

Gambino Family captain "Ralphie Bones" Mosca and his son Peter ran a chemin de fer game in Queens, New York for more than 20 years. (GA

---

[24/] As Cutler pointed out, Rampino's post-arrest statements could not be deemed perjurious because they were not made under oath. (GA 275).

34

134-38, 1212-13). Electronic surveillance of Peter Mosca during one month in 1990 revealed a profit of more than $31,000 for the month. (GA 2384-85). During the period when John Gotti was in jail in 1986-87, Ralph Mosca was "turning in" approximately $5,000 per month to the administration. (GA 1216).

In January 1990, a Greek organized crime group affiliated with the Luchese Crime Family opened a chemin de fer game near the Gambino Family game run by the Moscas. (GA 1213-14). When Peter Mosca reported this to Gotti in the Ravenite Hallway, Gotti blew up. His instructions to Mosca were to go to Spiros Valentzas, the boss of the Greeks, and deliver a message:

> You tell this punk, I, me, John Gotti . . . will sever your motherfucking head off! You cocksucker! You're nobody there. . . . Tell him, "listen, you know better. He will sever your motherfucking head off! You know better than to open a game there."

(GA 135).

Six days later, during an administration meeting in the Ravenite Apartment, Gravano briefed Gotti and Locascio on the outcome of the dispute. The Luchese captain responsible for the Greeks, Peter Chiodo, had closed the Greeks' game and apologized on behalf of Vic Amuso and Anthony "Gaspipe" Casso, the Luchese boss and underboss, respectively. (GA 143-47, 1214-15). Because "[h]e did what he was supposed to do," Spiros Valentzas was not killed. (GA 1283).

35

## 2.  The Connecticut Gambling and Loansharking Operation[25]/ (Racketeering Acts Nine and Ten)

In addition to controlling the Gambino Family's criminal interests in New York City's garment district, captain Tommy Gambino was responsible for supervising the Connecticut operations, which included both gambling and loansharking businesses. (GA 1203-07, 1256). After the 1988 murder of Thomas DeBrizzi, the Connecticut crew was run by Anthony Megale, another soldier in Gambino's crew. The Connecticut operation, from which the administration received more than $80,000 per year in cash in 1986 (see GA 484, 1546), grew under Megale, and he made regular visits to the Ravenite Social Club. (GA 1567-68).

On December 7, 1989, Megale and 21 others were indicted in Connecticut for their role in the Family's Connecticut operation. (GA 1554-60). Twice in the next twelve days, Gotti was briefed in the Raven-ite Hallway on the efforts to obtain counsel for the Connecticut crew. (GA 463-72, 1540-43). While Megale and the others eventually obtained counsel, another problem arose later in the case that required further intervention by the Gambino Family administration.

A Gambino Family member or associate needed permission from the boss to plead guilty. (GA 1186-87). On occasion, people were permitted to plead guilty as long as they did not admit the existence of La Cosa Nostra. (GA 124-25, 1187). Megale received permission to plead guilty and did so. However, a newspaper article in the Stamford Advocate reported that during his plea, Megale had admitted that he was a member of the Gambino Family and the leader of its Connecticut faction. (GA 1208, 1575-77).

_____

[25]/  In addition to the Connecticut loansharking operation described below, the Ravenite Hallway conversation of December 6, 1989, also demonstrated that Gotti financed a $30,000 loansharking "book" operated by Gambino Family captain "Jackie Nose" D'Amico. As Gotti described the allocation of profits from this business: "at two points, you [referring to D'Amico] get 600 a week. Take 400, give me two. It's my 30,000." (GA 554).

Megale's captain, Tommy Gambino, was confronted with the
article.   In addition, at Gotti's direction, Locascio and Gravano
confronted Megale about the reported admission.  (GA 1209-11).   As a
result, Megale moved to withdraw his plea in Connecticut on the ground
that the newspapers had unfairly reported the nature of his admissions.
(GA 1211, 1577-78).   Although the court denied his motion, before he
reported to prison Megale was able to convince the administration that
he did not formally admit the existence of the Gambino Family.

H.    The Conspiracy to Defraud the Internal
      Revenue Service (Count Thirteen)

John Gotti made enormous sums of money as boss of the Gambino
Family.   His tape recorded statements alone revealed an annual cash
income well into the millions.[26]   He did not report this income.
Indeed, during the period covered by the indictment, he did not file any
tax returns.  (GA 1610-12).

In an effort to "show" some legitimate income, Gotti was an
employee of record in three companies.   From 1981 through 1985, he was
nominally a salesman for Capri Construction.   He received his paycheck
by mail; he never went to the Capri offices or got them any work of any
kind.  (GA 1613).   From 1985 through 1990, Gotti was nominally a full-
time salesman for Arc Plumbing and Heating.  (GA 1614-15).   According to
his employer, if Gotti saw a construction job in progress while being
driven around in his company-issued Mercedes, he would let the company
know about it.  (GA 1616-17, 1624-25).   Finally, during 1989 and 1990,
Gotti was an owner and employee of Scorpio Marketing, a garment center

---

[26]   See, e.g., AA 1706-07 ($240,000 every 10 weeks from Gravano's
construction rackets); AA 1706 ($3,000 from each of his 21 captains for
his birthday); AA 1653 ($2,000 per week from Marine Concrete Company);
AA 1668 (unspecified weekly payments from "garbage club"); GA 484 ($1,600
per week from the Connecticut operation); GA 170 ($2 for every cubic yard
of concrete poured in New York City); GA 186 ($6,000 for an unspecified
time period from Gem Steel); GA 546 ($26,000 Christmas "present" from
"scores" at the docks).

37

company that sold zippers and other trimmings for women's clothing.  (GA 1651, 1652).  Gotti did nothing for that business, either.  (GA 1653).

Gotti's co-conspirators in his efforts to frustrate the IRS included Gambino Family house counsel, who took money from him "under the table" in order to deflect IRS attention away from Gotti.  (GA 67-71).

During the December 12, 1989 conversation in the Ravenite Apartment, Gotti discussed with Locascio his efforts to defraud the IRS. Gotti mentioned that he had just gone on the payroll at Scorpio "to keep my ass out of fuckin' jail, no other reason."  (AA 1712).  Gotti then discussed with his underboss whether Gotti showed enough income (through the W-2 forms filed with the IRS) to cover his traceable expenses.  After detailing for Locascio all of his "paper" income and all of his expenses, Locascio concluded that Gotti was living "well within" the amount of income reported to the IRS by Gotti's bogus employers.  (AA 1713-15).

ARGUMENT

POINT ONE

THE COURT'S RULINGS REGARDING EXPERT TESTIMONY WERE PROPER

Both Gotti and Locascio complain that the district court erred by allowing FBI Special Agent Lewis Schiliro to testify as an expert to help the jury understand the structure of organized crime families and the intercepted conversations which formed the bulk of the government's evidence.  In addition to arguing that Schiliro's testimony should have been excluded because of the availability of similar testimony by an accomplice witness, the appellants also raise several arguments for the first time on appeal.  In particular, they claim that Schiliro was not properly qualified as an expert and that they were denied their right to confrontation because Schiliro relied on hearsay in forming his opinions. Finally, they also take issue with the court's decision that an "expert"

POINT FIVE

ALL OF THE DISTRICT COURT'S JURY INSTRUCTIONS WERE CORRECT

Gotti and Locascio challenge several portions of the district court's jury instructions. Gotti claims that the court erred in instructing the jury about both the "pattern" requirement of the RICO statute and the intent element of the murder and murder conspiracy counts under section 1959. (Br. at 43-53). Locascio cites as erroneous the district court's instructions regarding the concept of "mere presence" as well as its refusal to give the "multiple conspiracies" charge he says he requested. (Br. at 31-41). None of these claims has merit.

A.    The RICO "Pattern" Element

Gotti first challenges the district court's instruction about the "pattern" element of the RICO law. He claims that the charge as given was erroneous and also that the court erred by failing to give the particular charge he requested instructing the jury that it could not find the defendants guilty if it found that the racketeering acts charged in the indictment were "committed exclusively for an individual's own purposes or gain rather than to further, at least in part, the goals or affairs of the enterprise . . . ." (Gotti Br. at 43).[71]

The RICO Act's "pattern" element has three components. In addition to proving the commission of at least two acts of racketeering

_____

[71] Gotti claims that there was evidence to support a theory that all of the predicate racketeering acts were committed for purposes other than conducting the affairs of the Gambino Family. As an example, he refers to the argument that three of the murders charged in the indictment were committed to advance only Gravano's interests. (Br. at 43). At no point, however, does he explain how the jury could have found that the gambling, loansharking and obstruction of justice racketeering acts, or the remaining murders, were committed for any reason other than conducting the affairs of the enterprise, and the evidence could not support such a theory. Indeed, Gotti made no such argument below, and instead simply attempted to diminish the significance of these charges in his arguments to the jury, describing them as mere "window dressing," "a joke" and a "bowl of mush." (GA 604, 2004, 2005).

. . .       . .  . .. .. . . . . . . . . .     . .   . . . . . .  .  . . . . . .  . .  . . . . . . . .   . . .    . .  . .. . . . . . . . .  . .... .. ... . ...

activity within certain time limits, the government must also show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989); see also United States v. Minicone, 960 F.2d 1099, 1106 (2d Cir.), cert. denied, 112 S.Ct. 1511 (1992); United States v. Alkins, 925 F.2d 541, 551 (2d Cir. 1991); United States v. Simmons, 923 F.2d 934, 951 (2d Cir.), cert. denied, 111 S.Ct. 2018 (1991).  The district court correctly instructed the jury about each of these components, and Gotti's arguments to the contrary have previously been rejected by this Court.

1.    Relatedness

In describing the "relatedness" component of the pattern element, the district court instructed the jury that the government was required to prove that "the racketeering acts were in some way related to the activities of the enterprise, or that the defendant was able to commit the racketeering acts solely by virtue of his position in or involvement in the enterprise."   (AA 1088).   It elaborated on this requirement as set forth in the appellants' appendix.  (AA 1091-92).

Gotti's first complaint about this instruction is that it omitted a requirement that the jury find the racketeering acts to have been "necessary or helpful in the operation of the enterprise."  (Br. at 44).  He concedes, however, that while other jurisdictions may impose such a requirement, this Court does not.  (See Br. at 44-45 & n. 39).

In United States v. Robilotto, 828 F.2d 940, 947-48 (2d Cir.), cert. denied, 484 U.S. 1011 (1988) (cited in Gotti Br. at 44 n.39), this Court used language almost identical to that used below to hold that the relatedness requirement can be satisfied in at least two ways: "first, when a defendant 'is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise,' . . . or second, when 'the predicate

104

offenses are related to the activities of that enterprise.'" Id. at 947-48 (citations omitted; emphasis in original); see Minicone, 960 F.2d at 1106; Simmons, 923 F.2d at 951. The Court followed this language with a citation to United States v. LeRoy, 687 F.2d 610, 617 (2d Cir. 1982), cert. denied, 459 U.S. 1174 (1983), and quoted the portion of that ruling which held that "section 1962(c) 'does not require that predicate acts be in furtherance of the enterprise.'" Robilotto, 828 F.2d at 948; see Simmons 923 F.2d at 951 (citing Robilotto and LeRoy; "the predicate acts need not be in furtherance of the affairs of the criminal enterprise").

Without identifying the authority under which a panel of this Court could do so, Gotti asks that the Court overrule the recent precedent of Simmons, Robilotto, LeRoy and similar cases, decisions of this Court which Gotti dismisses as not only "incorrect" but so obviously wrong as to violate the "mandat[e] [of] the clear language of the statute." (Br. at 44). This Court should instead reject Gotti's argument and adhere to its clear and correct precedent.

Gotti's second complaint about the court's relatedness instruction is that it "eviscerated" the requirement that the predicate racketeering acts be related both to each other and to the enterprise. (Br. at 44-45). Because the court's instructions in this regard conformed exactly to the law of this Circuit, this argument should be rejected as well.

Gotti asserts that showing these two separate types of relatedness is "a clear legal requirement" to be found in the Supreme Court's opinion in H.J., Inc. (Br. at 45 n.40 (citing 492 U.S. at 238). However, the cited portion of H.J., Inc. demonstrates that a showing of either type of relatedness suffices:

> A "pattern" is an "arrangement or order of things or activity," [citation omitted] . . . . It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them "ordered" or "arranged." The text of RICO conspicuously fails

> anywhere to identify, however, <u>forms of
> relationship</u> or external principles to be used in
> determining whether racketeering activity falls
> into a pattern for purposes of the Act.

> It is reasonable to infer . . . that Congress
> intended to take a flexible approach, and envisaged
> that a pattern might be demonstrated by reference
> to a range of different ordering principles or
> relationships between predicates, within the
> expansive bounds set.

<u>H.J., Inc.</u>, 492 U.S. at 238 (emphasis added).

Although Gotti does not acknowledge it, the source of the
requirement of showing both "horizontal" and "vertical" relatedness is
this Court's opinion in <u>Minicone</u>. <u>See</u> 960 F.2d at 1106. The district
court drew its charging language directly from that opinion in
instructing the jury on each type of relatedness. (GA 1991-92). In
particular, the phrase which to which Gotti objects -- namely, that
"[t]wo racketeering acts that are not directly related to each other may
nevertheless be related indirectly because each is related to the RICO
enterprise" (Br. at 45 (quoting T 8095 (GA 1091))) -- is taken verbatim
from this Court's opinion in <u>Minicone</u>. <u>See id</u>. (quoting <u>United States
v. Indelicato</u>, 865 F.2d 1370, 1383 (2d Cir.) (en banc), <u>cert</u>. <u>denied</u>, 493
U.S. 811 (1989)).

In a definition embraced by Gotti (<u>see</u> Br. at 45), the Supreme
Court held that the relatedness requirement is satisfied when the gover-
nment proves that the predicate acts "have the same or similar purposes,
results, participants, victims, or methods of commission, or otherwise
are interrelated by distinguishing characteristics and are not isolated
events." <u>H.J., Inc.</u>, 492 U.S. at 240. This definition, however, pro-
vides Gotti no assistance because a series of crimes that are all com-
mitted by members of the same criminal enterprise are "interrelated by
distinguishing characteristics and are not isolated events."

Perhaps the clearest demonstration of the fallacy of Gotti's
claim is his assertion that those instructions might have allowed the

jury erroneously to find a relationship among the Castellano murder, the loansharking activities, the obstruction of justice in the Gambino trial and the Connecticut gambling operation. (Br. at 45-46). However, all of these crimes shared Gotti as a participant (and Locascio was a participant in the latter three); and they all had the common purpose and result of maintaining and increasing the ability of Gotti and others to make money through the Gambino Family. See H.J., Inc., 492 U.S. at 250 (separate acts of bribery held related where united by common purpose "to influence commissioners in carrying out their duties in order to win approval of unfairly and unreasonably high rates for Northwestern Bell"); Minicone, 960 F.2d at 1107-08 (disparate acts, including murder, loansharking and gambling offenses, held related). Therefore, those crimes were related under the definition supplied by the Supreme Court.

2.   Continuity

        In instructing the jury on the continuity requirement, the court stated:

> A pattern of racketeering activity also requires a finding that the racketeering acts constitute a threat of continuing criminal activity, and the Government sustains its burden as to this, if it establishes beyond a reasonable doubt a series of related racketeering acts, extended over a substantial period of time, or if the related racketeering acts themselves involve a distinct threat of long-term racketeering activity.
>
> In other words, the nature of the racketeering acts of the enterprise itself may be enough to establish a threat of continuing criminal activity.
>
> As to the requirement of continuity, the threat of continuity, if you are satisfied beyond a reasonable doubt that the enterprise charged existed, that the business of the enterprise was racketeering activity, then you may conclude that an act performed in furtherance of that business carried with it the threat of continued racketeering activity.
>
> And the threat of continuity is sufficiently established if you find beyond a reasonable doubt

107

> that the racketeering acts can be attributed to the
> defendant you are considering who was operating as
> part of a long-term association that exists for
> criminal purposes.

(AA 1092-93).

The one portion of this charge that Gotti contests is the
second paragraph quoted above. (Br. at 46). Gotti's brief, however,
quotes even this small portion of the charge only in part (leaving out
the "in other words" preface) and out of context. Viewed as a whole, the
instruction is plainly in accord with controlling precedent. See, e.g.,
H.J., Inc., 492 U.S. at 242-43; Simmons, 923 F.2d at 951. Moreover, the
sentence fragment about which Gotti complains is correct even viewed in
isolation. Two obvious examples of its correctness are seen in the New
York gambling predicate and the murder charges.

The evidence showed that the Gambino Family's chemin de fer
game in Queens had been in operation for decades, that it could move from
one location to another when discovered by law enforcement authorities,
and that Gotti, Locascio and others would routinely use or threaten
violence in order to maintain its operation. "In other words, the nature
of th[is] racketeering ac[t] of the enterprise itself [demonstrated] a
threat of continuing criminal activity." Similarly, the evidence
relating to the murders of DiBernardo, Milito and DiBono, as well as of
the conspiracy to murder Vastola, showed that the Gambino Family used
murder to insure that its ability to continue to commit crimes would not
be compromised through lack of discipline or by informants. The very
nature of these crimes, therefore, demonstrated a threat of continuing
criminal activity. Thus, even standing alone, the challenged portion of
the district court's instruction was correct.

### 3. Any Error Was Harmless

Even if the district court had erred in its instruction on the
pattern element, there would be no basis for reversal because any such

108

error was unquestionably harmless. See Metromedia Co. v. Fugazy, 983 F.2d 350, 368-69 (2d Cir. 1992) (affirming civil RICO verdict despite erroneous instruction on "pattern" element where court identified requirements of relatedness and continuity and evidence supported finding of pattern of racketeering activity). As this Court has recently noted, "[t]he question of whether acts form a pattern 'rarely is a problem with a criminal enterprise, as distinct from a lawful enterprise that commits occasional criminal acts.'" Minicone, 960 F.2d at 1108 (quoting United States v. Masters, 924 F.2d 1362, 1366 (7th Cir.), cert. denied, 111 S.Ct. 2019 (1991)). [12]/

First, with respect to relatedness, the evidence was overwhelming that if Gotti did kill Castellano, he did so in order to maintain and increase his own position in the Gambino Family; the evidence was also overwhelming that Gotti and Locascio committed the other crimes by virtue of their leadership positions in that enterprise. Second, the jury's verdicts with respect to the murder and murder conspiracy counts demonstrate that the jury believed that the Gambino Family's leaders used murder as a method of maintaining discipline -- and thereby continuing the existence of -- a criminal enterprise. No rational jury could have rendered guilty verdicts on these counts without also finding that these crimes posed a threat of continuing criminal activity.

B.  The Element Of Intent Under Section 1959

With respect to the murder and murder conspiracy counts, Gotti complains for the first time on appeal that the court's instructions

---

[12]/  This was plainly the case here, as defense counsel recognized towards the end of the trial. In arguing whether evidence tending to prove the pattern element of the RICO charges should be admitted under Rule 403 of the Federal Rules of Evidence, counsel stated that although he would not concede the element, "I don't think anyone can fairly argue that we need more proof in this case of the existence of the enterprise after Agent Schiliro's testimony already and after Mr. Gravano's testimony." (GA 1484).

erroneously allowed the jury to convict him even if it believed that the crimes were committed solely in order to advance Gravano's personal financial position.[73/]    In making this argument, Gotti ignores the court's actual charge, which explicitly and repeatedly informed the jury that it could not convict a defendant under Section 1959 without finding that that defendant's motive in committing the murder or murder conspiracy was to maintain or advance "his position in the racketeering enterprise."  (AA 1040, 1041, 1045-47 (emphasis added)).

        Gotti does not acknowledge the court's constant use of such phrases as "his position" and "the defendant's position" in complaining about the court's instructions.  Instead, he begins his discussion with an extended and largely irrelevant dissection of portions of Gravano's testimony (Br. at 46-49), which he then claims demonstrates that the murders and murder conspiracies charged in the indictment may have been committed "solely to solidify Gravano's personal financial empire." (Br. at 50).  Gotti then complains that the court's instructions on Section 1959 "precluded" the defense from arguing this defense theory to the jury.  Nothing of the sort actually happened.

        First, as the language quoted above makes plain, the court required the jury to find that Gotti sought to maintain or increase his own position in the Gambino Family in order to find him guilty.  Far from precluding an argument that the murders and murder conspiracies were committed "solely to solidify Gravano's personal financial empire," these instructions informed the jury that if it accepted such a defense theory, it would have to acquit.  Second, Gotti actually argued the very theory he now claims to have been precluded from arguing.  (See, e.g., GA 1978-

_____

[73/]    While counsel for both Gotti and Locascio lodged objections to this portion of the court's proposed charge, neither raised the concern that the language of the instruction allowed the jury to convict based on a finding that the intent of the murders or murder conspiracies was to maintain or increase the position of anyone other than the defendants. (See GA 1689-1707).  Accordingly, this objection has been waived and should not even be considered on the merits.  Fed. R. Crim. P. 30.

110

82 (arguing that Milito was murdered to further Gravano's financial interests); GA 1998 ("the greed which at all times motivated Gravano was of such a nature that it would eventually lead to the vengeful killing of DiBono in 1990"); GA 2000-03 (arguing that Gravano profited from murders of DiBernardo, Milito and DiBono)). His claim that the court's instructions precluded this argument is thus incomprehensible.

        Gotti further asserts that the possibility of the jury convicting him on an improper theory was exacerbated by the court's inclusion of instructions about aiding and abetting and the Pinkerton theory of liability. He does not appear to claim that those charges were themselves improper, nor could he reasonably do so. The indictment itself charged the defendants with liability for substantive crimes as aiders and abetters, and it was thus necessary for the jury to be instructed on this theory. Moreover, there can be no dispute that the jury was entitled to convict the defendants for murders committed by others that were the foreseeable results of conspiracies of which the defendants were members. See, e.g., Pinkerton v. United States, 328 U.S. 640, 646-47 (1946); United States v. Jordan, 927 F.2d 53, 56 (2d Cir.), cert. denied, 111 S.Ct. 2811 (1991); United States v. Romero, 897 F.2d 47, 51-52 (2d Cir.), cert. denied, 497 U.S. 1010 (1990); United States v. Bruno, 873 F.2d 555, 560 (2d Cir.), cert. denied, 493 U.S. 840 (1989); United States v. Wiley, 846 F.2d 150, 154 (2d Cir. 1988); United States v. Blackmon, 839 F.2d 900, 909-10 (2d Cir. 1988). Since this theory was properly available to the jury, the court was well within its discretion to explain it in its charge.

        Further, neither the aiding and abetting instruction nor the Pinkerton charge relieved the government of the obligation explicitly imposed by the court of proving that each defendant's purpose in committing each of the charged murders was to maintain or increase his own position in the Gambino Family. These instructions were given in the context of explaining a different element of the crime; namely, "that the

111

defendant you are considering murdered the person named in the count in question in violation of the New York Penal Law . . . ." (AA 1043). The court simply instructed the jury that in order to satisfy this element of the crime, the government need not prove that the defendant himself killed the victim, but could also rely on the aiding and abetting and Pinkerton theories. (See AA 1044-45, 1058-61).[74/]

These instructions did not affect in any way the court's instruction that the jury must also find that the defendant's purpose in having the victim killed was to maintain or increase his own position in the enterprise. Indeed, in the middle of its charge on these counts, the court explicitly warned the jury that "[y]ou can't infer the existence of one element from proof of another." (AA 1057). Since the court's instructions thus did not permit the jury to convict on what Gotti characterizes as impermissible theories, there is no basis for reversal.

Finally, even if the court instructed the jury as Gotti claims, there would be no error. Gotti concedes that, at least in some circumstances, it is sufficient to prove that a defendant's purpose was to maintain or increase the position within a racketeering enterprise of some other member of a conspiracy. (Br. at 51). He distinguishes this case, however, on the ground that the indictment charged "a Section 1959(a)(5) conspiracy" as opposed to "a conspiracy to violate Section

[74/]  The court's formulation of the Pinkerton instruction did not explicitly tie that theory of liability into the element of having murdered the victim, as opposed to the element of having acted to maintain or increase position in the enterprise. Instead, the court spoke of the commission of "the crime" as a foreseeable result of one or more conspiracies. (AA 1058-61). In doing so, the court continued to refer to the act of killing as "the crime," as it had earlier done in explaining the motive element. (Compare AA 1046 ("If the defendant committed a crime because he thought it would enhance his position . . .") with AA 1059 ("First, that the crime charged in counts four, six, and/or eight was committed")). Neither Gotti nor Locascio objected to this wording of the Pinkerton charge. Indeed, neither defendant ever objected below on the ground that any part of the court's instructions improperly allowed the jury to convict absent a finding that he had acted for the purpose of maintaining or increasing his own position in the enterprise. (See GA 1709-13 (defense objections to Pinkerton charge); GA 1986-90 (more defense objections to instructions on § 1959)).

112

1959(a)(1) (assuming, arguendo, Congress intended to permit such an offense to be charged at all)." (Br. at 51). This distinction is nonsensical. Section 1959(a) makes it a crime to commit murder and other acts of violence in furtherance of a racketeering enterprise or to conspire to do so, and the subdivisions of that section merely set forth the different punishments that apply to different violations of that section. Indeed, it is plain from the language of the statute that Congress did intend to make it a crime to conspire to commit a crime of violence that is punishable under subsection (a)(1). See 18 U.S.C. § 1959(a) ("Whoever . . . for the purpose of maintaining or increasing position . . . murders . . . any individual . . . or conspires so to do, shall be punished").

Nothing in the language or structure of the statute suggests that the motive element for murder under the statute should differ from the motive element for conspiracy to commit murder. Both must be committed "to maintain or increase position." The lack of any pronoun modifying the word "position" indicates an intent to prohibit not only acts intended to maintain or increase the defendant's own position in an enterprise, but also acts by one defendant intended to maintain or increase the position of some other person. Thus, while the district court's instructions below did not do so, Gotti would have no cause to complain even if the court had told the jury that it could find the motive element satisfied by finding that Gotti conspired with Gravano to commit murders "to improve Mr. Gravano's or some fourth party's position in the Gambino Family." (Br. at 51).

In sum, Gotti's challenges to the instructions on Section 1959 are both factually and legally incorrect. Moreover, even putting aside the defects in Gotti's claims, his argument is premised on the assumption that there was "substantial evidence that the only purpose of [the murders of DiBernardo, Milito and DiBono] was the advancement of Gravano's personal financial interests." (Br. at 52). In fact, the only

purposes for those murders established by the evidence were those that Gotti related on tape: he killed DiBernardo and Milito because he felt they were subversive; and he killed DiBono for disobeying his order to come in. These purposes were confirmed by Gravano, and remained uncontradicted throughout the trial. Thus, wholly apart from his erroneous characterization of the district court's charge and his incorrect reading of the statute, Gotti's claim that the jury may have found a different purpose behind these murders is refuted by the record.

C.   "Mere Presence"

The court carefully instructed the jury that a defendant's mere presence at meetings and mere association with conspirators was not sufficient to prove a defendant's guilt. (AA 1054-55). However, Locascio attacks the concluding portion of this instruction, in which the court stated:

> Now, although mere presence or mere association with conspirators is not enough, it's a factor that you may consider among others to determine whether the defendant was a member of the conspiracy. The defendant's presence may establish his membership in a conspiracy, if all of the circumstances considered together show that his presence was meant to advance the goals of that conspiracy.
>
> He must not only have been present, he must have known about the conspiracy, he must have intended by his presence to participate in the conspiracy or to help it succeed.
>
> In other words, presence itself may demonstrate membership in a conspiracy only if that presence is a functional part of the conspiracy.

(AA 1055).

This Court has previously drawn the same distinction between "mere presence" and purposeful presence. Most recently, for example, this Court rejected a "mere presence" claim where "the government's evidence . . . established 'not mere presence, but presence under a

114

particular set of circumstances that provided a reasonable jury with ample grounds' to conclude that" the defendant was guilty. <u>United States v. Gordils</u>, 982 F.2d 64, 71 (2d Cir. 1992) (quoting <u>United States v. Soto</u>, 959 F.2d 1181, 1185 (2d Cir. 1992)); <u>see also United States v. Benitez</u>, 920 F.2d 1080, 1089 (2d Cir. 1990) ("'In most cases including this one . . . the evidence establishes not mere presence but presence under a particular set of circumstances. In such a case, the task of determining the sufficiency of the evidence is not aided by the ritualistic invocation of the "mere presence" rubric.'" (quoting <u>United States v. Henry</u>, 849 F.2d 1534, 1537 (5th Cir. 1988) (quoting <u>United States v. Cruz-Valdez</u>, 773 F.2d 1541, 1545 (11th Cir. 1985) (in banc), <u>cert</u>. <u>denied</u>, 475 U.S. 1049 (1986)))).

In both <u>Gordils</u> and <u>Soto</u>, moreover, the Court relied on essentially the same theory that the government advanced below with respect to the significance of Locascio's presence in the apartment above the Ravenite:

> [I]n <u>Soto</u>, we ruled that where a defendant was arrested inside an apartment in which large quantities of narcotics were being packaged in plain view, the jury could infer that he was a trusted member of the narcotics organization operating from the apartment, because permitting outsiders to have such access would compromise security of the operation.

<u>Gordils</u>, 982 F.2d at 72 (citing <u>Soto</u>, 959 F.2d at 1183).

In the instant case, the jury could easily have concluded that Locascio was a trusted member of each of the conspiracies that existed in the apartment above the Ravenite, "because permitting outsiders to have such access" to the discussions held in that apartment "would compromise the security of the operation."[75] Since this theory was

---

[75] Indeed, the evidence showed that Locascio in particular was especially concerned about whether conversations held within the apartment could be overheard by those outside the door. (GA 80-81). Further, the evidence also showed that individuals were admitted to the apartment only long enough to discuss the particular crimes in which they

available to the jury, it was proper for the court to include instructions about it in its jury charge.

The Seventh Circuit has also explicitly recognized that presence suffices to support a finding of guilt where the defendant's presence is itself intended to aid the commission of a crime. See United States v. Green, 735 F.2d 1018, 1024-25 (7th Cir. 1984) ("while 'mere presence . . . or mere association with conspirators will not themselves support a conspiracy conviction . . . presence . . . will suffice if the circumstances permit the inference that the presence . . . was intended to advance the ends of the conspiracy'" (emphasis added)); United States v. Xheka, 704 F.2d 974, 989 (7th Cir.) (same), cert. denied, 464 U.S. 993 (1983)). Locascio is thus plainly wrong when he claims that "the 'functional presence' concept embodied in the instruction [below] has no basis in the law of this (or any other) circuit." (Br. at 33; see GA 1714-18).

Locascio appears to suggest that even if the court's instruction on the concept of presence was legally accurate it should nevertheless be reversed because it "[went] beyond the standard instruction" and thereby "meddled with the delicate balance that has evolved in the pattern instruction on conspiracy." (Br. at 33). The legal correctness of the district court's instruction, however, should end this Court's inquiry on appeal. See, e.g., United States v. Imran, 964 F.2d 1313, 1317 (2d Cir.), cert. denied, 113 S.Ct. 626 (1992) (defendant entitled only to legally correct jury charge, not to particular wording he prefers). Because the court's instruction was correct and in accord with the law of this and several other circuits, it should be affirmed.

---

were involved. Thus, the jury could rationally have concluded that Locascio would have been excluded from the apartment during the conversation of any particular crime in which he was not a participant.

144

POINT EIGHT

THERE WAS MORE THAN SUFFICIENT EVIDENCE
SUPPORTING LOCASCIO'S CONVICTION ON EACH COUNT

Locascio contends that there was insufficient evidence to support any of his convictions.  This Court has often described the "very heavy burden" borne by an appellant raising this claim.  A comprehensive statement of the standard of review in such cases is found in the Court's opinion in United States v. Skowronski, 968 F.2d 242 (2d Cir. 1992):

> In reviewing such a challenge, we must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor, . . . and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt . . . .   In order to prove a charge of conspiracy, the government need not present evidence of an explicit agreement; proof of a tacit understanding will suffice. . . .   The coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan. . . .   The defendant's knowledge of the conspiracy and participation in it with the requisite criminal intent may be established through circumstantial evidence. . . . Any challenge to the weight of the evidence is for argument to the jury, not a ground for reversal on appeal.

Id. at 247 (citations omitted); see also United States v. Concepcion, 983 F.2d 369, 382 (2d Cir. 1992).

Further, "'[t]he government is not required to "preclude every reasonable hypothesis which is consistent with innocence."'"  United States v. Rivera, 971 F.2d 876, 890 (2d Cir. 1992) (citations omitted).  Finally, "'"[o]nce a conspiracy is shown to exist, the 'evidence sufficient to link another defendant to it need not be overwhelming.'"'"  Rivera, 876 F.2d at 891 (citations omitted).  Viewed under these standards, the evidence against Locascio was more than sufficient.

As a general matter, Locascio's involvement in all of the charged crimes was supported by two facts:  first, that Locascio's role

as Gambino Family underboss was to advise and, where appropriate, "correct" Gotti in the formulation of plans for the Family's criminal activities (see, e.g., AA 1651 ("You're my . . . 'Underboss.' Correct me Frankie."); see also GA 905 (Gravano's testimony that as underboss, he "helped John run the Family")); and second, that Locascio was present in the Ravenite Apartment for discussions about every one of the crimes of which he was convicted.

This Court adopted this precise theory in <u>United States v. Soto</u>, 959 F.2d 1181 (2d Cir. 1992). In that case, appellant Vasquez claimed that evidence established nothing more than his "mere presence" in the apartment of co-defendant Soto, where drugs, guns and cash were found inside of some safes. In rejecting this contention, this Court wrote that "[t]he jury could also have reasonably determined that only trusted members of the operation would be permitted entry into the apartment, because allowing outsiders to have access to an apartment with large quantities of narcotics in plain view could compromise the security of the operation." <u>Id</u>. at 1185.

Here, as in <u>Soto</u>, the jury could reasonably have determined that only very few people had access to the apartment above the Ravenite, and only for very limited purposes: to discuss crimes in which they were participating. Gotti, Locascio and Gravano could always be present because, as the Gambino Family's administration, they comprised the group that had to approve and oversee all of the Family's crimes. Others were allowed up to the apartment only to the extent that their participation in the planning of other crimes was necessary.[96] Thus, Helbig and Corrao appeared in the apartment only to discuss the particular bribery scheme in which they were involved; Coiro was allowed access to the

---

[96] The evidence clearly showed that Locascio in particular was extremely careful about security in the apartment. For example, during a conversation there on January 17, 1990, Locascio advised Gotti to turn on a radio to guard against eavesdropping, and expressed his concern that on January 4, 1990, he had been able to hear what Gotti was saying from outside the apartment door. (GA 80-81).

... . . . . .  . .  .  . . . . . . .  . . . . .  . . . . . . . . . .  . . . . . . . . . . .

146

apartment only to discuss the particular obstruction of justice in which
his assistance was needed; and John D'Amato was admitted into the
apartment only when his presence was needed to further the plan to kill
Corky Vastola.[97]/

Since the jury could infer from this evidence that the only
persons allowed into the apartment were individuals who were participat-
ing in the crimes under discussion when they were present, the jury could
rationally conclude that anyone present in the apartment when a particu-
lar crime was being discussed was in fact participating not just in the
general affairs of the Gambino Family, but in the particular crime under
discussion. In other words, the evidence supported a finding by the jury
that nobody -- let alone an underboss -- could be "merely present" in the
Ravenite Apartment when a crime was being discussed.

In addition, with respect to each crime charged against
Locascio, the evidence showed that Locascio's participation went beyond
simply being present for discussions. As demonstrated below, there was
evidence that Locascio had participated in each of the crimes of which
he was convicted.

A.    The DiBono Murder and Murder Conspiracy
      (Racketeering Act Six; Counts Seven and Eight)

On December 12, 1989, Gotti told Locascio that Louis DiBono
would be killed because he had violated Gambino Family protocol by fail-
ing to "come in" when called. As soon as Gotti said this, Locascio re-
minded Gotti of a meeting that Gotti was going to have with DiBono, and
predicted that DiBono would come to the meeting with money for Gotti.
From this a jury could reasonably infer that Locascio was trying to make
the conspiracy to kill DiBono succeed by helping Gotti plan for unexpect-

---

[97]/    Indeed, members of the administration would send people out of the
apartment when their presence was no longer necessary and send messages
down from the apartment to the club to have the appropriate persons come
up when they were ready to turn from discussing one crime to the next.
(See, e.g., GA 85).

147

ed contingencies at the meeting. In particular, the jury could infer that Locascio wanted Gotti to decide in advance what would happen if, as Locascio expected, DiBono offered Gotti $50,000 to persuade Gotti not to kill him.[98] Gotti decided that although he should take DiBono's $50,000 "and more," he would not; DiBono would be killed. (AA 1675).

A subsequent conversation, which included Locascio, explicitly established that the reason for the murder was to punish DiBono's "challenge" to the "administration," of which Locascio was indisputably a member. (GA 513). Indeed, Locascio himself, during a conversation about who would become "made," emphasized the importance of made members being "there when you need them." (GA 22). He and the rest of the administration killed DiBono for violating that rule.

Locascio thus joined the conspiracy and reasonably foresaw that it would result in DiBono being killed.[99] The jury was plainly entitled to find Locascio guilty of both conspiracy to murder DiBono and the substantive murder charge.

B.   The Vastola Murder Conspiracy (Racketeering Act Seven; Count Nine)

On January 24, 1990, Gotti, Locascio and Gravano held an extended discussion about how to help the DeCavalcante Family kill one of its soldiers, Corky Vastola. The only way to do so was to secure the permission of the Genovese Family's boss, Vincent "Chin" Gigante, to have Barry Nicholo, a Genovese associate, commit the murder. The Gambino Family administration realized, however, that Gigante would not want to do anything to help the DeCavalcante Family, and in particular, its boss, John Riggi. Accordingly, they decided that Gravano would try to persuade

---

[98]   DiBono was not the first person to try to buy his way out of trouble for failing to "come in." (See GA 483 (Gotti discussing whether Tommy DeBrizzi would "offer anything" when confronted about not coming in)).

[99]   Locascio was also present in the apartment on January 4, 1990 when the Gambino Family Administration further discussed the plan to kill DiBono. See p. 23-24 n.19, supra.

148

the Genovese administration that allowing Nicholo to murder Vastola would constitute a favor to the Gambino Family. Locascio contributed to this plan by suggesting that Gravano tell the Genovese underboss that in addition to doing a favor for the Gambino Family, allowing Nicholo to commit the murder would have the added advantage of getting the job done quickly because Nicholo "could hurry up" Vastola's murder. (GA 507).

From this participation in the conversation about how to kill Vastola, the jury could infer that Locascio was a member of the conspiracy to commit the murder who, by his contribution of advice, sought to make the conspiracy succeed. In addition, the jury could also infer Locascio's participation in the conspiracy from the evidence that Locascio had (a) attended a meeting with both Gotti and Riggi at a Brooklyn restaurant during which the murder of Vastola was discussed; (b) discussed with Gotti after the meeting the way Riggi was handling the situation. (See GA 522, 1343-44, 1359, 1401-03).

It is of course no defense that the conspiracy did not achieve its objective of murdering Vastola. See, e.g., United States v. Feola, 420 U.S. 671, 694 (1975) (crime of conspiracy is complete "regardless of whether the crime agreed upon is actually committed"). Locascio's assertion that the Gambino Family administration did no more than "explor[e] whether the conditions necessary for the crime's commission -- the willingness of the Genoveses to make Nicholo available -- could be fulfilled" (Br. at 28) is a jury argument that goes to the weight of the evidence rather than its legal sufficiency. Viewing the January 24, 1990 conversation and Gravano's testimony in the light most favorable to the government, the jury had ample grounds to infer that Locascio and his co-conspirators had actually agreed upon the plan to kill Vastola.

149

C.  Obstructions of Justice And Conspiracy To Obstruct Justice

1.  Obstruction of the Castellano Murder
    Investigation (Racketeering Act Twelve)

In Racketeering Act 12, Locascio was charged with endeavoring to obstruct the Castellano murder investigation. As set forth below, the evidence showed that he affirmatively did so in two separate ways. First, on November 30, 1989, he advised Gotti how to use attorney Gerald Shargel to gather information about the investigation without having Shargel inadvertently disclose the fact that the Gambino Family had corrupt sources of law enforcement information. Second, he participated in the conspiracy to murder Vastola, a conspiracy designed in part to prevent Vastola from cooperating with law enforcement at a time when the administration of the Gambino Family knew about the ongoing Castellano murder investigation.

a.  The November 30, 1989 Apartment Conversation

On November 29, 1989, in the Ravenite Hallway, George Helbig reported to Gotti that, according to his source -- corrupt Detective William Peist -- Gotti was soon to be arrested by both state and federal authorities for the Castellano murder. With Corrao and Helbig still present, Gotti immediately called Shargel into the hallway to ask whether such a thing was possible. Shargel told Gotti that it was, and mentioned the recently-enacted federal statute prohibiting murders in aid of racketeering. Gotti then asked when the statute had become effective and Shargel agreed to look into the issue. (GA 358-66).

The next night, November 30, 1989, the Gambino Family administration met in the Ravenite Apartment to discuss further the status of the Castellano murder investigation. Gotti, Gravano and Locascio discussed, among other things, the ways in which they had been using and could continue to use the Gambino Family's lawyers, including

150

Shargel and Michael Coiro, to obtain law enforcement information about the investigation.

In discussing the fact that Shargel was sent to find out whether the new federal statute might apply to the Castellano murder, Locascio asked: "Well how is Gerry putting this? He's put it that he heard the rumor in the, in the courtroom. What I caught in the hall." (GA 371). From this question, the jury could rationally infer that Locascio wanted to make sure that Shargel, in carrying out his assignment, was using a cover story that would not disclose the fact that the Gambino Family had corrupt "hooks" in law enforcement. By suggesting that Shargel use the innocuous excuse of having heard a "rumor . . . in the courtroom" or having "caught" something "in the hall," Locascio participated in the endeavor corruptly to obtain confidential information about the Castellano murder investigation. Specifically, the jury could infer that Locascio's question was intended to make sure that Peist, a valuable source of information, would not be discovered and could therefore continue to keep the Gambino Family administration advised of the progress of the investigation. Moreover, it was plain from Gravano's testimony that whenever the administration brought Coiro or Helbig to the privacy of the Ravenite Apartment, it was to act "as the administration" to obstruct justice, regardless of who gave the directions to these "hooks." (See GA 1157, 1176).

b.    The Conspiracy To Murder A Witness (Vastola)

For the reasons discussed above, the jury could rationally infer that Locascio was an active participant in the conspiracy to murder Corky Vastola. The jury could also infer -- indeed, it was explicit -- that among the reasons Vastola was to be killed was the Gambino Family administration's fear that Vastola might become an informant. As Gotti stated, Vastola could "destroy a few families." (GA 516). It was thus a fair inference for the jury to draw that by taking part in a conspiracy

151

to kill a potential witness who could provide information to the Castellano murder investigation, Locascio also endeavored to obstruct that investigation.

### 2. The Bribery Of A Public Servant (Racketeering Act Thirteen)

Locascio participated in this crime, along with Gotti and Gravano, by asking George Helbig on January 17, 1990, to bribe Detective William Peist to get confidential information. Corrao and Helbig had reported that Gravano was the subject of ongoing electronic surveillance at both Tali's (Gravano's restaurant), and a trailer in Brooklyn from which Gravano conducted some of his construction business. (GA 378-86). This news posed a threat not just to Gravano, but to everyone in the Gambino Family. As Locascio noted, those caught talking on the bugs were "[j]erking us over." (GA 388 (emphasis added)).

The administration decided it needed more information about this investigation. Accordingly, Helbig was asked to go back to Peist to get more "specifics" about the investigation and to pay Peist an additional bribe if necessary. Because the investigation was affecting the entire Family, the official request came from the administration as a whole. As Gravano testified at trial, Helbig was asked to get the information by Gotti, Locascio and Gravano together, "acting as the administration." (GA 1157). Since Locascio himself showed that the investigation affected his own interests as a member of the Gambino Family, and since Gravano's testimony showed that Locascio was one of the three people who asked Helbig to bribe Peist, the jury could rationally infer that Locascio actively participated in this part of the conspiracy to obstruct justice.[100]

_____

[100]/ In addition, as discussed above, Locascio took steps to make sure that Peist would remain available as a corrupt source of information by making sure that Shargel did not inadvertently reveal that the Gambino Family had such a source. There was thus a reasonable basis for the jury to find that Locascio knew Peist was being bribed to provide information, participated in the bribery by requesting further information, and took

152

## 3. The Conspiracy To Obstruct Justice (Count Eleven)

Locascio was charged in Count Eleven with conspiracy to obstruct justice in connection with both the Southern District's Castellano murder investigation and the Eastern District's Gambino Family investigation. For the reasons discussed above with respect to Racketeering Acts Twelve and Thirteen, there was evidence from which a rational jury could draw the logical inference that Locascio actively participated in a conspiracy to obstruct justice in both investigations. He did so not only by participating in the administration's efforts to obtain information through corrupt means -- from Coiro's unidentified source and from the corrupt detective Peist -- but also by agreeing to kill potential witnesses, in particular, Vastola. Indeed, the January 24, 1990 conversation in which the defendants planned Vastola's murder was alleged as an overt act in Count Eleven (AA 23). Locascio's aforementioned participation in all of these efforts to obstruct justice plainly supported the jury's verdict against him on that Count.

## D. The Connecticut Gambling and Loansharking Operation (Racketeering Acts Nine and Ten)

There is no dispute that the evidence was plainly sufficient to allow a rational jury to conclude that the Gambino Family ran a gambling and loansharking operation based in Connecticut that was run for a time by Gambino soldier Tommy DeBrizzi and later, after DeBrizzi's murder, by Gambino soldier Tony Megale. (See, e.g., GA 1202-09). Gravano's testimony showed that Locascio actively participated in the operation by taking steps to insure that to the extent Megale's participation in the operation had been detected, law enforcement authorities would not be able to use his conviction to implicate other members of the Gambino Family in that criminal business. Specifically,

---

steps to make sure that Peist would continue to be available for such bribery.

153

Locascio and Gravano approached Megale at a wedding on April 21, 1990, to instruct him to remedy the public perception that Megale had admitted the existence of the Family. (GA 1209-11). Two days later, Megale attempted to withdraw his guilty plea. (GA 1574-78, 1665).

In addition, the evidence revealed that much of the criminal business of the Gambino Family was conducted during "walk-talks" on Mulberry Street, where conversations could not be intercepted. (GA 1261; see also 1452-53). The video surveillance revealed several such conversations between Megale (a Connecticut resident with no plausibly legitimate reason to report to the Ravenite) and Locascio. (GA 1580-81, 1582, 1584). A rational jury could thus, by crediting Gravano's testimony and drawing inferences favorable to the government from Locascio's "walk-talks" with Megale, find that Locascio had been involved in the management of that gambling and loansharking business.

E.   The Queens Gambling Operation (Racketeering Act Eight; Count Ten)

One of the items on the administration's agenda on January 24, 1990, was the resolution of the problem posed by the opening of a Greek gambling business in the territory controlled by Gambino captain "Ralphie Bones" Mosca. See pp. 33-34, supra. Gravano reported to Gotti and Locascio that the Greeks, in response to Gotti's threat to kill their boss, had closed their game and that their sponsors in the Luchese Family had apologized profusely. Apparently because he was silent during this portion of the meeting -- but not during others (see, e.g., GA 102, 103) -- Locascio now claims there was insufficient evidence of his supervisory role over Mosca's gambling operation. (Br. at 29).

As noted above, we disagree with that legal premise. Moreover, Locascio ignores the evidence that he personally supervised Ralph and Peter Mosca. In addition to the fact that the Moscas made 80 visits to the Ravenite (GA 735-36), Ralph Mosca, Locascio and Gravano

154

engaged in at least one "walk-talk" that was captured on a video tape shown to the jury. (GA 1454-55).

F.     The Conspiracy To Defraud The United States (Count Thirteen)

In contesting the sufficiency of the evidence, Locascio does not dispute that the proof was overwhelming that the conspiracy charged in Count Thirteen existed or that several overt acts were committed by members of the conspiracy in order to further its objectives. Instead, he claims that there was insufficient evidence of his own participation in that conspiracy. (See Br. at 30-31). This argument ignores the fact that during the conversation of December 12, 1989, Locascio advised Gotti as to whether Gotti was "showing" enough income to account for his readily traceable expenses. (See AA 1712-15).

In particular, Gotti told Locascio that he had recently put himself "on the . . . payroll" at Albie Trimming after having been a "partner" in it for the five years since he had "put [it] into business." Gotti explained to Locascio that he had done so "to keep . . . out of . . . jail, no other . . . reason." (AA 1712). Gotti then told Locascio how much income he was showing for "tax purposes" and Locascio responded, "you don't spend more than that shows." (AA 1713). Moments later, after Gotti listed his readily traceable expenses, Locascio confirmed this advice, saying "[y]ou're well within, well within." (AA 1715).

From this evidence, a rational jury could easily have concluded that (a) Locascio understood that Gotti wished to defraud the United States by hiding his true income as boss of the Gambino Family from the Internal Revenue Service; (b) a conspiracy existed to accomplish this goal; and (c) Locascio intentionally joined and participated in this conspiracy by advising Gotti as to whether the steps already taken were sufficient to achieve the conspiracy's purpose.

BQ46551.REV



GOVERNMENT
EXHIBIT
304.1A(T)
90 CR 1051 (ILG)

REGO PARK, NEW YORK

FILE NUMBER:          183A-3507

SDNY NUMBER:          2005

DATE:                 DECEMBER 12, 1989

TIME:                 7:13 PM


PARTICIPANTS:

JOHN GOTTI                GOTTI
FRANK LOCASCIO            LOCASCIO

INAUDIBLE:                IA
PHONETIC:                 PH

1

Case 1:90-cr-01051-LCG-43 Document 444-31 Filed 03/23/2003 Page 67 of 183 PageID #: 869
SGA064

BQ 183A-3507                                            2

                    (Steps)

GOTTI:          Today I go and have lunch. I mixed up about four
                lunches, at once, you know? You know, Frankie, I,
                I, I don't like you, I love you. I don't like
                Sammy, I love him. As far as this life, no one
                knows it better than me. If a guy offends me, I'll
                break him that's the fuckin' end of it. But not for
                me. It's this "thing of ours." It's gotten to be
                a circus. I'm not gonna leave a circus when I go
                to jail, Frankie. I don't wanna be a phony. I
                ain't gonna talk about a guy behind his back. Um,
                Louie was a fuckin' coffee boy. Know what a coffee
                boy was? A motherfuckin' coffee boy.

LOCASCIO:       You told me once (IA).

GOTTI:          Never did nothin', I'm telling you again. Never
                did nothin'. He's a billionaire now. Billionaire,
                now! Owns buildings. Throws a half million into
                fuckin' factories, and, and bars. And all the rest
                of them. Yeah, yeah, make the faces. But, anyway,
                this is all well and good. I got guys around me
                aren't making five cents. This is my back! When
                "Di B" got "whacked," they told me a story. I was
                in jail when I "whacked" him. I knew why it was



BQ 183A-3507                                           3

being done. I done it, anyway. I allowed it to be
done, anyway. He got there. I saved that whole
fucking industry. I got a piece of the company.
For a year -- an arrangement -- a year! They
haven't got a fucking job! One job! I got them a
job. They got a run-around. I was sent for, you
sent for my partners. To the (IA). "Johnny
Blowjob" sends for him. And they give him a run
around. Come down on the figures. Dupe this guy,
dupe that. So, they, they told him taking him, they
going to a party. (IA) fuck them! Those Irish
motherfuckers! Fuck them. They don't mean nothing
to me. I send this "Joe Crotty" here, he's a good
friend of ours. He's taken care of dozens of people
is in the jail. He done nothing but good things for
us. He's in the carpet business. Joe Gallo brought
him to me about eight years ago. I put my vote here
to get these jobs. "If my name could help you in
any point in time, go ahead." He goes there, two
months ago. He got thrown out! "Johnny Gotti wants
Johnny G. to have it." Where's this guy come in the
carpet business? They're in Rebock business.
There's a conc, there's a builder up in the Bronx.
A billionaire builder. The guy's with me, through
ARC Plumbing. Sammy sends me word. You were there.
Where they told me. Says, "I had the plans ahead

③

BQ 183A-3507                                                    4

of time. Everybody gets the plans when you build,
when you bid for it." I sat with the fuckin' owner
of the building today. They don't know who the fuck
Sammy is. And they don't know who fuckin' Marathon
is (IA). They knew Marine and them way before that.
They were told, this is where I wanted it to go.
So it went to Marathon. "Who's Marathon?" he says
today. "That's Sammy." Where are we going here?
Where the fuck are we going here? Where are we
going here? Every fucking time I turn around
there's a new company popping up. Rebars, Building,
Consulting, Concrete. And every time we got a
partner that don't agree with us, we kill him. You
go to the "Boss," and your "Boss" kills him. He
kills 'em. He okays it. Say it's alright, good.
Where are we going here, Frankie? Who the fuck are
we? What do I get out of this here? Better not
become a clown. Where am I going? What do I do
with the rest of the "borgata?" You throw 'em in
the fuckin' street? The rest of the "borgata."
What are we going to do with the rest of this
"borgata?" Hah? Twenty-five "Capodecinas," we got
twenty-two, twenty-five "beef" to me. What do I do
here, Frankie? Sammy tells me you and him, took a
walk, about a concrete plant in New Jersey?

(4)

BQ 183A-3507                                                5

Somewhere?  I told him when do youse decide to tell
me about it?

LOCASCIO:    There's nothing for sure.  I just got the plans and
             I asked him...

GOTTI:       Yeah, but I told him, "Don't I have the right?
             Frankie's my "Acting Underboss."  Supposed to tell
             me first then I'll tell you if it's okay to go ahead
             or not."  I told him now, Sammy.  "Don't you people
             listen here?"  I mean where are we going here?

LOCASCIO:    This was the plant (IA).

GOTTI:       Frankie, I won't stop ya, Frankie.  I would give
             ya, I'll go take it in the ass and give ya the money
             (IA).

LOCASCIO:    There was nothin'.  I just, he said he was gonna
             meet with, ah, Carl.  I says, "Here, show him this.
             See if he knows this spot...

GOTTI:       Frank, I didn't say you did anything under-handed.

LOCASCIO:    I would never do anything like that!

⑤

Case 1:90-cr-01051-ILG Document 444-3 Filed 03/23/2003 Page 71 of 183 PageID #: 873
SGA068

GOTTI:          I didn't say that.  I know you better than that,
                Frankie.  Don't you understand?  I want you to own
                500 plants, and I don't tell no one (IA) about a
                plant.  But I wanna know about it, Frank.  I got
                "beef," guys "beefin" at me every fuckin' hour every
                day.  Yesterday one of them fuckin' "Capodecinas"
                sent, they sent for me for a glory fuckin' meeting.
                On Sunday.  And the people think that this is my
                fuckin' green eyes.

LOCASCIO:       (IA).

GOTTI:          Couple of our "Capodecinas."  You think it's my
                green eyes.  You think this is me doing this!  This
                is not me, Frankie!  What do I get outta this
                fuckin' shit?

LOCASCIO:       Which building, er, is this?

GOTTI:          It's a big building.  I don't know where.  Six, six
                million, twenty million, whatever it is?  But what,
                what, where are we going here, Frankie?  Frankie,
                where the hell did all these new companies come
                from?  Where did five new companies come from?  Ah,
                I mean, when, when Nasabeak died, you were nothing.
                Louie had Gem Steel.  You, you told me that the guy

                                    .                       6

talked behind my back.  Now you got Gem Steel.  The
other thing, you told me "Di B" cried behind my
back.  Now you got all that!  And you got, uh, Bobby
Sasso.  (IA).  Hey, Frankie, you're not, are, are,
are you gonna, are you in with me, Frank?  I'll walk
outta here, and we'll terminate our friendship.  Is
that the way this, is that what our "marriage" is?
That's not the way it's gonna be, Frank.  I give you
my word, Frank.  (Pause)  I, I love you guys.  I
don't, I don't fabricate no part of it.

LOCASCIO:    Why don't you pull him and...

GOTTI:       And there...

LOCASCIO:    ... pull his coat.

GOTTI:       ... that's why I wanted to end tonight here.  I
             wanted it to end tonight.  I just (IA).

LOCASCIO:    (IA) you want me to go and get him?  I'll bring him.

GOTTI:       No, no, no.  No, no, no.

LOCASCIO:    I'll go and get him.

⑦

BQ 183A-3507                                    8

GOTTI:          This is bullshit!  These people are being taken away
                from him.  He's not a "Capodecina."  He wants to be
                a    "Capodecina,"      I'll  take  him  down  from
                "Consigliere," and I'll make him a "Capodecina."
                He can have all the fun he wants to have.  Frankie,
                this shit ain't gonna take it.

LOCASCIO:       I'll go and get him, for you and...

GOTTI:          No, I'll send them.  They're gonna do it.  This is
                not the way this is gonna be, Frank.  I'll see him
                tomorrow, and I'm gonna tell him tomorrow.  I told
                him the other fuckin' day, Saturday.  I see eight
                of our fuckin' kids, none of our kids supposed to
                be future prospects, like fuckin' bum "junkies," in
                the hall of the fuckin' house.  Where are we going
                here, Frankie?  Where are we going here?  This is
                not my teaching.  None of my teaching.  (Pause)

LOCASCIO:       Talking about a house for liars (IA).  He knows what
                he's doing.

GOTTI:          He's not gone, he's home in bed.  (IA).  He's home.
                He's home at his house.  I'm on that, Frank.  I'm
                on every fuckin' thing.  (Tap sound) Selling half
                million, four-hundred thousand dollar deal.  You

9

> know, Frankie, you could love me, he loves me, I
> know he does. But Jesus fuckin' Christ! This is
> not your candy store! You take a cocksucker like
> a fuckin' Johnny G., you make this guy rebel against
> his own cousin. You heard him just now downstairs,
> the cousin, "Capodecina." I never rehearsed this.
> I haven't spoken one word to this guy. Gets near
> you, he rebels against him? I think, he's in charge
> of, ah, two unions. You got him, Johnny G, working
> hand-in-hand with "Joe Brewster," in Local 23. You
> convinced me that's good for me. You got Joe
> Francolino working hand-in-hand. Don't you see this
> or am I, am I talking to myself, Frank? Am I lying,
> am I out of order here? Correct me! You're my
> fuckin' "Underboss." Correct me, Frankie.

LOCASCIO:    I agree with ya.

GOTTI:       Am I wrong Frankie? If I'm wrong, correct me.

LOCASCIO:    Fuck, ah, John, it's up to you to pull him up.

GOTTI:       Yes, but am I wrong, I'm saying?

LOCASCIO:    No, you're not wrong!

(9)

Case 1:90-cr-01051-ILG Document 444-31 Filed 03/23/2003 Page 75 of 183 PageID #: 877

BQ 183A-3507                                                    10

GOTTI:      But Jesus motherfuckin' Christ, I'm with some people
            today.  Ah, but I was Marine Construction.  I said,
            "Maybe it's because...

LOCASCIO:   Well...

GOTTI:      ... it's my company."

LOCASCIO:   ... you said it two weeks ago, with Marine
            Construction (IA).

GOTTI:      You, was he sitting there when I told him?

LOCASCIO:   Yeah.

GOTTI:      He got nothing!  They got no job.  If Angelo was
            sitting next to me, would they have a job?  If
            Angelo was handling Bobby Sasso, would they have a
            job?  You tell me.  Right or wrong?

LOCASCIO:   (IA) they would get all the jobs.

GOTTI:      Guaranteed!  And I don't want that, Frank.  You know
            me better than that, I don't want that.  I said,
            "Give him one job."  Now, I told him...

(10)

BQ 183A-3507                                          11

LOCASCIO:       You get Bosco off your back, 'cause he keeps on
                breaking your fucking balls (IA).

GOTTI:          (IA) Frankie, the guy gives Joe Watts 9,000 every
                two weeks.  He takes a third, and I get two-thirds.
                Don't I get 2,000 a week?  Don't I get 2,000 a week
                pay?  Who gives you 2,000 a week?  (IA).

LOCASCIO:       But he should, he should'a done something.

GOTTI:          Nothing!  And, since March!  That's too many months
                in a fuckin' year, Frank.  And I'm not gonna go for
                this shit.  And another thing, this shit about your
                "Decina" is on welfare.    And another fuckin'
                "Decina" is on, on easy street.   I purposely done
                that tonight with Jackie and this "Butterass."  He
                gives me this Arpege, this fuckin' Jackie with this
                fuckin' guy.  I purposely told "Butterass," "Bring
                the guy down, Tuesday."   And I told Jackie,
                (coughs), "Can ya get the guy?"

LOCASCIO:       When he comes, chase him.

GOTTI:          No, I told Jackie, "Can you get the guy?"  He says,
                "No, I can't reach him."   "You can't reach him?
                Ain't he with you?"  "Yeah,"  "And you can't reach

Case 1:90-cr-01051-KAM-LB Document 444-31 Filed 03/23/2003 Page 77 of 183 PageID #: 879
SGA074

him?" "No." So, I showed him. (low voice) (IA)
You follow me, Frank? I mean, this guy's with you.
Frankie, you'd think they'd know how to get him.
Okay. Them two get "pinched." You follow what I'm
trying to say, Frankie? Where are we going here,
with this (IA)? This is the new game. You gotta
(IA). We got tough guy's tough guys with us. They
look at me like I'm fuckin' nuts. And you think
that I was, I'm reaping billions of dollars,
Frankie. I, I, I don't want none! I don't want a
fuckin' thing! And this guy, I mean, what's, I love
you. Where are we going here? You know what's
frightening to me, Frankie? I love him. I don't
give a fuck, because I know I blast him a little bit
and he'll slow it down. What happens when I go
away, or I'm gone? When I'm dead, Frankie? Youse
two guys are the fuckin' guys I, nothin'! Fuck me!
The whole "Family" gotta go and find out. Is this
what we gonna invite? This is probably what happen?
I'll throw myself in front of fuckin' (pause). I'm
sick, Frankie. I've been sick over the whole
weekend. You know what I mean? I love the guy.
I go up to the hospital, I see his kid. I find out
he bought the fuckin' moped. Hah?


LOCASCIO:       He did.

Case 1:90-cr-01051-JTG-3 Document 444-31 Filed 03/23/2003 Page 78 of 183 PageID #: 880
SGA075

GOTTI:      Yeah!  No (IA).

LOCASCIO:   ... But did you tell him that he (IA).

GOTTI:      He's got them, he's gotta tell, if your kid done
            that, you would've, you would've...

LOCASCIO:   Thank God that he's alright.  You would've
            thought...

GOTTI:      Good he's alright.  But then you wanna kill him for
            what he done, right?  I mean, right or wrong?  He's
            got to "whack" the kid down.

LOCASCIO:   You done good.

GOTTI:      Yeah!  So, I told him, "You didn't do a nice thing."
            Son?  But then I kept my respect.  I didn't, I
            didn't know what I said.  I told him, "He didn't do
            a nice fuckin' thing.  You're being buddies, that
            makes you happy?  She's gotta cry?  Make you happy
            he's gotta be sick.  We gotta be sick?  Dozens of
            your father's friends?  That makes you happy?"  I
            told him, "I had a son like you.  Make a little
            tough for the guy.  I go and visit him every

Saturday, Sunday, 11:00 o'clock in the morning. That what you want your mom and dad to do? They'll do it. You'll have your fuckin' home in the cemetery." I mean where we going here? We're creating, (IA) these fuckin' kids. You know, Frankie? I'm not a jerk-off. If I see kids go, I should never (IA) I hate them, Frankie. I hate them. Nobody had it worse than I had it in life. And I didn't need that shit. You know what I mean. I didn't need that shit. Take a couple of scotches and go fuck yourself, know what I mean?

LOCASCIO:   Well, I wanna see what, what's happening. We got that tire disclaim coming up. 'Cause if...

GOTTI:      (Coughs)

LOCASCIO:   ... I wanna see how he's gonna act during that. I'll fight it tooth and nail down the line, you know, because it's...

GOTTI:      There's nothing to fight, Frankie. It's (IA) said.

LOCASCIO:   It's my people against his people.

GOTTI:      Yeah, but no, Frankie.

Case 1:90-cr-01051-ILG-3 Document 444-31 Filed 03/23/2003 Page 80 of 183 PageID #: 882

BQ 183A-3507                                          15


LOCASCIO:      But you...

GOTTI:         That's no good.  I don't even want none, part of
               it.

LOCASCIO:      (IA).

GOTTI:         I gotta be honest with ya.  I don't want any part
               these kind of things here because I could see, we
               ain't got our, we ain't got the "borgata" in hock
               no more.  Now we got ourselves gain (IA).  And
               that's not for me. That's not John Gotti. At least
               I hope that's not me.  Maybe I see myself in the
               light that I'm not in, I don't know.  But that's
               what I feel I am.  But, but, but, he's gonna get it
               off me pretty good tomorrow.  And I wanna know
               everything that everyone of these guys are in.  What
               businesses they're in.  I wanna know when they got
               in them, and how they got in them!  That fuckin'
               guy.

LOCASCIO:      That's it, the key.  That's the key...

GOTTI:         I wanna know when and how they got in them.  These
               are all businesses that nobody had a fuckin' year

ago, Frank! On my back? I got a million (IA) good
guys. My son didn't. open no new companies up. My
brothers didn't. My son-in-laws didn't. Nobody
opened no new companies up. They took it upon
themselves. "Joe Piney" and, and, and Sammy, he
made my brother Pete get involved with that fuckin'
asshole with the "Windows." Never made a dime.
He's going to jail for it. Well, tell me something
that one of my family got that they never had it
before. I'll make ya fuck me in the ass. But that
ain't what I'm getting at, Frankie. That's not the
way this is run. And you should know better than
that. You've been around long enough. This is not
the way a fuckin' "borgata" is run. And I shouldn't
break my fuckin' heart. When, when I hear you're
(IA).

LOCASCIO:    In reality (IA). In reality, you put everything on
             him.

GOTTI:       Yes.

LOCASCIO:    If it's anything to do with construction.

(16)

Case 1:90-cr-01051-ILG Document 444-31 Filed 03/23/2003 Page 82 of 183 PageID #: 884
SGA079

BQ 183A-3507                                    17

GOTTI:       Why did I do that?  (Tap sound)  What, what did,
             what did I do that for, Frankie?  What did I do that
             for, Frankie?

LOCASCIO:    You might be able to, the way you said before...
             (IA).

GOTTI:       (IA).

LOCASCIO:    ... fuckin' (IA).

GOTTI:       I did!  But why did I do that for, Frankie?  If I
             did that to you, that means you gotta make a ple,
             a pleasure thing out of it?  (Pause - radio in
             background).

GOTTI:       For Christsake, I love you more than I love myself,
             for fuckin' Christsake!  I'm worried about you going
             to jail.  I don't give two fucks about myself going
             to jail.  Don't I know they ain't gonna rest until
             they put me in jail?  So I fight it tooth and nail
             to the fuckin' end.  But at least if I know you two
             guys are out here, we got a shot.  Somebody got a
             shot, Frankie.  Maybe our kids gotta, my kid's in
             trouble.   Maybe some other jerk-off's kid's in
             trouble, they come to you.  You guide them right,

(17)

Case 1:90-cr-01059-12-TG3-D Document 444-31 Filed 03/23/2003 Page 83 of 183 PageID #: 885

SGA080

give them a little lecture. And maybe, we gotta
think there's some proper resemblance of a "Family."
Where else can you lead them? Don't you see it?
With this Johnny told me on the phone, forget about
it. Don't you see what I mean, Frankie? (IA) the
guy cried today to me on the fuckin' phone. He's
in jail. Says to you (IA) he send his lawyer, his
private investigator. You asked for help, I send
you the help that you asked for, you listen? Did
ya speak to the lawyer. (IA) Yeah, he walked away.
He says, "Minchia, he treated me like an equal."
Johnny told him. And he got through with it. He
said he sent word to that other guy, about what they
should do with the other guy. He told him, "I don't
know." (Tap sound) Pretty fuckin' (IA) but that's
selfish people. We're not selfish, Frankie. And
every time I sit down, every time you fuckin' talk
with somebody, they have another business. What
business you in? Where the fuck are you going here?
Where the fuck are we going here? Ya know what I
mean? Where the fuck you kidding somebody, or what?
(Pause) Listen, Frankie, I could'a been like other
cocksuckers. Put Sammy in. Who's gonna challenge
me? Who's gonna defy me? What are you gonna do?
Take a shot, (IA) sleeping, like I did to the other
guy? No! (IA) Frank, I welcome that, Frank. I'd

(18)

BQ 183A-3507                                    19

>          welcome that.    I'll kill their fuckin' mothers,
>          their fathers.    I, but I would welcome that,
>          Frankie.  But I'm, saying, I'm not going for that.
>          They don't belong here.  You belong where you are!
>          That's the way I feel in my heart.  He belongs where
>          he is.  What tomorrow, I didn't give him no fuckin'
>          gift, bring you no gift, Frankie.  I didn't give you
>          no gift, because you make good meatballs?    You
>          deserve to be here!  But that don't mean you gotta
>          fuckin' rob the "Family."

LOCASCIO:    He's telling the truth.  He belongs...

GOTTI:       He does, he does belong.

LOCASCIO:    He belongs there.   More than anybody that I can
             think of.

GOTTI:       He does.  You're right.

LOCASCIO:    They think they only control (IA) whichever way...

GOTTI:       But you know that, Frankie, as well as I do.

LOCASCIO:    But this has been going on for two years, John.

⑲

Case 1:90-cr-01051-PCH Document 444-31 Filed 03/23/2003 Page 85 of 183 PageID #: 887
SGA082

GOTTI:          I know it, Frankie...

LOCASCIO:       (IA).

GOTTI:          ... but I'm trying to say...

LOCASCIO:       You said it two years ago.

GOTTI:          Yeah, but I'm trying, you know what happened?  Joe
                Arcuri came to me one day, crying.  He's a fucking
                pain in the ass old-timer.  He's one of us.  He
                ain't a bad guy.  He's one of us, Frankie.  He's an
                old time "Captain."  They thought they were in
                trouble when we first took over.    They so
                comfortable now.  They, they've seen, people see
                them.  They make us stronger by people seeing them.
                Minchia, these guys didn't gobble up the old timers.
                It's good for those guys.  He says to me, "Jesus
                Christ,"  he says, "John.   I'm there like I'm
                lying."   I said, "That's my fault.  Go ask Joe
                Arcuri."  I said, "That's my fault.  I picked on
                him."  It wasn't my fault.  I didn't pick on him.
                He, he uncovered a guy through this Johnny G.,
                uncovered a guy through this Bob Levy.  Where, where
                are we going here?  What are you create snakes here?
                Monsters?   (Pause)  I mean, Frankie, I don't like



you guys, I say it and I don't say it loosely, I
love you guys. But, but I gotta be honest, I gotta
be me, Frank. I can't, I can't just fuckin', ah,
and, and if you tell me you put an extra 50,000 in
the envelope, I don't want it. If, if you're gonna
fuckin' break everybody's heart, I don't want no
extra 50,000. Keep it. I got no big fuckin' needs.
I ain't no big mansion needs, you know what I mean?
And this is fuckin' insanity. The guy, the other
guy comes, there's three in a row. Don't even know
each other, the three lunches, Frankie, I was sick
to my stomach. The last one I know better. We go
by the Marlin where (IA) kill ourselves. They're
crazy. I meet this Buddy Leahy. The guy's the
nicest guy in the world. He's giving that fuckin'
punk 10,000 a month. In jail with Jimmy, ah,
Coonan. This kid's gettin' "shaken down" for like
30,000 a month, Frankie. What the fuck? He's gotta
live. Fuckin', I said to him, "What happened with
that job down there?" He says, ah, ah, "Carbone,
whatever the fuck his name, Mike Carbone called up
and he hollered at me. I'm not to go, bid any
jobs." "Who the fuck are you talking to? This
guy's my partner! Who the fuck are you? You're a
legitimate hard-on, and he's a legitimate hard-on.
Youse two legitimate hard-ons. Where did you get

(21)

Case 1:90-cr-01059-ILG Document 441-31 Filed 09/23/2030 Page 87 of 183 PageID #: 889
SGA084

this confidence from?" You follow what I'm trying
to say, Frankie?

LOCASCIO:     Confidence comes from Sam.

GOTTI:        Yeah! So, where did you get this confidence from?
              (Pause) But you know, I even told him, "You know,
              Sammy, you, you see the fuckin' trust I put you, in
              faith. I told the whole 'Family.'" I told Joe
              Watts, "You see where I put (IA)." You tell me that
              you don't want nobody to see, "Gees, 'Boss' to
              protect you, I'd rather nobody sees Bobby Sasso but
              me." You think I'm fuckin' stupid? (Pause) I
              mean, I mean where am I going here? "Yeah, yeah
              (IA)." I got other people I'm responsible with,
              too. So, the guy told me, he said, "I just, I just
              fired 90 of my guys." Tell Joe Watts downstairs,
              if I, on my son's grave, I told him, I said, "Well,
              I don't know how you could salvage anything right
              now. Ya, you're not gonna get me, my nose all...
              Whatever Sammy done, he done on my orders. You
              could ask for, for this mama (PH), Mamona (PH)
              cocksucker, didn't do it on my orders. His ass I'll
              fix! Sammy done it on my, I'm responsible, totally
              responsible" (IA). Joe Watts (IA). I says, "And
              you can start by ending my salary. I don't need no

(22)

BQ 183A-3507                                   23

salary. Whatever you gave Joe Watts for him and me,
end it. We don't want it no more. So, that's a
burden off your fuckin' back. You're right. Eleven
months I never got you one job. I got you chased
off three jobs. That job, that's, that's 6-7
million dollar job. That job belongs lock, stock
and barrel! 'Cause I was with the boss, the owner,
and the contractor today."

LOCASCIO:       Who wound up...

GOTTI:          They did. They did. Marathon, Sammy. Sammy and
                this guy, Joe Madonia, whatever the fuck his name
                is. He says, he said, "I waited for orders for a
                month." He said, " I sent word to who you'd want
                me to give it to!" He said, "This is what I was
                told." I don't care if I had to pick between Sammy
                and this Irish fuck. Sam's with me anyway. But
                this Irish fuck, I never would'a got 200,000 from.
                He had me in conversation. But I don't even care
                about that. But you don't need eight jobs, he don't
                get nothing. This guy's been in the business for
                fuckin' seven years. You just formed this fuckin'
                company. But, ya, ya, ya, I don't know if you
                follow me, Frankie. I mean, maybe I'm...

(23)

Case 1:90-cr-01059-ILG-RML Document 441-31 Filed 09/23/2030 Page 89 of 183 PageID #: 891

BQ 183A-3507                                    24

LOCASCIO:    But I'm hearing it.

GOTTI:       I mean this is not right here.

LOCASCIO:    Of course not.

GOTTI:       This...

LOCASCIO:    It ain't, ain't right. It ain't right. Let's not
             argue. But I think you should pull him up and say
             this, er, this is '89. It ain't gonna happen in
             '90 because...

GOTTI:       I'm gonna do it. I, I'm telling you. Listen...

LOCASCIO:    Whatever happened, happened in the past. Let's
             forget about it.

GOTTI:       But not only that. But there's no past with him
             and I, and you and I, Frankie. We're too close for
             that. We're too close. I, I, I could'a done this
             a stupid way. (IA) and there's no future (IA).
             This bothers me. And you shouldn't wanna bother me.
             Correct it. If I had an end coming, which is gonna
             hurt you there, keep my end. Do it right. Don't
             you understand make people love you? Doesn't he

(24)

understand people gotta like you guys.   I mean,
don't you understand that, Frankie?   You're, and
don't have to people fuck you in the ass for people
to like ya.   Ehh, believe me, Frankie, people are
scared.   I like it when people (IA).   Don't you
realize people hate it?   But you don't believe me.
So, now, now, that's no good, because it breaks my
fuckin' heart.   Breaks my fuckin' heart.   Who the
fuck wants to be here?   We got nothin' but troubles.
I got cases coming up.   I got nothing but fuckin'
trouble.   I don't feel good.   I gotta fuckin' sit
here.   I gotta sit here with my closest two friends.
Not even, even if I sit here with guys which are,
a "Capodecina" that's from New Jersey, you wanna
pull his cover a little bit.   Ya, ya, ya, you guys
are, ah, youse are supposed to be pulling my covers,
I, I gotta pull his fuckin' cover.   And I tell him
a million times, "Sammy, slow it down.   Pull it in
a fuckin' notch.   Slow it down!   Pull it in a notch!
You, you, you come up with fifteen companies, for
Christsake!     You got Rebars; you got concrete
pouring; you got Italian floors now.     You got
construction; you got dry-wall; you got asbestos;
you got rugs.   What the fuck next?"

LOCASCIO:      How the fuck did he get "Windows?"

Case 1:90-cr-01059-1063, Document 441-31/File 09/23/2030 Page 91 of 168 PageID #: 893

GOTTI:          Yeah, they goin' to jail!

LOCASCIO:       We got, we got the word. But I shouldn't blame him.

GOTTI:          Garbage! You told me...

LOCASCIO:       (IA).

GOTTI:          Don't you think I, I told him the other day, when
                he said to me, "Jesus, the, the garbage club, ah,
                if Joe Francolino gets you a hundred thousand I
                don't want one hundred thousand. You take the
                hundred thousand. Give me the piece that you've
                got. X-amount for a week for the rest of your life.

LOCASCIO:       (IA).

GOTTI:          "But no, I'll give him the book." "I don't want
                it, Sammy. I want what's right here. You're
                torturing 'Jimmy Brown.' The 'Capodecina' gotta
                come crying here. The fuckin' docks guy's gotta
                come crying. You got all the 'Capodecina's' coming
                crying." And you know I'm not gonna side with them,
                Frankie, I never did, and I never will. What do you
                think I told "Jimmy Brown," Saturday? You go down



BQ 183A-3507                                                    27

and you ask Danny Marino, word for word.  I told
him, "That's my fault," I says, "Sammy got nothin'
to do with Joe Francolino."  I said, "I told him,"
but I didn't fuckin' tell him (IA).  I don't want
them to not like Sammy.  I don't want them to hate
the guy.   "It's my fault."  I said, "Sammy had
nothing to do with it.  (IA)."  I can't keep going
around and say it's my fault!

LOCASCIO:     The way youse told him, "Construction you take care
              of.  Anything with construction.  When it comes to
              the garbage, "Jimmy Brown's" (IA).

GOTTI:        But that is "Jimmy Brown's"...

LOCASCIO:     ... Brown's decision.

GOTTI:        Right.

LOCASCIO:     Can't be...

GOTTI:        That's right.

LOCASCIO:     (IA) okay.

GOTTI:        And I just told him that.

(27)

Case 1:90-cr-01059-RJD Document 441-31 Filed 09/23/2003 Page 93 of 183 PageID #: 895
SGA090

LOCASCIO:      The grudge (IA).

GOTTI:         And I just told him, last night he was there, I
               grabbed Joe Francolino.  I told Joe Francolino,
               "Listen, Joey, you're a nice fella. (Coughs) you're
               a 'friend of ours.'  I made you a 'friend of ours,'
               through your cousin Eddie Lino, and that gang (IA)
               we knew good things about you, or because Sammy put
               a good word out for you.  For no other reason.  No
               other reason.  Your cousin is a 'Capodecina' now.
               I'm supposed to put you with him.  Johnny
               Gammarano's cousin, he was a 'Capodecina,' I should
               put him with him.  I don't take all our money people
               and put them in a fuckin' 'Decina' and leave, the
               'Capodecinas' naked."  That's not the way this goes
               and you know that, Frankie.  How would you like it
               if you had nephews or cousins and they put them in
               different fuckin' "Decinas?"  That's not the way
               this goes here!  Alright?  So, now I told Joe
               Francolino, I says, "Joey, you're making a decision?
               Tomorrow (IA) you're making the decision, without
               'Jimmy Brown's' knowledge, you (IA)."  "No," he
               said, "I thought you wanted it that way."  "Well,
               maybe I slipped and told Sammy that.  Maybe I told
               Sammy."  You know I never told him that.  I never



Case 1:90-cr-01059-1763, Document 441-31/F6/2009/23/2030 Page 94 of 183 PageID #: 896

BQ 183A-3507                                    29

GOTTI:      told nobody to override "Jimmy Brown." I mean where
            are we doing here, Frankie?

LOCASCIO:   Anybody would ask ya, "Jimmy Brown" would'a asked
            ya.  This we don't want.

GOTTI:      Heh, but Christ almighty.  Where the fuck are we
            going here?  This is not, ah, yours for keeping.
            You're gonna die someday.  Even, if God forbid,
            hopefully, it's when you're 95, in your sleep, a
            heart attack.  But, like Angelo, he's gone; you're
            dead!  Gonna go to jail, or some fuckin' thing.  Is
            this what we working for?  To leave a fuckin' mess
            behind?

LOCASCIO:   Messes we don't need.

GOTTI:      For Christsake.

LOCASCIO:   Just got over messes.

GOTTI:      Minchia!  And you know I tell you the fuckin' truth,
            Frankie, I, I don't believe I'm lying.  And, more
            important, I don't believe in that fuckin'
            bulldozin'.  That's what made me hate, really,
            fuckin' Paul.  You, ya, you couldn't get a fuckin'

Case 1:90-Ca010559-17063, Document 441-31/FIL6009/237203 Page 95 of 183 PageID #: 897

BQ 183A-3507                                      30

> ham sandwich.   Everyone is right.   He sold the
> "borgata" out for fuckin' construction company.  And
> that's what we're doing. . That's what we're doing
> right now.   I don't know if you could see it, but
> that's what we're doing right now.   Three, four guys
> will wind up with every fuckin' thing.  And the rest
> of the "borgata" looks like fuckin' waste.

LOCASCIO:    In defense, in defense (IA) what would happen to
             these businesses if he didn't put these people?
             (IA).

GOTTI:       (IA).

LOCASCIO:    Would, would there be other people involved?

GOTTI:       Sure!

LOCASCIO:    Except for Marine I'm talkin'.

GOTTI:       Sure!  Sure they'd be involved, what are you talking
             about?

LOCASCIO:    In other words, the people that he's putting are
             taking away from (IA), from others.

Case 1:90-cr-01059-ILG Document 441-31 Filed 09/23/2003 Page 96 of 183 PageID #: 898

BQ 183A-3507                                    31

GOTTI:      Sure.

LOCASCIO:   That ain't right.  That ain't right!  Eh, if there
            was nothing there, and he's creating something,
            that's different.

GOTTI:      Yeah, but you're creating under this flag!  Frankie!

LOCASCIO:   It's not like (IA).

GOTTI:      Where, where's my piece of these companies?

LOCASCIO:   Right.  That's another thing.  But there's nothing
            wrong in creating new.

GOTTI:      Yeah, but where, er, let me tell you, Frankie,
            there's creating and there's creating.  Now look,
            Frankie.  You wanna put your head with a fuckin'
            Sammy.  You're too bright for that.  (Pause)
            "Di B," did he ever talk subversive to you?

LOCASCIO:   Never.

GOTTI:      Never talked it to Angelo, and he never talked to
            "Joe Piney."  I took Sammy's word that he talked

(31)

BQ 183A-3507                                        32

                    about me behind my back.  Louie, did he ever talk
                    to any of you guys?

LOCASCIO:     No.

GOTTI:        I took Sammy's word.  Louie Di Bono.  And I sat with
              this guy.  I saw the papers and everything.   He
              didn't rob nothin'.  You know why he's dying?  He's
              gonna die because he refused to come in when I
              called.  He didn't do nothing else wrong.

LOCASCIO:     You have that meeting yet?

GOTTI:        No.  Gonna have it tomorrow.

LOCASCIO:     Because at that meeting, I predict he's gonna bring
              you fifty.

GOTTI:        But I wouldn't take nothing.

LOCASCIO:     You don't think...

GOTTI:        I wouldn't even take it, Frankie.  I'm not a goon.
              I'm not a grease --

LOCASCIO:     He's buying it, he's buying lunch.

(32)

GOTTI:          Never take me, bring me to lunch, Frank. Frank, if
                it wouldn't be for the other guy I wouldn't take
                nothing.   That I shouldn't see my kids alive.   I
                will not take nothing.   This guy can't bring me
                nothing.    But I should take that and more, the
                cocksucker!  I wouldn't take nothing from him.  He's
                gonna get killed because he, he disobeyed coming.
                And we had no bad intentions when we first sent him
                his fuckin' (IA).  But where are we going?  What am
                I doing here, Frankie?  Where are we going here?
                Every fuckin' time we, we're parking a fuckin'
                company.  Where's my end of these companies?  These
                other people wanna open companies.  Gonna give me
                a, a sixth.  Gonna give me 10,000 a fuckin', every
                two weeks, a month, whatever the fuck it comes to.
                Where's my fuckin' end of these things there that
                my name is all over the fuckin' lot?  A fuckin'
                hard-on like Johnny G.  He's one of the reasons
                Genie's in jail.  He's a fuckin' hard-on.  (Pause)
                Go against your own cousin.  Go against your own
                uncles.    Fuck you think you're kidding?    Love
                nobody.    Love nobody.   Who do you think you're
                fuckin' kidding?  (Pause)  I, and I'm not gonna get
                myself sick, Frankie.  And he's, he's, he's creating
                enough (IA) these fuckin' situations.  But one thing

                                                                    (33)

Case 1:90-cr-01059-RJD Document 441-31 Filed 09/23/2030 Page 99 of 183 PageID #: 901

I ain't gonna be is two-faced. I'm gonna call 'em, like I see 'em. That I gotta do 'til the day I die.

LOCASCIO: What was he telling ya? (IA).

GOTTI: Yeah. I was gonna, I, I, I waited, a lot of people (IA) see even Johnny D'Amato knew it. You know I was gonna over it tonight. Today I would bet, I don't feel that fuckin' good (IA) it looked like it had the earmarks of a nice day and to, to get all this Christmas shit out of my system, and I go...

LOCASCIO: (IA) names suggested.

GOTTI: Yeah, yeah. I don't know. Think, have a few names (IA) Frankie. But I don't know if I wanna do that either, no more. I don't know about this tokenism shit. What, what, where these, what did these guys ever do? Tomorrow they'll ask me to make them "Captains." Ya know? What, where are we going, Frankie, here? Gotta prove whether we need them, and who deserves it. This here, tokenism shit, is over, Frank. I'm, I'm a (clap sound) I'm, I'm sick, Frankie, and I ain't got no right to be sick. I ain't got no right to be sick. I had twenty "Capodecinas" with us Saturday. Ten or twelve were

ours. Five or six from other "Families." I, I
excused myself. I told them, "I gotta go meet a
girl." I went to the hospital to see Sammy's son.
I gotta get myself double sick. I came home I got
caught in that fuckin' traffic. The next morning,
triple sick, we're at the cemetery. Then go make
other guys happy, at a (IA). Then go to the fuckin'
wake. I, I'm not going partying. I'm not going to
race, popping girls. I'm not doing nothin' fuckin',
selfish here, know what I mean? But I'm not gonna
go every fuckin' block and hear a "beef." And I
keep telling people it's my fault. "I told him to
do that. I told the guy to do this. I told the guy
to do that." What the fuck am I nuts here? If I
go to jail they'd be happy! "Minchia, (IA) we
finally got rid of him." Hah! They don't know,
they got no new "cazzu!" (prick). (Pause) I wasn't
even gonna say nothing, until he was here. Ya know,
I wanted to have the two of youse together. But
I'm, I'm getting myself sick, Frank. I (IA) sick.

LOCASCIO: Gotta get it out. You gotta get it out.

GOTTI: I, I don't...

(35)

Case 1:90-cr-01051-LTG-43D Document 444-31 Filed 03/23/2003 Page 101 of 183 PageID #: 903
SGA098

BQ 183A-3507                                                    36

LOCASCIO:    You can't hold it.

GOTTI:       ... wanna get myself sick.

LOCASCIO:    You can't hold it.  So, tomorrow, I think it's the
             best thing for you...

GOTTI:       This guy's look, these guys look at me, these people
             look at me.  But they, I don't even have to explain
             it.  Anybody that don't see what's going on, is a
             fuckin' lunatic.  Is a fuckin' jerkoff.  Hand-job,
             and that's the end of it.  I mean, you kidding?  You
             wanna take these fuckin' guys that were welfare
             cases.  People hanging around Frankie De Cicco.
             Welfare motherfuckin' cases!  They end up (IA).
             Nobody is gonna act that.  Just by that.  Frank...

LOCASCIO:    If I could (IA) here comprehend that.  I know, I
             know what you told me.  But I can't comprehend that.
             Who (IA) fuck asked that he's this?

GOTTI:       Oh, he's in good shape, you know that.  Oh, you
             don't know he's in good shape?  Whoever gave him
             the money, if Sammy gave him the money, or you gave
             him the money, the guy's in good shape, come on.
             The guy was a bum.  He owed every fuckin' Tom, Dick

(36)

Case 1:90-cr-01051-PLF-GMH Document 444-3 1 Filed 09/23/2003 Page 102 of 183 PageID #: 904
SGA099

and Harry will you please? The guy was a bum! You, do you know the guy?

LOCASCIO:     I don't know him. But you told me.

GOTTI:        I know the guy intimately! For 20 years. What am I talking? '68 is what? Twenty years. I know the guy intimately 21 years. Do you know what "intimately" is? Used to bring the coffee to me and Frankie. (IA) shot? That was this scumbag. So, you don't know the guy, that's what I'm saying, Frank. It's amazing how, I don't understand some people. I don't (pause) I got 500 guys that (IA) none of 'em are like that.

LOCASCIO:     Even me.

GOTTI:        We got guys that have been hanging around, caught with (IA). I could do that. Can't I do this here? Can I put guys in spots? Can't I fuckin' give guys, ah, these positions? And make guys rich? I never did that for one guy, and I'll never do it for one guy. This fuckin' cripple downstairs, "Jackie Nose," I give him, every week out of my pocket. Every week, Frankie. Every week he gets $2,000. Where do ya think I get it from a fuckin', the

(37)

BQ 183A-3507                                                      38

          mulberry bush?  That "junk" business?  I told him
          the other day, "When you, when, when are you gonna
          start providing for yourself?

LOCASCIO:    Start providing.  Jump off with a, a reduction.

GOTTI:       Do some fuckin' thing!  (Pause)  But I'm not, ah,
             again I'm not "beefing," Frankie.  That's not the
             way things, and I told him, "What am I creatin'
             here?"  Ya know, I don't create a cripple here.
             Ah, even these other guys, ya know, you gotta get
             a tongue lashing, you'll get it.  I gotta get one,
             I get it (IA).  Look at this fuckin' guy, too.
             Jesus Christ!  You know what this guy told me today?
             This, ah, carpet guy?  "Minchia," he says, ah...

LOCASCIO:    (IA).

GOTTI:       ... "I thought I had the fuckin' contract.  As soon
             as your name comes up, I get pushed out by our
             people!  With, with the construction company,
             (mumbles) I, I, I, I was making all kinds of money,"
             the guys says.  "I was the biggest in the city.  I
             made you a partner, I can't get a job!"  He don't
             make... minchia!  My fuckin' nose is wide open!  You
             fuckin' kiddin' somebody, or what?  And I see it.

(38)

Case 1:90-cr-01051-LDC43-D Document 144-3 1/Filed 03/23/2003 Page 104 of 183 PageID #: 906
SGA101

> I see it myself. I don't need him to tell me, I
> don't need nobody to tell me that. (Pause) Fuck,
> where ya going here? Where ya goin' here? (Pause)

LOCASCIO:       Who's that builder Marano? Builds in the Bronx, ya
                says?

GOTTI:          He might be, Frankie I, I, I, I lose. I know the
                guy, Jamie, that's aligned with us. The guy we meet
                today. I was waiting for you to meet him. (IA).
                Who do I got prove this kind of shit. I don't, I
                don't know nothin' about building. I don't (IA),
                anything. All I want is a good sandwich. You see
                this sandwich here? This tuna sandwich? That's all
                I want, a good sandwich. (Background noise) I was
                thinking, Sammy gives me the shit. I send that
                fuckin' moron I got downstairs for a brother, he
                says, "I have the, the, the plans there." Yeah, you
                have the plans there. Don't you think I wasn't
                gonna inquire about that? Every fuckin' guy that
                bids the job gets the plans! How you gonna bid the
                job without plans? How could you bid a job without
                plans? Without no plans you bid a job?" I didn't
                know that. 'Cause I told the guy. He's, he, he had
                the plans (IA). He says, "John, we all got the
                plans. Every fuckin' company."

(39)

BQ 183A-3507 40

LOCASCIO:     (IA) company (IA).

GOTTI:     What the fuck you crazy or what?

LOCASCIO:     You pay so much for the plans.

GOTTI:     Yeah!   You tellin', so you tellin' a "babbo" (a
          dope) like me, I don't know that.  How would I know
          about that shit, you know what I'm saying, Frankie?
          (Pause)  I put him in charge of that, and even more,
          for the simple reason, Frankie, I think he's
          qualified and capable.  And I love the guy.  Then
          I don't wanna have to fuckin' watch a situation, so
          I put him there.  If I put you there, I gotta watch
          you?  You there to watch it for us.  (Pause)  Fuck!
          Make 90 billion dollars!  You wanna make legitimate
          businesses?   Make them!   Give me a bird of the
          illegitimate shit, keep the fuckin' (IA).

LOCASCIO:     But ya see like (IA) you know "Jimmy Brown" is
          unique.  He's unique (IA) 'cause "Jimmy Brown" is
          there.   There's an older guy.  And that's all he's
          doing.

GOTTI:     That's right.

BQ 183A-3507                                                    41


LOCASCIO:     He ain't putting (IA).

GOTTI:        Right, and they make a candy store out of it.

LOCASCIO:     Jimmy's unique.

GOTTI:        And ya make a candy store out of it.

LOCASCIO:     Whatever he does, alright, comes in here.

GOTTI:        And what (IA).

LOCASCIO:     Should watch them.  Jimmy's unique.  And ya got to
              be nice (IA).

GOTTI:        But, but, but Frankie, you don't need (IA).  Once
              you got (IA) we're gonna be alright.  We get rid of
              these fuckin' lawyers and fuckin' "rat" tapes, we're
              gonna be okay, Frank.  We're all gonna be okay.  And
              nobody seem to create.

LOCASCIO:     Ah...

GOTTI:        But you don't cripple people.

BQ 183A-3507                                                42

LOCASCIO:    If, if I could suggest something.  Why don't you
             try and get somebody that is qualified (IA) in
             construction.   Make him just to handle the
             administrative things, you know?

GOTTI:       Well, you know...

LOCASCIO:    You know like ah, ah, ah...

GOTTA:       ... but you know what, Frankie...

LOCASCIO:    ... I think that would take the greed away from...

GOTTI:       What happen, you know what, Frankie?  That doesn't
             bother me.  It doesn't even bother me if he had six,
             seven companies, companies himself.  You know what
             I would tell him?  You would be, I'll tell him, "Let
             me know when ya feel you're gonna choke.  Keep that.
             (IA) you're gonna choke.  But you're not doing that!
             You're creating a fuckin' army inside an army."  You
             know what I'm saying Frankie?

LOCASCIO:    End up creating another faction.

GOTTI:       That's right!

BQ 183A-3507                                         43

LOCASCIO:    (IA) you're, you're saying it mildly.

GOTTI:       You know...

LOCASCIO:    Another faction.

GOTTI:       ... what I'm saying. And you're not gonna do that!
             I'm not gonna allow that.

LOCASCIO:    Shouldn't be.

GOTTI:       He wants it, he could have fifty fucking businesses!
             I don't care, Frankie.   If you, but I'm your
             brother, Frankie.   You know when I hear something
             good about a guy, I'll probably be in jail, because
             I get caught on tape bragging about it.   But, but
             Frankie, how many times you tell me (IA) Frankie,
             and Tommy Gambino we brag about his (IA).   Minchia!
             I'm proud for the guy.   I don't, I don't wish the
             guy no bad.   But Jesus, we're, we're bragging about
             a guy with his money.   (Coughs)   (IA) want his
             money?   If I hear good about you, and we got no
             problems, I'm glad.   Minchia!   Ah, ah, I got one
             less Jackie to worry about, alright?   But you ain't
             gonna create a fuckin' faction.   No.   That, that

                                                        (43)

BQ 183A-3507                                          44

        shit, I saw that shit here.  I saw that shit and I
        don't need that shit.

LOCASCIO:   No good.  And that's what got him weak.  That's what
            got him weak.

GOTTI:      Sure.  But you'll see...

LOCASCIO:   The reason I don't want to lead to that.

GOTTI:      You'll see that, Frankie.  I mean...

LOCASCIO:   "Let's get this and let's get that, and maybe we
            can sweeten this here, maybe we can get this here.
            How, how could we do?  Well, we get rid of that."
            No good.  That's no good.

GOTTI:      We're making fuckin' laughing stock.  We be back
            like other "families."  Laughing stock.  (Pause)
            I called the shot.  They already got that in the
            Colombo "Crew."  Now they're gettin' it in, ah, Vic
            and "Gas".  For what?  The troops can feel it.

LOCASCIO:   (IA).

Case 1:90-cr-01051-ILG-JBG-3 Document 444-31 Filed 03/23/2003 Page 110 of 183 PageID #: 912

GOTTI:          Ya kiddin'?  It's only natural, Frankie.  But it
                shouldn't be here.  It shouldn't be here.  We see
                each other three or four times a week.  It's not
                like the guy's in Boston, and we're in fuckin'
                Providence.  We see each other three or four times
                a week.  There should be nothin' that we can't
                fuckin' talk about quick!  Over with, next problem!
                Ya know what I'm saying?  The thing that I don't see
                you for three months.  You got a problem up there,
                and I don't, I don't handle it for three or four
                months.  Minchia!  I'm a cocksucker.  We see each
                other, only three days (IA).  Thursday morning,
                that's it.  No big deal!  And Sammy I meet four or
                five days a week.  There's no, there's, there's no
                need for this fuckin' nonsense.  And you know,
                there's nothing wrong with you.  What are you giving
                these fuckin' kids?  Every kid who comes on your
                corner, are gettin' all our piece of the company
                jobs.  These are not your fuckin' private toys.
                Every Teamster foreman, the guy comes from his
                neighborhood.  Do you know that?  I see that, I see
                that.

LOCASCIO:       That's why Tuesday night is a big night.

GOTTI:          Hah?



LOCASCIO:        That's why Tuesday night is a big night.

GOTTI:           Yeah!   And that's not good, Frankie.   Come on!
                 Where are we going here?   Don't you think other
                 people see it?   How many guys told me this?   How
                 many "Capodecinas" tell me?   Don't I tell them?
                 Because I don't want a fuckin', I could even say
                 it, that he's wrong.   Will say I'm a jerkoff.   So
                 I say, "I want it that way.   That's the way I do
                 it."   (Pause)   You ask Joe Arcuri tomorrow,
                 Thursday, if I didn't say that Sunday.   "That's the
                 way I want it.   I don't wanna hear nothing."   But
                 I don't want it that way!   What am I saying that's
                 the way I want it.   (Pause)   You tell me, "I got a
                 million irons in the fire, 'Chief.'"   What am I
                 supposed to, love that?   Money's, ah, that's not me,
                 Frankie.   I never was that way, and I never will be
                 that fuckin' way.   I remember how I used to fight.
                 I wanna hear, if we got fifty jobs, maybe three, if
                 Frankie's got three cri, cripples in the Bronx, give
                 him three.   Give this other guy a cripple, over
                 there one.   Give that guy two, take four!   (Coughs)
                 Ya got cripples to be here, (IA) to come over here
                 on Saturday, payroll day?   Who has it coming to
                 them?   (Pause)   Ya know, I, I, I could never see

that, even years ago. Any good leader stops these
things. He won't let these things happen. Can't
see that situation happen.. Someone'll think you're
a figurehead, some jerkoff (IA) and that I ain't,
know what I mean, Frankie? You know, I didn't care,
ah, Louie Di Bono, opened up a business for him.
He hates Louie, Louie hates him. Why did they go
together, Frankie? (Tapping sounds) You know he
hate, he wanted permission to shoot Louie Di Bono.
Louie Di Bono wanted permission to get him shot.
Why did they go partners, Frankie? After Nasabeak
got sick. Well, if the two guys hate each other,
why would you think they become partners? Greed!
Both sides. I mean, ah, ah, ah, unless you can come
up with a fuckin' magical word. To me it was greed
on both sides. Him, he figured Louie, (IA) himself.
Louie figured he's close to the top, hearing
everything. Ya know, it was just a little greed.
(Mumbles) But ya know, he was looking to fuck him,
and he was gonna fuck him. (Clap) And just what
happened now. Know what I mean? We got another
fuckin' situation (IA) fuckin' (IA). They sent me
word in jail that you got ten percent. Guy never
had nothin' in his life; a fuckin' jerk like me.
Best I ever did was go on a few hijackings. Never
had nothing in my life. Ya know (IA) they grab

Case 1:90-cr-01051-PLG43-DC Document 444-31 Filed 003/237/2003 Page 113 of 183 PageID #: 915
SGA110

BQ 183A-3507                                                    48

everything.  (IA) bucks.  You're telling me, I got
ten percent of a million dollar business.

LOCASCIO:    Million, million dollars worth of business!

GOTTI:       Yeah.  Minchia!

LOCASCIO:    (IA).

GOTTI:       You know what I want you to do, Frank?  We gotta
             both buy chemotherapy with the money I got.  You
             know, so this is what we get after two and a half
             fuckin' years.  So, so why do you give me Arpege
             when you got a piece of (IA) a piece of what?  A
             piece of what?  And every time I see a kid that was
             a hobo, "Kid's a no good cocksucker."  You were
             telling me the story.  He tells who with this
             Frankie Fap?"  He tells me "This kid's a little
             cocksucker.  I'm gonna split his head.  I wish you
             would let me split his head."  This over three and
             a half years ago, four years ago.  Frankie De Cicco
             alive.  Frankie dies, the kid hangs around with him
             a little bit.  What a beautiful kid, the kid is.
             Got him the head Teamsters job.  The kid drives a
             fuckin' Mercedes Benz.  He makes somebody to
             straighten him (IA) take it easy.  Let's go back to



BQ 183A-3507                                                    49

> your first opinion.   Take it easy.   You know,
> Frankie (IA) where are we going here?   (Pause -
> radio in background)   No, no, good, Frankie.   No
> good.   I know you know, and I know I know (IA) that,
> that, that he knows it, too.   Sammy knows it.

LOCASCIO:     You gotta pull him up...

GOTTI:        Sammy, Frankie if I thought different, believe me
              Frank (IA) ya know, I love the guy.   Much as I love
              you, but I'm more.   But I just gotta say what I
              feel, Frankie.   He's my brother.   And if I think he
              done some wrong, I'll slap him on the hand.   He
              knows it.   You know that.   You know I'll pull him
              up a million times.   But do you agree with me to,
              to, he's doing...

LOCASCIO:     Definitely, it was wrong.

GOTTI:        I mean...

LOCASCIO:     There's creating, there's creating, and there's
              creating.

(49)

BQ 183A-3507                                                50

GOTTI:        I'm gonna go to jail and leave him in charge!  So
              obviously, I gotta love the guy!  I gotta think he's
              capable.  But not for things like this!

LOCASCIO:     I, I think you should pull him up and I think you
              should take away...

GOTTI:        (Coughs)

LOCASCIO:     ... (IA) business.

GOTTI:        I'm gonna do that, Frankie.

LOCASCIO:     Let him, let somebody else handle (IA).

GOTTI:        You know why?

LOCASCIO:     ... (IA) somebody else handle (IA).

GOTTI:        You know, you know what I'm gonna tell him?  I swear
              on my mother.

LOCASCIO:     I'm sure that you know somebody that, that's capable
              as him when it comes to business.  That could
              handle.

(50)

Case 1:90-cr-01051-ILG Document 444-31 Filed 03/23/2003 Page 116 of 183 PageID #: 918
SGA113

GOTTI:          Here's why...

LOCASCIO:       Ya start thinking about it...

GOTTI:          I could.  Yeah, yeah, I could.  You know why I
                didn't, Frankie?  I put it all in his lap for one
                reason, Frankie.  You know something, Frank?  They
                used to bring me a pay (IA) times five weeks (IA)
                seventy-two hundred (IA).  (Coughs)  But Frankie,
                you're the underboss.  You're my brother.  Why I
                gotta see a paper, (IA) from you.  (Tap sound)  If
                you tell me there's two hundred thousand, there's
                two hundred thousand, Frankie.  So, he used to bring
                me the paper.  I told him, "I don't, er, Sam, don't
                bring me no paper.  I don't wanna see no paper."
                "You know up there I hear?"  "Yeah, but what happens
                if something happens to me?  What if that happens
                to both of us?  Look, I don't wanna see no paper."
                I haven't seen a paper in two years.  'Cause I
                didn't want to find this out.  "Joe Piney" used to
                show me the paper.  You know why I used to look at
                'em?  Frankie, and I love "Joe Piney."  He's a
                fuckin' idiot.  He used to go like this.  This, he
                didn't know what the fuck he was talking about.  I
                know that.  But I figured, I didn't know what I'm
                talking about.  He didn't know what he was talking

(51)

Case 1:90-cr-01051-RJD Document 444-31 Filed 07/23/2003 Page 117 of 183 PageID #: 919
SGA114

BQ 183A-3507                                                        52

about. So he won't know that I don't know what I'm
talkin' about. (Laughter) Fuck this. I swear to
God, Frankie, I still didn't show it. "What's
this?" I used to go (IA). "Huh, hah."

(Laughter)

LOCASCIO:     (IA).

GOTTI:        (Coughs)

LOCASCIO:     "Hah, hah, hah, hah, alright?"

GOTTI:        So like with Sam (IA) Sam, not you. "Whatever you
              say is there, that's what's there."

LOCASCIO:     (IA).

GOTTI:        "Take what you gotta take. Sammy, if you were broke
              take 20 percent, if there's such a thing." There's
              six guys in the fuckin' city. Whether it's right
              or wrong, I (IA). I would be a billionaire if I was
              looking to be a selfish "boss." That's not me. You
              don't know the best part of it. A guy passed a
              remark just recently. I swear on my mother.
              "Chief, can I get 10,000 a week?" (IA). I went up



Case 1:90-cr-01051-LTS Document 444-3 1/F&3 003/23/2003 Page 118 of 183 PageID #: 920
SGA115

to see him. Fuckin' MCC third floor. "What do you
think this some fuckin' gang here? What do you
think this is a park here? You a millionaire
fifteen times over! What do you need (IA) bother
ya? What are you kiddin' somebody?" Then he said,
he said, "I was just kidding." "Yeah, but the guy
you were kiddin' (IA) was a half a cop! I go to
jail for that stuff. I don't need you to put me in
jail." They don't say it, Frankie, but what I'm
getting at is, I don't, I don't, I don't, if I was
that other motherfucker! Everything goes on there
and nothin' goes out. You know I'm taking care of
the people. If you don't believe me, you take care
of them! God, God fuckin' bless you! Gimme 50
percent, take the other 50 percent. Knock yourself
out because I'll be getting way more than what I'm
getting now. What? Bring in papers, we don't need
no papers. We brothers, Frankie. We don't need
none of these papers, and shit nothin' like that.
We don't need none of that. We're too close for
that shit. Know what I mean? But Jesus fuckin'
Christ! Ya see I got that kind of fuckin' trust and
put that (IA) "Cosa Nostra." We are where we
belong. We're in the positions we belong in,
Frankie, and, and nobody could change that. But
this business, thing. Ahh, it's brothers! Please.

(53)

54

And if you robbing people on my behalf, stop.  When
I say "robbing," I don't mean robbing.  You know,
ya taking work out of other peoples' mouths.   You
wanna rob people on my behalf, stop on my behalf.
You feel you gotta (IA) yours.   Like you said,
Frankie, guys gotta a right to be in businesses.
(IA).

LOCASCIO:     As long as you're off the record.   (IA).

GOTTI:        (IA).

LOCASCIO:     Not like you're gonna outsmart them.

GOTTI:        (IA).  It's like you were put in charge of the gas
              and six months from now...

LOCASCIO:     What, what, what happened?

GOTTI:        Tellin' people I, I think he just told me he got
              thirteen or eleven thousand (IA) he's gonna come
              down.   He wages a fuckin' battle and then he, ya
              see today's paper?  With that?  Frank, you should
              read the column about the thing with that "Frankie
              the bug", "rat!"  But look how he get in the paper.
              But, anyway, listen to me.  (Tap sound)  Ahhh, six

(54)

BQ 183A-3507                                    55

months from now, nobody's gonna be in the gas
business but you? You'll be in the gas business,
Tory, ahh, Vinny. Whoa! Wouldn't it be the same
thing? Ya see how crazy that sounds? Listen up,
Frank. Wouldn't it be the same thing? Think about
it. It wouldn't it be almost the same? Would it
be fair (IA)? That's all I try to say. And I love
him. And I'm sick I'm even saying what I'm saying.
And I love Frankie. I actually, three different
appointments the other day. Three people. They
think I'm (IA) around.

LOCASCIO:    All (IA) Sal (PH).

GOTTI:       Yeah.

LOCASCIO:    (IA).

GOTTI:       (IA) they're all "beefs." They're all saying,
             (coughs) (IA).

LOCASCIO:    It ain't, it ain't no "beef" because nobody (IA)
             what I'm telling, John, right.

GOTTI:       Minchia! Maybe Joe Watts'll be running the whole
             business. But I feel like a fuckin' hard-on.

(55)

Case 1:90-cr-01051-ILG-LB Document 1144-3 1 Filed 03/23/2003 Page 121 of 183 PageID #: 923
SGA118

'Cause I keep saying, "That's the way I want it."
I don't even know what the fuck I'm talking about.

LOCASCIO:      We're the only ones that can talk (IA).

GOTTI:         He had the appointment (IA).

LOCASCIO:      (IA).

GOTTI:         (IA).  Listen to me.

LOCASCIO:      That's it.  There nobody else.  No "Capodecina,"
               nobody else.

GOTTI:         Listen, listen.  The guy turned around and said that
               I was told, "That's a 'Family' company and I'm a
               'Family' company.  And this is the way it's gotta
               be."  Minchia!  You know enough to use them terms.
               The guy didn't make up no terms.  "This is a
               'Family' company, and this is a 'Family' company."
               Don't you gotta feed them a little bit, too?  I mean
               you know enough to use that terminology.  You get
               what I'm trying to say?  You get this other fuckin'
               "male-minchiata" (lousy fuck).  I wonder when he
               went to the rug business, this cocksucker.  Minchia!
               You giving it to a fuckin', another guy.  He can't



57

have it.  I told you this is the one I want to have
it.  He knew the fuck that he was a "rat!"  I won't
give five cents.  I swear on my son's grave.  And
if I did, who's business is it but mine.  But today
if the best part, if the guy, he's says, "Nobody's
help to the guy that's in jail."  You cocksucker!
They got a comp, they're in the business nine years.
Joe Gallo told me.  What's, when was the last time
me and Joe Gallo was together, four years ago?  When
that half-ass got sick, three years ago?  The fuck
are you (IA)?  The business, you, you just chasing
everybody out of town?  (Pause)  The fuck, I mean,
ah, ah, it can't be, Frankie.  (Pause)  It
definitely not fair.  It definitely not fair.  And
then...  (Pause)  Probably would say, Frankie, he
never (IA).  They chased him out of (IA) 'cause
Danny, after all, was straightened out.  Frankie De
Cicco took Sammy, (IA) Danny to me.  You know how
I felt about him.  Probably won't say he never said
anything about a bomb, he called the club, big bomb.
I'll pluck his fuckin' answer.  But they stole from
me.  I let him go into (IA) hellacious thing.  And,
as you see, I gave him "Buckwheats."  Okay, you're
right.  Never got nothing, Frankie.  Never got five
cents.  My birthday, they put 3,000.  That's what
I got from this guy.  I swear on my kid, I'd rather

(57)

Case 1:90-cr-01051-ILG-RML Document 444-31 Filed 03/23/2003 Page 123 of 183 PageID #: 925
SGA120

die. I never got a fuckin' tie from this guy. I got a jumpsuit I won't even wear because it ain't ours, Frank. (Coughs) But why are they such arch enemies? These guys were shit and stink, Johnny Gammarano and him. I never saw him without seeing the other.

LOCASCIO:    Were always partners.

GOTTI:       Yeah! So, now, I'm laying in bed, I said, "Could it be, this guy, who felt he had the strength in each other, would even chase his own fuckin' cousin." You were sitting at the table that wasn't strong arm, personnally get them out for a reason. Now just the effect it had." I said, "Who, since when are you and Johnny arguing?" When did this rift come...

LOCASCIO:    Not on good terms.

GOTTI:       Not on good terms (IA). "Is this what you want me to do?" I should never see my kids alive. You know, that's (IA). You know that's, that's not what this is about. This is not what this is about. Somebody got the wrong con, concept, this fuckin' guy. And I don't go for it. I don't go for it.

(58)

Case 1:90-cr-01051-LTG43D Document 444-31 Filed 03/23/2003 Page 124 of 183 PageID #: 926
SGA121

59

I can go for anything.  I can tolerate anything.
But that I ain't gonna tolerate.  What the fuck are
we doing here?  My own fucking brother comes over
to me.  He's a fucking "Acting Capodecina," he comes
over to me and (IA) these guys are four or five guys
with me that I whacked.  Who knows who half these
cocks '(IA) away.  Or Georgie De Cicco, this Louie,
the rest of these fuckin' guys.  Whoever tried them?
Whoever will try them?  But mean-fuckin'-time, he
comes over to me, when he's got a problem, I tell
him, "Go see Sammy, go see Frankie."  Tell once,
fifty times.

LOCASCIO:      He come today.  That, you know, that he seen him
               the other day.

GOTTI:         Who?

LOCASCIO:      That Eddie!

GOTTI:         They gonna hear about this crook.

LOCASCIO:      So Pete come over.  He's got, "This guys wants to
               see my brother about that Frank (IA) remember?"
               Says chase him!  Tell him that your brother doesn't

Case 1:90-cr-01051-LTG43D Document 444-31 Filed 03/23/2003 Page 125 of 183 PageID #: 927
SGA122

BQ 183A-3507                                            60

                    want to see him, anyway.  He told ya, he called
                    him."

GOTTI:              I told him a million times, "You got anything,
                    unless it's got to do with your mother," meaning my
                    mother, "I don't wanna hear it.  See Frankie, or see
                    Sammy.  They're always available.  Don't bother me!"
                    He could tell you if I turned a little (IA).

LOCASCIO:           And after he told him, here in the back room, and
                    they were still there talking, "Ba, ba, ba."  I was
                    gonna (IA).



Case 1:90-cr-01051-PLG-43D Document 444-3 1/Filed 003/23/2003 Page 126 of 183 PageID #: 928
SGA123

(Pause)

LOCASCIO:      Bossed them around (IA). .

GOTTI:         I can push (IA) because nothing. Well tell me who?
               Tell me who benefitted by, by, by making me a
               partner. And I became a piece. I got a piece of
               something. (Pause) I can't, I can name a dozen
               guys (IA). I don't service nobody. Absolutely
               nobody! Purposely don't make my brother, Pete,
               service nobody. I purposely don't. The only thing
               I make my brother, Pete do, is he picks up about ten
               thousand (10,000) every month, or every other month
               the kid, from, ahh... (tapping sound) ah, ah, Carl.
               And he brings it to Sammy. You (IA) Frank? Or you
               get it (IA) so sure about Carl (IA) expose that.
               No! Nah, ah... I trust Carl with, ah, just about
               anything. Get what I mean? Because I mean if he
               was gonna "rat," he ain't gonna wait two fuckin'
               years (IA) I know three years. But you understand
               what I'm trying to say, Frankie? If I got five
               hundred (500) companies that belong to me, when you
               say, "Well, they belong to you -- me, they don't
               belong to the 'borgata!' Yeah. Well, when you're
               the 'Boss!'" So, you were sure that (IA) eh, eh,
               Sammy is the "Consigliere." He could turn the whole



Case 1:90-cr-01051-PLC-43D Document 44-31 Filed 03/23/2003 Page 127 of 183 PageID #: 929

fuckin' industry into a private playpen. What could
I tell you to do? You know what I'm saying. And
I could (IA) if I didn't know. But if I take every
fifty (50) companies, and I say, "Frank, these are
what we got."

LOCASCIO:      (Coughs)

GOTTI:         "Handle the fifty companies." "How bad a guy could
               I be? Can you see? If I never see, if I never see
               one, I tell you, "Frankie, you gonna see that guy?"
               "Yeah?" "Tell him this, this and this."

LOCASCIO:      You know what (IA) I gotta say it. You're telling
               of all the businesses that he's got, you don't get
               nothin? (IA).

GOTTI:         Other than that I know of. Well let me put it this
               way, Frankie. I was getting X-amount of monies, the
               day I became the "Boss," when he had nothing to do
               with this. And "DiB" and the other guy, and I said,
               "Sammy, ah, ah, ya got one, ah, a lump one, these
               fuckin' guys.   We grabbed a hundred thousand
               (100,000), got a, twenty thousand (20,000) went to
               Di Bono.    Twenty thousand went to Bobby Sasso
               (coughs) (IA) three ways I got maybe twenty or

(62)

BQ 183A-3507                                              70

> twenty-five thousand (25,000).  He took the check
> and I got booked out.  Some kind of Chinese checker
> way.  Now, with the money that comes in, that's my
> business if I wanna distribute it, Frankie.  Some
> day I'll show you what I take out, what I give out.

LOCASCIO:    No, but I'm talking about the businesses that he's
             creatin'...

GOTTI:       (IA).  Well, tell me, if I am, then I'm crazier
             (IA).

LOCASCIO:    I, I don't know it.

GOTTI:       (IA).

LOCASCIO:    ... I was asking you because every time he talks,
             like this tire business.  He says, "Well, me and
             John, John and I are gonna get so much.". And the
             other thing, you know, like if there (IA).

GOTTI:       Well Frankie!

LOCASCIO:    (IA).

GOTTI:       Frankie, well, Frankie, let me say something.

(63)

BQ 183A-3507                                    71

LOCASCIO:       So I assume that...

GOTTI:          Well let me say something to you, Frankie, a minute.
                The monies didn't change.  Like he said to me, like
                it was about ten weeks, he turned in, he turned in
                two-ninety (290).  He said, "I turned in two-
                ninety."  He didn't turn in two-ninety.  He turned
                in sixty-three thousand (63,000) was my birthday
                money!  Youse gave that to me as a birthday present!
                Am I correct, Frankie?

LOCASCIO:       Right.

GOTTI:          You weren't, 'cause that, is that, is that a "Cosa
                Nostra?"  But then I'm in the wrong fuckin'
                businesses.

LOCASCIO:       (IA)...  Shouldn't have (IA).

GOTTI:          Come on!  (IA)...

LOCASCIO:       (IA) be, anyway!

GOTTI:          Yes, well, so that's what I'm saying.  So, if the
                figure's always been around the two bracket.  The

(64)

Case 1:90-cr-01051-PLG-43-D Document 441-31 Filed 03/23/2003 Page 130 of 183 PageID #: 932
SGA127

two-forty (240) like that.  Unless we make it go
longer and longer.  But that's not what I'm getting
at.  I'm not (IA) but I don't give a fuck if there's
nothing there, Frankie.  I don't want nobody get in
trouble.  Fuck the people, and that's the only way
it goes!  An ends an end.  But what I'm, you were
saying these personal businesses, and when I get
told there's a thousand (1,000) from this company
and a thousand (1,000) for me?  Not to my knowledge,
Frankie, best I can answer you.

LOCASCIO:       Alright.  Well, because this tire business, and we
                discuss, I discussed it with him.  'Cause if ah,
                not, not to get into it.  He says, "Out of the
                dollar, John gets thirty (30) cents, I get thirty
                (30) cents, and there's forty (40) cents left.

GOTTI:          Yeah but, but, Frankie, I...

LOCASCIO:       What, what it's gonna come about?

GOTTI:          (IA).

LOCASCIO:       (IA) the way he's got it.

GOTTI:          How did it come about...

BQ 183A-3507                                        73

LOCASCIO:    He's got the car (PH)...

GOTTI:       Ah...

LOCASCIO:    The pie cut up already before we even, ah...

GOTTI:       (Coughs)

LOCASCIO:    (IA).

GOTTI:       I'm not saying the guy forgets me, Frankie.  And,
             ya know, I won't tolerate that, anyway.  I'm not
             saying that, Frank.  This whole conversation (IA).
             We know what I'm in here for.

LOCASCIO:    (IA).



GOTTI:          Yeah! Remember that time? You fuckin' (IA) and I
                asked you, you told me that's my only livelihood
                this job.  That was three years ago.  Couldn't be
                (IA).  When I come out of jail.  Yeah!  So, okay,
                less than three years.  In other words, you told me
                your only livelihood.  Since then, you're in the
                building business, you in the carpet business, you
                into this business!  You cocksucker!  There ain't
                nothing you ain't into!  Where'd ya get this from?
                Which way?  Maybe you become "Representante?" (IA).
                Where'd all these come?  I mean, do, do you follow
                me, Frankie?  And...

LOCASCIO:       Maybe it was wrong for creatin' new...

GOTTI:          Yeah, but you're using my fuckin' flag to conquer
                the fuckin' market.  Who the fuck are you?  You're
                creating all these things here.  I got a made guys
                that want this business.  I got guys in these
                fuckin' businesses.  They, they, they get nothing.
                (Sound of something falling to floor)  You know
                that.  (Sound of something on floor)

LOCASCIO:       But that's what, it came out with this carpet...

Case 1:90-cr-01051-PLG-43D Document 444-31 Filed 03/23/2003 Page 133 of 183 PageID #: 935
SGA130

GOTTI:          Came out with everything, not only the carpet thing.

                C'mon. Them other kids got thrown out of three jobs

                for these for, for, for, for "Johnny come lately"

                company. And Johnny, they can't do the work that

                they can do. Nobody can do the work Marine does.

                Don't take my word for it (IA). You heard me say

                it. They know the guy does the best work, but they

                don't like Bosco! Who the fuck cares about Bosco!

                A guy ain't gonna take it on the chin for a million

                dollars because he don't like Bosco. Get the fuck

                outta here! Tell that to somebody else, a "babbo"

                (dope) who don't know any better. You don't like

                Bosco! And I don't blame you, 'cause I'm not crazy

                about the guy. But let's not, let's not jerk each

                other off here, ya know what I mean? (Pause) But

                I tell ya, Frankie, for me to get sick, and I'm

                getting myself to the point, where I got myself sick

                because I told him twice already, I told him,

                "You're there." I don't butt in. When the fuck do

                I butt in? This like if you're in charge of

                something, Frankie. I don't question. (Coughs)

                It's not in my makeup. (Coughs) "Cosa Nostra," I

                wanna know everything. But these things, I don't

                give two fucks about. Ah, you punish a guy

                purposely. Minchia! You torture the fuckin' guy!

(68)

BQ 183A-3507                                                    80

You fuckin' hard! Your company gets every job!
Everywhere you look. He's got five jobs that they
can't even do (IA) they got brand new company three
times bigger than you; that's my partner, he do one
job! Then fuckin' we nuts altogether here or what?
And I send him word, I told you, I didn't send
another guy to go see Bobby Sasso. I told you to
go. You're with me. You're my representative to,
to, to Bobby Sasso. Tell Bobby do me a favor and
to give him a job.

Case 1:90-cr-01051-LTS Document 144-31 Filed 03/23/2003 Page 135 of 183 PageID #: 937
SGA132

GOTTI:          And, I'm the "Representante," four fuckin' years.
                I got no companies! The only fuckin'´thing I did,
                I went partners with a company that I put into
                business, five years ago, Albie Trimming, when Paul
                was alive. Won the permission from him to fuckin'
                do it. Got a fucking tongue lashing, it's on the
                tape. And I just now got on the fuckin' payroll.
                I'm trying to keep my ass out of fuckin' jail, no
                other fuckin' reason. And this fuckin' Marine
                Construction that the guy got chastised for, for
                having me as a partner. The guy got chased out of
                the fuckin' country. He used to get five (5) jobs



a year.  Now he gets none, none a month.  Get the
fuck outta here!  (IA).  Gotta chase him (IA).

LOCASCIO:    The association (IA) got association.

GOTTI:       (IA) no, me, I got, ah, the only thing I'm on,
             paper.  I get forty thousand a year from the
             (tapping sound), plumbing (IA).  We get, ah, a
             thousand a week from ah, ah, (IA)

LOCASCIO:    You're down for a hundred a year.

GOTTI:       Nah, that's it, Frank.  (IA) just now tax purposes
             eighty-five thousand.  At Easter and I'll be like
             at a hundred twenty-five or thirty-five thousand,
             is good for me, Frank.  I, I (IA).

LOCASCIO:    You don't -- you don't spend more than that shows.

GOTTI:       Ah,... ah, you know, you know why, why Frankie, even
             though I never touched it (IA) my wife gets like
             thirty-three thousand.  So, now it reads another
             thirty-three on top of it.  Hah?

LOCASCIO:    Between you and your wife, it's another thirty-
             three on the top.

GOTTI:       Yeah, but not only that, Frank?  I don't, we don't
             have no, ah, mortgage or anything.  The only bill,
             bills that we got is the fuckin' car payments.  Ah,
             400, 300 and change.

LOCASCIO:    (IA) this.

GOTTI:       Yeah, nothing, I got nothing!

LOCASCIO:    That's nothing, yeah.

GOTTI:       All my kids are gone.  We get outta the house.

LOCASCIO:    Ya all cover...

GOTTI:       Peter, me and my wife, we pay for that Blue Cross,
             and, ah, and the fire insurance on the house.
             Nothing, believe me!

LOCASCIO:    And Blue Cross, are you covered under Blue Cross
             (IA)?

GOTTI:       Yeah, but no, I, ah...

LOCASCIO:    Extended coverage or something?

(72)

88


GOTTI:        Yeah, special kind of coverage you know. God forbid
              (IA) nine years. But, ah, but then fire insurance
              on the house, stupid things. Ehh, forget about it!
              Couple a thousand a month, Frank.

LOCASCIO:     You're well within, well within.

GOTTI:        Minchia! If I was ever, like I saying, I can get
              up to, me a hundred and thirty, and that other
              thirty we--, make a hundred and sixty a (IA) we're
              well within. (IA) you want to know the truth, if
              they followed us. Other, other than if they get a
              phone conversation with Becca. They followed us.
              Joe Watts has got the problem, not me! That fuck,
              he grabs two checks. Yours and the guy under the
              table you know that.

              (Pause) (Music in background)

GOTTI:        (IA) with this cold, coughing (IA) right? (Pause)

LOCASCIO:     I know this not the problem. (Tap sound).

GOTTI:        Hah?

(73)

Case 1:90-cr-01051-PJLTS43D Document 444-31 Filed 003/23/2003 Page 189 of 183 PageID #: 941

BQ 183A-3507                                              89

LOCASCIO:       I'm thinking about this problem.  And it's not a
                problem.  It's...

GOTTI:          It's not a problem.  He's gotta cut it out!

LOCASCIO:       Right.

GOTTI:          He's gotta cut it out!  And he's gotta cut it out.
                And he's gotta not treat these couple a guy -- now
                your're in Louie's "decina,"  who I "made" a
                "Capodecina," like they fuckin' special characters,
                and they get all these jobs that belong to the
                "borgata."  I mean, but, Frankie, every fuckin'
                Teamster foreman we got, we got nine (9) of them,
                they're all from that block.  Is that what this all
                about?  What, with the Teamsters came from that
                club?  You, you, I don't know what you follow me.

LOCASCIO:       Does he ever come and say, "I got an opening."

GOTTI:          Never!  But I never ask him to, Frankie.  Do I, do
                I have to ask you to do something if I put you in
                charge of something?

LOCASCIO:       Yeah, but if he's got an opening, he should come
                and...

(74)

GOTTI:          Yes, Frank.

LOCASCIO:       "I got an opening.  You got somebody?"

GOTTI:          No, never!  Never once.  (Steps)  Here's what he
                tells me.  Here's what he tells me, (steps) "Gee,
                that Joe 'Brewster', he didn't do such a good job.
                All the Teamsters foremen told me.  Alright, make
                John Gammarano help to you, if you want it.   "Go
                ahead, put him there."  "Gee, 'Jimmy Brown,' all the
                guys in, in, in the, in the garbage, they're not
                happy with him, hah?  Why don't you put, ah, Joe
                Francolino?"  "Forget about it!"  You know, where
                are we going here?   (Coughs)   And that's it,
                Frankie.  (Steps)  I mean, the... like I say, I, I
                know this life, and I know us, and I know love,...
                but I also have common sense.  (Steps)  (IA) over
                here...

                (Door is shut)

                (Music playing)



GOVERNMENT
EXHIBIT
300.18(7)
90 CR 105/(LG)

BQ46552.REV

## REGO PARK, NEW YORK

| FILE NUMBER: | 183A-3507 |
|---|---|
| SDNY NUMBER: | 2005 |
| DATE: | JANUARY 4, 1990 |
| TIME: | 7:15 P.M. |

PARTICIPANTS:

| JOHN GOTTI | GOTTI |
|---|---|
| SAL GRAVANO | GRAVANO |
| FRANK LOCASCIO | LOCASCIO |

| INAUDIBLE: | IA |
|---|---|
| PHONETIC: | PH |

BQ 183A-3507                                    113

Go fuck yourself! I think we go down, let them guys
give us (IA).  The rest of them guys might leave
and...

LOCASCIO:     We'll put them both names...

· (Steps)

GOTTI:        Tomorrow's Friday.  I won't be here ... I gotta ...
              Patsy wants to see me.   He says it's pretty
              important.  I don't know what the hell it's about.
              Tomorrow, Patsy Conte (IA) tomorrow.  It's gotta be
              that guy.  I already tell ya exactly (whispers) (IA)
              and now.

GRAVANO:      Did you?

GOTTI:        ... A casa (The house).  Until then I gotta hit him
              coming out of the fuckin door.  I don't give a fuck!
              (IA).

              (Steps)

GOTTI:        Right coming out of the door.  But uh, but uh, what
              the fuck.   What are you gonna do?   They blame

BQ 183A-3507                                            114

everything else on us, anyway.  They'll blame that

one on us.

(Steps)

(Door closes - radio in background - recording
stops)

(89A)

2644

Schiliro-Direct-Gleeson

1           Is that correct?

2    A    That's correct.

3    Q    Is he an official in the union?

4    A    No, he's not.

5    Q    Do you have an opinion based on his conversation

6    whether he exercises control of the union on behalf of the

7    Gambino Family?

8    A    Yes.

9    Q    What is your opinion?

10   A    By working hand-in-hand with Joe Brewster, he controls

11   Local 23 for the Gambino Family.

12   Q    Picking up where I left off, Gotti states:  You got Joe

13   Francolino working hand-in-hand.  Don't you see this or am

14   I, am I talking to myself, Frank?

15          Who's Joe Francolino?

16   A    Joe Francolino is a soldier in the Gambino Family.

17   Q    Does he have a position in the labor union?

18   A    No, sir, he does not.

19   Q    Gotti continues:  Am I lying, am I out of order here?

20   You're my underboss.  Correct me, Frankie.

21          At this point, Agent Schiliro, in your opinion, is

22   Locascio the official underboss of the Gambino Family?

23   A    No.

24   Q    In your opinion, what position --

25   A    He's the acting underboss.

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

2645
Schiliro-Direct-Gleeson

1   Q    What's the role of an acting underboss?

2   A    To advise the boss, to be an advisor to the boss, to

3   bring him in when thing gets out of hand.

4   Q    Turn to Page 10, please.

5        In the second line on that page, Gotti states:

6   But I was Marine Construction.  I said, maybe it's

7   because... and then he continues, in the next attribution,

8   it's my company.

9        Are there references to this company, Marine,

10  throughout this conversation?

11  A    Yes.

12  Q    What is your opinion as to John Gotti's relationship,

13  if any, with Marine?

14  A    John Gotti controls Marine Construction.

15  Q    On Page 10, middle of the page, Gotti states:  He got

16  nothing.  They got no job.

17       Based on this conversation, do you have an opinion

18  as to who or what entity got no job?

19  A    Marine Construction did not get a job.

20  Q    He continues:  If Angelo was sitting next to me, would

21  they have a job?  If Angelo was handling Bobby Sasso, would

22  they have a job?  You tell me.  Right or wrong?

23       Locascio:  Inaudible.

24       They would get all the jobs.

25       Do you have an opinion as to who the "Angelo"

A573

.3979

Gravano-Direct-Gleeson

1        We were told how to introduce one another.

2    Q    What do you mean by that, how to introduce one another:

3    A    When you introduce one made member to another made

4    member, you say he's a friend of ours or amica nostra.

5        If the guy is not a made member, you introduce him

6    as a friend of mine.

7    Q    You mentioned that one of the rules you were told when

8    you were made was there's no dealing in junk.

9        Is that the term you used?

10   A    Yes.

11   Q    What does that mean?

12   A    No drugs.

13   Q    Was there a penalty for that rule?

14   A    Death penalty.

15   Q    Was that rule enforced?

16   A    Yes.

17   Q    In 1990, at the time you were arrested, you mentioned

18   that your role was underboss, correct?

19   A    Yes.

20   Q    Was the rule still in existence, at that point?

21   A    Yes.

22   Q    Was the rule enforced?

23   A .  No.

24   Q    Did you have -- what was your role as underboss?  What

25   did you do?

MARY ANN STEIGER, CSR . OFFICIAL COURT REPORTER

3980

Gravano-Direct-Gleeson

1   A   First of all, I ran the construction industry and I

2   helped John run the Family.

3           I spoke with some of the captains and took care of

4   some of the problems in the Family.

5   Q   When you spoke to the captains, did you talk about

6   their criminal activity?

7   A   Some of them.

8   Q   Did you discuss their criminal activity with the other

9   members of the administration?

10  A   Yes.

11  Q   As a result of that, did you become familiar with the

12  criminal activity of the various crews in the family?

13  A   Yes.

14  Q   Were any of the crews involved in dealing narcotics?

15  A   Not with any kind of okay.

16  Q   They didn't have an okay to do it, correct?

17  A   No.

18  Q   Some of them were involved in it, nevertheless?

19  A   We assumed so.

20  Q   Was it overlooked?

21  A   Yes.

22  Q   Who were the ones you assumed were involved in

23  narcotics?

24          MR. KRIEGER:   Objection to the assumption, if the

25  Court please.

**A628**

4201

Gravano-Direct-Gleeson

1        MR. GLEESON:  Thank you, your Honor.

2        THE COURT:  Excuse me.

3        Before you proceed -- Mr. Krieger, are you ready?

4        MR. KRIEGER:  Yes, your Honor.

5        THE COURT:  All right, go ahead.

6    BY MR. GLEESON:

7    Q    Before the break, you testified that on November 16,

8    1989, you signed papers that ended your business

9    relationship with Louie DiBono, correct?

10   A    Yes.

11   Q    At that point, were there any outstanding liabilities,

12   as far as you were concerned, for those companies?

13   A    There was one, the tax, State tax.

14   Q    I am sorry?

15   A    The State tax.

16   Q    And what kind of liability was that?

17   A    It was about $129,000 owed in State taxes.

18   Q    Do you know which of the companies that you owed the

19   State tax?

20   A    Mario & DiBono Drywall.

21   Q    Now, after you got out of the company -- withdrawn.

22        You testified that John Gotti was going to take

23   over Louie DiBono, handling Louie DiBono?

24   A    Yes.

25   Q    Did that happen?

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A629**

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did you have conversations with him regarding Louie |
| 3 | | DiBono after that happened? |
| 4 | A | Yes. |
| 5 | Q | One conversation or more than one? |
| 6 | A | More than one. |
| 7 | Q | Did he make any complaints to you? |
| 8 | A | He was dealing with Louie and Louie was doing the same |
| 9 | | thing, making appointments with him, not showing. |
| 10 | | John would tell Patsy Conte to meet with him, the |
| 11 | | meeting was set up, and he wouldn't show again. |
| 12 | Q | Did John tell you this? |
| 13 | A | Yes. |
| 14 | Q | Did there come a point when he told you whether he had |
| 15 | | a solution to the problem? |
| 16 | A | I believe he became frustrated and eventually said that |
| 17 | | he was gonna kill him. |
| 18 | Q | Do you believe that or do you remember that happening? |
| 19 | A | I remember that happening. |
| 20 | Q | Do you recall when, for the first time, he told you |
| 21 | | that that would happen? |
| 22 | A | Not exactly the dates. |
| 23 | Q | Did he tell you anything about who was going to do it? |
| 24 | A | He was gonna give it to Patsy Conte and that crew. |
| 25 | Q | Patsy Conte was the captain of Louie DiBono's crew? |

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A630**

Gravano-Direct-Gleeson

```
 1   A   Yes.
 2   Q   When you say "give to it to them," what do you mean?
 3   A   He was going to order Patsy Conte to kill him.
 4   Q   Did he tell you that?
 5   A   Yes.
 6   Q   Did you find out, at any point, that some of the
 7       complaints about Louie DiBono made to you by John Gotti
 8       were tape recorded?
 9   A   Yes.
10   Q   Did you have occasion, Mr. Gravano, to listen to
11       recordings made at the Ravenite Social Club in
12       conversations including you and John Gotti?
13   A   Yes.
14   Q   And while you were listening to them, did you have
15       occasion to look at some transcripts?
16   A   Yes.
17   Q   Let me show you a book of transcripts.  It's called
18       Book Three.  The tapes, Mr. Gravano, of those transcripts
19       have already been played to the jury, but I would like to
20       ask you a few questions, if I might.
21           First, I would like to direct your attention to
22       page 78 which is a conversation from the hallway of the
23       Ravenite Social Club recorded on December 13, 1989.  I said
24       78 but I meant 77.  Turn to page 77.
25           Have you had a chance to listen to this tape?
```

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A631**

4204

Gravano-Direct-Gleeson

1  A    Yes.

2  Q    On page 77 -- and do you recall this conversation,

3  Mr. Gravano?

4  A    Yes.

5  Q    On page 77, Gotti said, to you:  He was told to pay.

6  You said:  He was stubborn.  Gotti continues:  This thing

7  eight months ago.  You mentioned:  He was a little

8  stubborn.  He says this mother F.

9        When he said to you he was told to pay, who did

10  you understand him to mean and what was he referring to?

11  A    Louie DiBono was supposed to pay the taxes.

12  Q    He said he was told to pay this thing eight months

13  ago.

14        Is that to pay the taxes eight months ago?

15  A    I believe so.

16  Q    Did John Gotti get involved in the problem, the tax

17  problem with Mario DiBono?

18  A    He tried to help me with it.

19  Q    Help you with it?  How?

20  A    To get it resolved and paid.

21  Q    The following page, page 78, Gotti says, the second

22  attribution to him, fuck him, Sammy.  You know what,

23  another thing?

24        Who is he referring to there?

25  A    Louie DiBono.

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

A632

Gravano-Direct-Gleeson                                    4205

1   Q    Continuing on down the page, he says, this is the

2   middle of the Page, 4 lines into that large attribution to

3   him:

4            But this guy, enough of that.  And I don't, I'm

5   not gonna let that kind of shit interfere with this, Cosa

6   Nostra.

7            Is he still referring to Louie DiBono?

8   A    Yes.

9   Q    When he said I'm not gonna let that kind of shit

10  interfere with that Cosa Nostra, what did you understand

11  him to be referring to?

12  A    With the taxes.

13  Q    He says:  When a punk like him was told, nine months

14  ago, resolve this thing.  I don't care if you don't pay the

15  outfit.  When a guy tells ya, the boss, inaudible, and he

16  continues, is he still, to your understanding, referring to

17  the taxes?

18  A    He's a little past the taxes.

19           He's giving him an order and the guy is not

20  listening, at this point.

21  Q    What is your understanding of the order that he's

22  giving?

23  A    He told him to resolve the problem, pay the taxes, and

24  end the situation.

25           He's, obviously, not listening.

MARY ANN STEIGER, CSR   OFFICIAL COURT REPORTER

**A633**

| | |
|---|---|
| 1 | Q   This conversation is December 13, 1989.  That's |
| 2 | approximately a month after you terminated your partnership |
| 3 | with Louie DiBono, correct? |
| 4 | A   Yes. |
| 5 | Q   Do you recall, Mr. Gravano, whether this conversation |
| 6 | occurred before or after John Gotti first told you Louie |
| 7 | DiBono was gonna die? |
| 8 | A   I don't know. |
| 9 | Q   You don't recall? |
| 10 | A   No. |
| 11 | Q   After he told you that he had given the contract, given |
| 12 | the job to kill Louie DiBono to Patsy Conte, did he tell |
| 13 | you whether or not there were any problems in getting that |
| 14 | done? |
| 15 | A   Yes.  They ran into problems doing it.  He didn't show |
| 16 | up for Patsy Conte, either, when there was an appointment |
| 17 | by a club, whatever, cafe.  He had an appointment to show |
| 18 | up, and he didn't show up.  He was continuously doing this. |
| 19 | Q   Did Gotti mention this to you more than once? |
| 20 | A   Yes. |
| 21 | Q   Let me direct your attention to another page in this |
| 22 | book which is page 89.  This is a conversation |
| 23 | approximately three weeks after the one we just looked at, |
| 24 | Mr. Gravano.  It's from January 4, 1990, in the apartment. |
| 25 |       Again, this is a conversation, the tape of which |

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

4207

Gravano-Direct-Gleeson

1   this jury has already heard.  Just take a moment to look at
2   the page, please.
3   A    (The witness complies.)
4   Q    Now, do you recall listening to this conversation?
5   A    Yes.
6   Q    Do you remember it?
7   A    Yes.
8   Q    Gotti says, in the first attribution to him, where his
9   name is mentioned on page 89, he says:
10          Tomorrow is Friday.  I won't be here.  I gotta...
11   Patsy wants to see me.  He says it's pretty important.  I
12   don't know what the hell it's about.
13          Tomorrow, Patsy Conte, inaudible, tomorrow.  It's
14   gotta be that guy.
15          Did you have an understanding as to who John Gotti
16   was referring to when he said it's got to be that guy?
17   A   Louie DiBono.
18   Q    Did you have an understanding as to what the meeting
19   with Patsy Conte was going to be about?
20   A    No.
21   Q    It follows on that page: A casa.  Until then I gotta
22   hit him coming out of the door.  I don't care.  Right
23   coming out of the door.
24          When he said until then I got to hit him, who did
25   you understand him to be referring to?

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A635**

4208

| | | |
|---|---|---|
| 1 | A | DiBono. |
| 2 | Q | Did you understand John Gotti to be telling you that he |
| 3 | | was gonna hit -- he was gonna have Louie DiBono murdered at |
| 4 | | his house? |
| 5 | A | No. |
| 6 | Q | What did you understand this to mean? |
| 7 | A | He was frustrated with him and he's just saying that |
| 8 | | out of frustration. I don't think he means he's gonna hit |
| 9 | | him coming out of his house. |
| 10 | Q | What did you understand him to be frustrated about? |
| 11 | A | That he's not coming in, he's not listening, and he had |
| 12 | | a conversation with John and, I believe, that John thought |
| 13 | | that after our partnership broke up that he would listen to |
| 14 | | John. |
| 15 | | John realizes what kind of man he is, what he's |
| 16 | | doing, and I think John is frustrated with him and very |
| 17 | | annoyed with him. |
| 18 | Q | This conversation, as far as you recall, is it before |
| 19 | | or after he told you that he was gonna have Louie DiBono |
| 20 | | killed? |
| 21 | A | This is after. |
| 22 | Q | Is the frustration related to Patsy Conte's inability |
| 23 | | to kill him? |
| 24 | A | Partially. |
| 25 | Q | And the other part of the frustration is what you just |

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

A636

1   described?

2   A    Yes.

3   Q    Did you continue to discuss Louie DiBono?

4   A    On occasion.

5   Q    Let me direct your attention to another conversation

6   which the jury has already heard and the page is 89.

7            THE COURT:  I think you were just on 89.

8            MR. GLEESON:  Yes.  It's one of the letters.

9   89-E.

10  Q    This is a conversation another three weeks later,

11  January 24th, 1990, in the apartment.

12           Do you recall this conversation, Mr. Gravano?

13  A    Yes.

14  Q    There's a previous reference in this conversation to

15  Johnny Gambino.

16           Do you have a recollection of what you're

17  discussing?

18  A    We're discussing people in Italy, we're discussing

19  Johnny Gambino's case that he's arrested on, which is a

20  drug case, and he's discussing that people in Italy, are a

21  father and son team, became informants for the Italian

22  Government and they're made members and he's discussing the

23  liaison guy from Italy to here who we believe might be a

24  made member of our Family and made in Italy and have one

25  foot here and one foot in Italy, and he's doing business

Gravano-Direct-Gleeson

```
1    A    Not for sure.

2    Q    He continues:  And he's got to get whacked because he's

3    getting -- for the same reason that jelly belly is getting

4    it.  You want to challenge the administration?  Well,

5    you'll meet the challenge and you're going.

6         Who did you understand him to be referring to when

7    he said jelly belly?

8    A    At that point of the conversation, he's talking about

9    Louie DiBono.

10   Q    Is that a name that was used more than once for Louie

11   DiBono?

12   A    Yes.

13   Q    Is that his nickname?

14   A    No.

15        Once we talk about killing him, we gave him a

16   nickname of jelly belly.

17   Q    When he said you want to challenge the administration,

18   you'll meet the challenge, what did you understand him to

19   mean by that?

20   A    Louie DiBono was defying the bosses orders.  He's

21   defying the administration.

22   Q    How was Louie DiBono denying the administration?

23   A    He's refusing to come in, he's refusing to listen and

24   he's doing whatever he wants.

25        The other example would be a guy doing drugs
```

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A638**

4213

Gravano-Direct-Gleeson

1   people would be doing it rather than you, did you discuss
2   it with him?
3   A    No.
4   Q    At any point, did you obtain any information about
5   Louie DiBono that was helpful in trying to kill him?
6   A    Toward the end, Joe Madonia came to me with a card,
7   that Louie DiBono was working downtown New York for a big
8   company, and asked me if Louie might be able to get him
9   some drywall work, and he gave me the card, the name of the
10  company he was working for.
11  Q    Do you recall the name of the company?
12  A    No.
13  Q    Did Joe Madonia have any idea that Louie DiBono's life
14  was in jeopardy, as far as you know?
15  A    No.
16  Q    What did you do with the card?
17  A    I gave the card over to John.
18  Q    Did any one else give you any information about Louie
19  DiBono?
20  A    Johnny Gammarana told me where he was working, as
21  well.
22  Q    Why did he tell you that?
23  A    They were doing business deals there and it was for
24  business reasons.
25       He had no knowledge of this, either.

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A639**

4214

Gravano-Direct-Gleeson

| | | |
|---|---|---|
| 1 | Q | Do you recall where it was Louie DiBono was working? |
| 2 | A | In the World Trade Center. |
| 3 | Q | Did you pass along the information you got from Johnny |
| 4 | | Gammarana to anyone? |
| 5 | A | It was the same exact information as the card. |
| 6 | Q | Did you pass it along? |
| 7 | A | Yes. |
| 8 | Q | To whom? |
| 9 | A | To John. |
| 10 | Q | Did there come a point when you learned that Louie |
| 11 | | DiBono was murdered? |
| 12 | A | A couple of weeks after I passed that information. |
| 13 | Q | Who did you learn it from? |
| 14 | A | I learned it from -- John told me that he was gone. |
| 15 | Q | Did he tell you anything else other than he was gone? |
| 16 | A | I don't think so. |
| 17 | Q | Was it in the newspaper? |
| 18 | A | No. |
| 19 | Q | Was there ever a point when it was in the newspaper? |
| 20 | A | A couple of days later when he was found. |
| 21 | Q | What do you mean a couple of days later? |
| 22 | A | A couple of days after he was killed, he was found. |
| 23 | Q | In between, did you talk to anybody about his being |
| 24 | | killed? |
| 25 | A | I talked to Bobby Borriello once. |

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A640**

Gravano-Direct-Gleeson

| 1 | Q | What did you say to him? |
|---|---|---|
| 2 | A | It didn't come out on television or in the paper and I |
| 3 | | asked him what happened? Was he sure that happened. |
| 4 | Q | What did he say? |
| 5 | A | He assured me the guy was dead. He was in the garage |
| 6 | | in the World Trade Center. Why it wasn't in the paper or |
| 7 | | on the news, he didn't know why. Then it came right out. |
| 8 | Q | I am sorry? |
| 9 | A | And then it came out then. They found him, and it came |
| 10 | | out. |
| 11 | Q | A couple of days later? |
| 12 | A | Yes. |
| 13 | Q | Were you a member of the administration when the |
| 14 | | decision was made to kill Louie DiBono? |
| 15 | A | Yes. |
| 16 | Q | Did you discuss it with John Gotti? |
| 17 | A | Yes. |
| 18 | Q | Did you agree with the decision? |
| 19 | A | Yes. |
| 20 | Q | You offered to do it, yourself? |
| 21 | A | Yes. |
| 22 | Q | Were you personally involved in the murder? |
| 23 | A | No. |
| 24 | Q | Did you provide information to John Gotti with the |
| 25 | | intent that it be carried out? |

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

4216

Gravano-Direct-Gleeson

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | You mentioned Tony as one of the people who was |
| 3 | | involved and that John Gotti told you would be involved in |
| 4 | | the murder of Louie DiBono, correct? |
| 5 | A | Yes. |
| 6 | Q | At that time, you testified he wasn't a made member of |
| 7 | | the family? |
| 8 | A | Yeah. |
| 9 | Q | Was he with anybody? |
| 10 | A | He was with Danny Marino. |
| 11 | Q | Did you, yourself, participate in discussions regarding |
| 12 | | who was gonna be made members of the Family? |
| 13 | A | Yes. |
| 14 | Q | And did you learn that some of those discussion, Mr. |
| 15 | | Gravano, were recorded by the F.B.I.? |
| 16 | A | Yes. |
| 17 | Q | Let me show you what we have marked here as Book One. |
| 18 | | THE COURT: Is that one or three? |
| 19 | | MR. GLEESON: Now, it's Book One. I just |
| 20 | | switched. |
| 21 | Q | By the way, Mr. Gravano, did Louie DiBono ever come |
| 22 | | into the club after John Gotti was complaining about the |
| 23 | | fact that he wouldn't come in? |
| 24 | A | Yes. |
| 25 | Q | Do you recall when that was? |

MARY ANN STEIGER, CSR     OFFICIAL COURT REPORTER

**A642**

1   A   Not exactly.

2   Q   Have you had occasion to listen to a club conversation

3   from March 28, 1990?

4   A   Yes.

5   Q   Did you recognize that conversation?

6   A   Yes.

7   Q   Was that the day that Louie DiBono came in?

8   A   Yes.

9   Q   Was he expected?

10  A   No.

11  Q   Could you describe to the jury what happened that day?

12  A   I don't know exactly who it was.  I believe Patsy Conte

13  or Pauley Graziano came into the club and said Louie DiBono

14  was outside.

15      After refusing to come to a lot of the meetings,

16  he was outside and that he was gonna come in just about

17  unannounced.  I guess he thought he caught us off guard and

18  he was pretty safe.

19      MR. CARDINALE:  Objection.  Move to strike,

20  your Honor.

21      THE COURT:  Overruled.

22  Q   Did he catch you off guard?

23  A   Yes and no.

24  Q   What do you mean by that?

25  A   He caught us off guard in that we didn't know he was

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A643**

Gravano-Direct-Gleeson 4218

1 coming, but not that we couldn't react to it.
2 As a matter of fact, at one point in the
3 conversation with John, the F.B.I. is outside watching the
4 club and I tell John, in a low tone, that if he sends for
5 somebody with a gun with a silencer, we'll turn up the
6 music. He could leave tell Louie DiBono to be back in a
7 half hour and I will kill Louie DiBono right in the club.
8 We'll close the club, come back two, three in the morning
9 and take him out.
10 Q When he came in, you offered to kill him in the club?
11 A Yeah.
12 Q You listened to the conversation on tape, correct?
13 A Yes.
14 Q Is your offer on the tape?
15 A Not really. You can't hear it. It's in a whisper.
16 Q Is the reaction of the people in the club on the tape?
17 A Yes.
18 Q What was the reaction?
19 A They laughed a little bit and just passed over the
20 idea.
21 Q Were you serious about it?
22 A Yes.
23 Q Did DiBono come into the club that night?
24 A Yes.
25 Q Did he a conversation with you in the club?

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

**A644**

Gravano-Direct-Gleeson

1  A  I don't remember if he talked with me.

2  Q  Do you remember whether he talked with anybody?

3  A  I believe he talked with John.

4  Q  Were you present when he spoke to John?

5  A  I might have been.

6  Q  Do you remember, one way or another?

7  A  I am not sure.

8  Q  Why didn't you kill him that night?

9  A  We just passed that idea up.

10 Q  When you talked to Bobby Borriello about the murder, he

11 told you it happened in a garage?

12 A  Yes.

13 Q  Did he tell you who had participated in the murder?

14 A  Yes.

15    He told me that him and Charlie were inside the

16 garage and Tony was outside in the get away car.

17 Q  Did he tell you who was the shooter?

18 A  I believe he was.

19 Q  Is Charlie Carneglia related to John Carneglia?

20 A  It's his brother.

21 Q  I interrupted myself when I was asking you whether you

22 were intercepted in conversations regarding making

23 people.

24    Let me direct your attention to page 18 of Book

25 One, about three quarters of the way down the page,

MARY ANN STEIGER, CSR    OFFICIAL COURT REPORTER

Gravano-cross/Krieger

1  A     Yes.

2  Q     And you also learned that the hallway outside of the club

3  itself, but in the same building, was the subject of

4  electronic surveillance?

5  A     Yes, I did.

6  Q     And in the course of that hearing, you heard, did you

7  not, your own voice, right?

8  A     Yes.

9  Q     Now, sir, there were numerous, were there not, numerous

10  days, evenings, times, better word times, numerous times you

11  would be in the Ravenite itself and have a conversation with

12  somebody, right?

13  A     Yes.

14  Q     And there were numerous times, not as numerous as going

15  to the club, but there were numerous times when you would have

16  a conversation with somebody in the hallway, right?

17  A     Not that many times, but sometimes.

18  Q     It happened, didn't it?

19  A     Not often.

20  Q     However many times, it happened, is that correct?

21  A     Yes.

22  Q     When you -- there were some private conversations that

23  you had in the Ravenite club with whoever you were speaking?

24  A     I guess so.

25  Q     But if you wanted real privacy what you used to do was

Michael Picozzi, RPR   Official Court Reporter

4443

Gravano-cross/Krieger

1  step out of the club, is that correct?

2  A    Yes.

3  Q    And you would step out of the club and do different

4  things depending upon different circumstances including the

5  weather, right?

6  A    Yes.

7  Q    If it was a nice pleasant afternoon you might do what you

8  have called a walk talk, is that correct?

9  A    Yes.

10  Q    And we have already covered the situation where you might

11  step out in the hallway, right?

12  A    Yes.

13  Q    And there came a time, did there not, when you used that

14  apartment upstairs as a place of privacy, is that correct?

15  A    Yes.

16  Q    And when you went up to the apartment and used the

17  apartment, Mr. Gravano, it was, was it not, with the intention

18  to have a truly private conversation, correct?

19  A    Yes.

20  Q    And in the conversation that you would have in the

21  apartment, well, you kind it let it all hang out, right?

22  A    I guess so.

23  Q    Now, in your relationship -- withdrawn.

24        At times when you were up in the apartment you would

25  be there with Mr. Gotti, is that correct?

Michael Picozzi, RPR    Official Court Reporter

1  A     Yes.

2  Q     And as you indicated to us a few moments ago you became

3  quite knowledgeable as to Mr. Gotti's temperament, is that

4  correct?

5  A     You could say that.

6  Q     In the years after 1985 -- well, you knew that Mr. Gotti

7  had a hot temper, right?

8  A     Yes.

9  Q     And when his temper was flaring he would speak in rather

10  extreme terms?  You understand what I am saying, sir?

11  A     No.

12  Q     You don't?

13  A     No.

14  Q     Well, you remember yesterday you were saying that

15  sometimes he uses phrases just, it's really just an

16  expression, correct?

17  A     I remember saying that.

18  Q     And you know that he would use expressions such as on one

19  day he might say, I think you heard this, might say, I will

20  cut his head off, I will sever his head, you heard him say

21  things like that, didn't you?

22  A     Yes.

23  Q     And you also heard him the very next day say about that

24  person whose head was going to be severed, I guess he's a nice

25  guys, doesn't make trouble, and talk about him with the same

7916

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,   :
4                                       CR 90 1051-S

5           -against-                United States Courthouse
                              :      Brooklyn, New York
6   JOHN GOTTI,
    FRANK LOCASCIO,
7
            Defendant.
8                             :      March 31, 1992
                                     9:00 o'clock a.m.
9   - - - - - - - - - - - - - X

10                       TRANSCRIPT OF TRIAL
                  BEFORE THE HONORABLE I. LEO GLASSER
11            UNITED STATES DISTRICT JUDGE and a jury

12  APPEARANCES:

13  For the Plaintiff:      ANDREW J. MALONEY
                            United States Attorney
14                          BY:  JOHN GLEESON, ESQ.,
                            LAURA WARD, ESQ.,
15                          PATRICK COTTER, ESQ.,
                            JAMIE ORENSTEIN, ES.,
16                          Assistant United States Attorneys
                            225 Cadman Plaza East
17                          Brooklyn, New York 11201

18  For the Defendant:      ALBERT J. KRIEGER, ESQ.,
                            SUSAN VAN DUZEN, ESQ.,
19                          KENNETH KUKEC, ESQ.,
                            For John Gotti
20
                            JOHN MITCHELL, ESQ.,
21                          ANTHONY CARDINALE, ESQ.,
                            For Frank Locascio
22

23
    Court Reporter:         Henry R. Shapiro
24                          225 Cadman Plaza East
                            Brooklyn, New York
25                          718-330-7687

    HENRY SHAPIRO        OFFICIAL COURT REPORTER

8051

Charge

1  enterprise.

2       With respect to counts four, six and eight, it's not
3  necessary that the Government prove that the defendant you are
4  considering himself personally committed the murder charged.
5  That's because the Government charges a violation of another
6  statute in Section 2 of Title 18 of the United States Code.

7       If you go back and look to the counts in this
8  indictment, after each count you see a reference 18 United
9  States Code, section 1959(a)(1), and then a reference to Title
10 18, Section 2.  Section 2 of Title 18 of the United States
11 Code provides that whoever commits an offense against the
12 United States, or aids, abets, counsels, command, induces, or
13 procures its commission is punishable as a principal.  Whoever
14 willfully causes an act to be done which if directly performed
15 by him or another, would be an offense against the United
16 States would be punishable as an a principal.

17      What that means if you find that a defendant
18 knowingly and willfully aided and abetted another person in
19 the commission of the crime, he's as guilty if he committed it
20 himself.

21      Before you can convict a defendant on the ground
22 that he aided in the commission of the crime charged, you must
23 first find that some other person committed that crime.
24 Obviously no one can be convicted of the crime of aiding and
25 abetting criminal acts of another.  No crime was committed by

HENRY SHAPIRO      OFFICIAL COURT REPORTER

Charge                                                                          8052

1   other persons in the first place.  But if you do find that the

2   crime was committed by another, then you must consider whether

3   the defendant aided or abetted the commission of that crime.

4           And before a defendant can be found guilty of aiding

5   and abetting, it's necessary that there be more than mere

6   presence at the scene of the occurrence or knowledge that a

7   crime is being committed and acquiescence in it.

8           A defendant must have willfully associated himself

9   in some way with the criminal venture, he must have willfully

10  participated in it as something that he wanted to bring about

11  and participates willfully, If he participates voluntarily and

12  intentionally.  The definition that I have given you earlier,

13  participates with a bad purpose to do something that the law

14  forbids, the defendant must willfully seek by some act on his

15  part to make the criminal venture succeed, that he had to

16  interest in furthering the unlawful act.

17          Mere presence or relationship to the person who

18  actually committed the crime, even if coupled with knowledge

19  that the crime was committed is not enough.  In short if you

20  find that the Government proved beyond a reasonable doubt that

21  the defendant you are considering committed the crime of

22  murder in aid of racketeering or that he aided and abetted the

23  commission of that crime, then you should find the defendant

24  guilty of the count you are considering be it four, six or

25  eight.

HENRY SHAPIRO          OFFICIAL COURT REPORTER

8053
## Charge

1          On the other hand, if the Government hasn't
2   satisfied you beyond a reasonable doubt that the defendant you
3   are considering either committed the crime of murder, murder
4   in aid of racketeering, or aided or abetted the commission of
5   that crime, then you must find him not guilty of count four
6   six and/or eight.

7          Counts three five and seven charge the defendants
8   named in those counts with conspiracy to murder the victims
9   named in counts four, six and eight respectively.

10         Robert DiBernardo, Liborio Louie Milito, Louie
11  DiBono.  Count nine charges John Gotti, Frank Locascio and
12  Salvatore Gravano and others with conspiracy to murder Gaetano
13  Corky Vastola in aid of racketeering activity.

14         Those counts read as follows.

15         Count three incorporating the first fourteen
16  paragraphs of the indictment alleges that between December 16,
17  1985 and June 5, 1986 those dates being approximate and
18  inclusive, in the Eastern District of New York and elsewhere,
19  the defendants John Gotti, and Salvatore Gravano together with
20  others, for the purpose of maintaining and increasing their
21  position in the Gambino family, an enterprise engaged in
22  racketeering activity, conspired to murder Robert DiBernardo.

23         Count Five except for the difference in dates reads
24  exactly the same way, charges Gotti and Gravano with
25  conspiracy to murder Liborio Milito.

HENRY SHAPIRO          OFFICIAL COURT REPORTER

8054

**Charge**

1    Count Seven with the exception of the dates which
2  differ, charges the defendants John Gotti, Frank Locascio and
3  Salvatore Gravano and others with conspiracy to murder Louie
4  DiBono.

5    And count nine again, bearing in mind the different
6  dates charges the defendants named, Gotti, Locascio and
7  Gravano with conspiracy to murder Gaetano Corky Vastola.  The
8  statutes -- the statute which the defendants named in each of
9  those counts are charged with violating provides in relevant
10  part as follows:

11    It says: Whoever for the purpose of maintaining or
12  increasing position in an enterprise engaged in racketeering
13  activity, murders any individual in violation of the laws of
14  any state or the United States, so far as it's exactly the
15  same as counts four, six and eight but then says, or conspires
16  so to do, shall be punished.

17    Counts three, five, seven and nine charge the
18  defendants named with conspiring to commit the crime of murder
19  in aid of racketeering.  And a conspiracy to commit a crime is
20  an entirely separate and distinct offense from the substantive
21  crime which is charged.

22    We speak of the crimes charged in four, six and
23  eight as the substantive charges.  Charging the murder in aid
24  of racketeering.  Counts three, five, seven and nine charge
25  conspiracy to commit those substantive offenses.

HENRY SHAPIRO     OFFICIAL COURT REPORTER

Charge

1      You can find that the defendant you are considering

2  committed the substantive offense charged in four six and/or

3  eight, but that the Government didn't proof beyond a

4  reasonable doubt that he committed the conspiracy charged in

5  counts three five or seven.  Or you may find that the

6  defendant you are considering did commit the crime of

7  conspiracy, but the Government didn't proof beyond a

8  reasonable doubt that he committed the substantive offense or

9  you can find the Government proved that he committed both or

10  neither.

11      Before you can convict a defendant you are

12  considering of a crime of conspiracy, you must find that the

13  Government established the following two elements beyond a

14  reasonable doubt.

15      First:  The conspiracy charged existed, and

16      Second:  That the defendant knowingly and willfully

17  became a member of the conspiracy.

18      Let me examine each of those elements with you in

19  some detail.

20      Let's look at the first one.  Namely that a

21  conspiracy existed.  A question which immediately comes to

22  mind, what is a conspiracy?  A conspiracy is defined very

23  simply as an agreement between two or more persons to commit a

24  crime.  An agreement between two or more persons to accomplish

25  some unlawful purpose.  The core, the heart of the crime of

HENRY SHAPIRO        OFFICIAL COURT REPORTER

### Charge

1  conspiracy is the unlawful agreement to commit a crime, to
2  violate the law.

3  A conspiracy is sometimes referred to as a
4  partnership for criminal purposes in which each member of the
5  conspiracy becomes the agents of every other member.

6  To prove a conspiracy the Government is not required
7  to prove that two or more people sat around a table, at a
8  lawyer's office, entered into a very formal contract, either
9  orally or in writing, provide we have hereby formed a
10  conspiracy to violate the law, setting forth all the details,
11  the plans and the ways in which that unlawful endeavor is to
12  be carried out or the part that each is to play.

13  It would be extraordinary if there were such formal
14  documents or a specific oral agreement. Common sense would
15  suggest that when persons in fact enter into a conspiracy,
16  they leave a lot to unexpressed understanding. Conspirators
17  don't usually reduce their agreements to writing.

18  They don't usually appear before a notary public to
19  have their signatures acknowledged. From its very nature a
20  conspiracy is almost invariably secret in its origin, secret
21  in its execution.

22  It's not necessary that the Government prove that
23  co-conspirators knew each other, or the ultimate objectives of
24  the the conspiracy were successfully accomplished.

25  It is enough if the Government proved two or more

HENRY-SHAPIRO     OFFICIAL COURT REPORTER

8057
## Charge

1  persons, one of whom being the defendant you are considering
2  in any way, either expressly or impliedly, came to a common
3  understanding to commit a crime to violate the law and if
4  based upon all the evidence, direct and circumstantial you are
5  satisfied beyond a reasonable doubt that the minds of at least
6  two of the alleged conspirators, one of whom became the
7  defendant you are considering, met in an understanding way,
8  they agreed to work together to accomplish the object of the
9  conspiracy charged in the indictment, then the first element
10  namely the existence of the conspiracy has been established.

11         The second element which the Government must prove
12  beyond a reasonable doubt is that the defendant knowingly and
13  willfully became a member of the conspiracy. A person may
14  become a member of a conspiracy without full knowledge of all
15  its details.

16         On the other hand, a person who has no knowledge at
17  all before of a conspiracy, simply happens to act in a way
18  which furthers some objective or purpose of it, does not
19  thereby become a conspirator.

20         Before you can find that a defendant was a member of
21  the conspiracy, the evidence must show beyond a reasonable
22  doubt the conspiracy was knowingly formed and that the
23  defendant willfully participated in the unlawful plan, with
24  the intent to advance, further, some object or purpose of the
25  conspiracy.

8058

Charge

1    I have already explained to you that an act is done
2  "knowingly" if done voluntarily and intentionally, not
3  because of some accident or mistake. I have already explained
4  to you to act or participate "willfully" means to act
5  voluntarily, intentionally, and with the specific intent to do
6  something that the law forbids.

7    So if the defendant you are considering, in an
8  understanding of the unlawful character of the plan, knowingly
9  encourages, advises or assists for the purposes of furthering
10  the undertaking or scheme, he thereby becomes a wilful
11  participant, he becomes a conspirator.

12    A person who joins an existing conspiracy is charged
13  with the same responsibility as if he had been one of the
14  originators or instigators of the conspiracy.

15    Again in determining intent, et cetera, since we
16  can't look into a person's mind, you can find intent from all
17  the surrounding facts and circumstances, from all the evidence
18  in the case. The mere fact that the defendant was present at
19  meetings or was seen with one of the conspirators or
20  associated with him, was related to or had a friendship with
21  one of them or worked with one of them, in and of itself is
22  not enough to make a conspirator.

23    I want to caution you too, mere knowledge of or
24  acquiescence without participation in the unlawful plan is not
25  enough.  What the law requires, is that the defendant must

HENRY SHAPIRO     OFFICIAL COURT REPORTER

8059

**Charge**

1  have participated with knowledge of at least some of the

2  purposes or objectives of the conspiracy, with the intent of

3  aiding in the accomplishment of those unlawful objectives.

4       Before you can find the defendant was a member of

5  the conspiracy, you would have to find that he intentionally,

6  deliberately joined the conspiracy, participated in it, had a

7  specific intent to do something that the law forbids.

8       Now, although mere presence or mere association with

9  conspirators is not enough, it's a factor that you may

10 consider among others to determine whether the defendant was a

11 member of the conspiracy.  The defendant's presence may

12 establish his membership in a conspiracy, if all of the

13 circumstances considered together show that his presence was

14 meant to advance the goals of that conspiracy.

15      He must not only have been present, he must have

16 known about the conspiracy, he must have intended by his

17 presence to participate in the conspiracy or to help it

18 succeed.

19      In other words, presence itself may demonstrate

20 membership in a conspiracy only if that presence is a

21 functional part of the conspiracy.

22      The extent of participation has no bearing on guilt

23 or innocence, even if a person participated in a much lesser

24 extent than another co-conspirator, he is equally liable so

25 long as you find that he deliberately and intentionally became

HENRY SHAPIRO       OFFICIAL COURT REPORTER

Charge

1 a member of the conspiracy and participated in it, and you

2 have to be satisfied of that beyond a reasonable doubt.

3        Each defendant is entitled to individual

4 consideration of the proof as regards him including but not

5 limited to any evidence of his knowledge of the scheme, his

6 status in the group, his level of participation in activities,

7 key conversation, his participation in the design of the

8 unlawful plan or scheme.

9        Summing up then, the essential elements of the

10 offense charged in counts three, five, seven and nine,

11 conspiracy to murder in aid of racketeering, each of which the

12 Government must prove beyond a reasonable doubt are:

13        First, that. A conspiracy existed. That is two or

14 more people, one of whom is the defendant that you are

15 considering, agreed to violate federal law against murder in

16 aid of racketeering.

17        And second, that the defendant knowingly and

18 willfully became a member of the conspiracy.

19        In considering the evidence with respect to these

20 offenses, determine first whether or not the conspiracy as it

21 is alleged in the indictment existed. If you conclude that it

22 did, determine next whether or not the defendant you are

23 considering willfully became a member of it.

24        If it appears beyond a reasonable doubt from all the

25 evidence in the case that the conspiracy alleged was willfully

HENRY SHAPIRO        OFFICIAL COURT REPORTER

8061
Charge

1  formed, the defendant you are considering willfully became a
2  member of it, then there may be a conviction even though the
3  conspirators may not have succeeded in accomplishing their
4  common objective or purpose, even though they may have failed
5  in doing so.

6       If you should find beyond a reasonable doubt from
7  all the evidence in this case that the conspiracy as charged
8  existed, that the defendant knowingly and intentionally became
9  a member of it, then the conspiracy as charged in the
10 indictment has been proved beyond a reasonable doubt with
11 regard to that defendant.

12      On the other hand, if you do not find that the
13 elements have been proved beyond a reasonable doubt, obviously
14 the crime of conspiracy has not been proved as regards that
15 defendant.

16      The burden is on the Government to prove each and
17 every element.  There are two, the existence of the conspiracy
18 and the defendant's membership in it, beyond a reasonable
19 doubt.

20      You can't infer the existence of one element from
21 proof of another.  If you are left with a reasonable doubt as
22 to either element necessary to establish this crime, you must
23 find the defendant not guilty.

24      If you have no reasonable doubt, you should
25 convict.

HENRY SHAPIRO       OFFICIAL COURT REPORTER

8062
**Charge**

1    Having instructed you on the crimes of conspiracy
2  which have been charged in counts three, five, seven and nine
3  I want to return for a couple of minutes to the substantive
4  counts, the crimes alleged in counts four, six and eight which
5  as I indicated to you do not charge conspiracy, to commit the
6  crime but the commission of the crime itself.

7    You recall I instructed you that if the Government
8  proved beyond a reasonable doubt that the defendant you are
9  considering actually committed the crime of murder in aid of
10  racketeering, or aided and abetted the commission of that
11  crime, then you should find him guilty of the count in
12  question, and that you must acquit him if the Government does
13  not sustain its burden of proof.

14    There is another ground on which you may evaluate
15  the possible guilt of a defendant you are considering for the
16  substantive crime of murder in aid of racketeering in counts
17  four, six and/or eight.

18    In light of the instructions that I just have given
19  you regarding conspiracy, if you find beyond a reasonable
20  doubt that the defendant was a member of the conspiracy as
21  it's charged, in counts three, five and seven, then you may
22  also, but you are not required to, find him guilty of the
23  corresponding substantive crime of murder in aid of
24  racketeering in four, six or eight, provided you find beyond a
25  reasonable doubt each of the following elements:

**HENRY SHAPIRO      OFFICIAL COURT REPORTER**

8063

Charge

1        First, that the crime charged in counts four, six,
2    and/or eight was committed.

3        Second, that the person or persons who committed
4    that crime with members of a conspiracy that you found
5    existed.

6        Third, that the crime charged in four six and/or
7    eight, was committed pursuant to a common plan and
8    understanding that you found to exist among the conspirators.

9        Fourth that the defendant was a member of that
10   conspiracy at the time the crime of murder in aid of
11   racketeering was committed.

12       Finally, that the defendant could have reasonably
13   foreseen that the substantive crime of murder in aid of
14   racketeering might be committed by his co-conspirators.

15       If you find all five of those elements to exist
16   beyond a reasonable doubt, you can find the defendant guilty
17   of the substantive crime of murder charged against him even
18   though he didn't personally participate in the acts,
19   constituting the crime or didn't have actual knowledge of it.

20       The reason for this rule is simply that a
21   co-conspirator who commits a substantive crime pursuant to a
22   conspiracy is deemed to be the agent of the other
23   conspirators.

24       Therefore, all of the co-conspirators must bear
25   criminal responsibility for the commission of the substantive

HENRY SHAPIRO        OFFICIAL COURT REPORTER

**Charge**

1  crimes.

2          If you are not satisfied as to the existence of any

3  of those five elements, if you are not satisfied that they

4  have been established beyond a reasonable doubt, then you may

5  not find the defendant guilty of the substantive crime unless

6  you have found that the Government proved beyond a reasonable

7  doubt that the defendant personally committed or that he aided

8  and abetted the commission of the substantive crime charged.

9          Just one additional word with respect to this theory

10  of liability.  I just told you that each member of a

11  conspiracy may be held criminally liable for the criminal acts

12  of his co-conspirators that were reasonably foreseeable to

13  him.  I must remind you that there are several different

14  conspiracies charged in the indictment, which if you find them

15  to exist, may overlap as to the identities of the conspirators

16  and the criminal acts reasonably foreseeable to those

17  conspirators.

18          For example, when you get to Count Two, it charges

19  that a conspiracy existed between John Gotti and Frank

20  Locascio and others to violate the RICO statute by conducting

21  the affairs of enterprise through a pattern of racketeering

22  activity.

23          Count Seven charged that a different conspiracy

24  existed among Gotti, Locascio and others, the objective of

25  which was the murder of Louie DiBono.

HENRY SHAPIRO          OFFICIAL COURT REPORTER

8065

Charge

1    If you find either one of those conspiracies existed

2  you may find it was reasonably foreseeable to the members of

3  either that DiBono would be murdered.  That is you may find

4  there came a time when the members of the Gambino Family

5  reasonably could have foreseen that DiBono would be murdered

6  accordance to a common plan and understanding, you found to

7  exist among the members on the Gambino family, in that case

8  you would be entitled find the defendant guilty of the charge

9  in count eight provided you found him to reasonably have

10  foreseen as a result of his membership in that family that

11  DiBono would be murdered.

12    Why don't we take a brief recess here and I'll

13  continue with count ten.

14    (Jury leaves courtroom.)

15    (Recess taken.)

16

17

18

19

20

21

22

23

24

25

HENRY SHAPIRO    OFFICIAL COURT REPORTER