Government Exhibit 2

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 92-1382 (L), 92-1384 and 92-1671

---

UNITED STATES OF AMERICA,

Appellee,

- against -

FRANK LOCASCIO and JOHN GOTTI,

Defendants-Appellants.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

BRIEF FOR THE UNITED STATES

---

PRELIMINARY STATEMENT

Frank Locascio and John Gotti appeal from judgments of conviction entered on June 23, 1992 in the United States District Court for the Eastern District of New York (Glasser, J.). The same appellants also appeal from the district court's order of October 30, 1992, denying their motion for a new trial.

On July 18, 1991, a grand jury returned a 13-count superseding indictment against Gotti, Locascio and two other defendants, Salvatore Gravano and Thomas Gambino.[1] Counts One and Two charged all four defendants with substantive and conspiracy violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). The charged enterprise was the Gambino Family of La Cosa Nostra.

---

[1] Gravano later pleaded guilty to a superseding racketeering charge and testified at trial. The trial of Gambino was severed.

surveillances at Tali's, testified that he saw Gene Gotti and John Carneglia there only once -- on Tuesday, March 8, 1988, the night Milito was murdered. (GA 1599, 1600-01).

Gravano's testimony, however, simply corroborated the evidence that came from Gotti himself. In the December 12, 1989 conversation with Locascio, Gotti admitted that he had authorized Milito's murder because Gravano reported that Milito, like DiBernardo, had been "subversive":

> GOTTI: . . . Frankie, where the hell did all these new companies come from? Where did five new companies come from? Ah, I mean, when, when Nasabeak [Castellano] died, you [referring to Gravano] were nothing. Louie had Gem Steel. You, you told me that the guy talked behind my back. Now you got Gem Steel.
>
>     \*    \*    \*    \*
>
> GOTTI: . . . "DiB," did he ever talk subversive to you?
>
> LOCASCIO: Never.
>
> GOTTI: Never talked it to Angelo, and he never talked to "Joe Piney." I took Sammy's word that he talked about me behind my back. Louie, did he ever talk to any of you guys?
>
> LOCASCIO: No.
>
> GOTTI: I took Sammy's word.

(AA 1648-49, 1673-74).

    4. The Murder of Louis DiBono
       (Racketeering Act Six; Counts Seven and Eight)

On this appeal, Gotti describes the murder of Louis DiBono as "primarily a matter of business disputes between DiBono and Gravano," and suggests that it happened because Gravano believed that DiBono had "robbed" him. (Br. at 48). In fact, during the December 12, 1989 conversation, which Gotti has ignored on appeal, he explicitly stated otherwise:

> GOTTI:      Louie DiBono. And I sat with this guy. I saw the papers and everything. <u>He didn't rob nothin'. You know why he's dying? He's gonna die because he refused to come in when I called.</u> He didn't do nothing else wrong.
>
> LOCASCIO:   You have that meeting yet?
>
> GOTTI:      No. Gonna have it tomorrow.
>
> LOCASCIO:   Because at that meeting, I predict he's gonna bring you fifty. . . .
>
> GOTTI:      . . . I wouldn't take nothing from him. <u>He's gonna get killed because he, he disobeyed coming.</u> . . .

(AA 1674-75 (emphasis added)).[18/]

DiBono was a Gambino soldier who owned a large drywall business. In the early 1980s, he and Gravano had been in business together. After a financial dispute, DiBono and Gravano each asked Castellano for permission to kill the other. Their requests were denied, and they were told to stop doing business together. (GA 1096-1100).

In 1986, while Gotti was in jail, Joe "Piney" Armone, who succeeded DeCicco as the Gambino Family underboss, suggested that Gravano go back into business with DiBono in order to make money for Gotti. (GA 1100). Gravano complied, and as Gotti later described it to Locascio, they sent word to Gotti in jail that Gotti had a hidden ten percent interest in DiBono's company. (AA 1689-90; GA 752-53, 1102-03).

Once again, Gravano and DiBono had problems. DiBono disappeared to Atlantic City, failed to remit substantial withholding taxes for the company, and refused to "come in" when Gravano called. By early 1989, these problems prompted Gravano to ask Gotti for permission

---

[18/] Locascio similarly misrepresents the record when he asserts that "Gravano attributed DiBono's murder to problems DiBono had caused Gravano in their joint business ventures. . . ." (Br. at 8). In fact, Gravano explicitly testified that while their business dealings had caused him to want to kill DiBono, Gotti had denied him permission to do so. (GA 1103-05). Gravano further testified that when DiBono finally was murdered, it was because Gotti had decided DiBono should die for failing to come in when called. (GA 1111).

to kill DiBono. Gotti denied the request and said that he would handle DiBono's business interests himself. (GA 1103-07).

DiBono did not treat Gotti any better than he had treated Gravano, particularly with respect to missing appointments. This culminated by December 12, 1989 in the decision, quoted above, to kill DiBono for refusing to come in when Gotti called. The job was given to DiBono's captain, Patsy Conte. (GA 1111-12, 1353-55).

Not surprisingly, Conte's ability to do the job was impeded because DiBono, unlike DiBernardo and Milito, would not show up at appointments that were arranged in order to murder him. (GA 1115). Indeed, at the end of a secret meeting with Locascio and Gravano in the Ravenite Apartment on January 4, 1990, Gotti expressed his frustration at Patsy Conte's inability to murder DiBono:

> GOTTI: Tomorrow's Friday. . . . Patsy wants to see me. He says it's pretty important. I don't know what the hell it's about. Tomorrow, Patsy Conte (IA) tomorrow. It's gotta be that guy. I already tell ya exactly (whispers) (IA) and now.
>
> GRAVANO: Did you?
>
> GOTTI: . . . A casa (The house). Until then I gotta hit him coming out of the fuckin door. I don't give a fuck! (IA).
>
> (Steps)
>
> GOTTI: Right coming out of the door. But uh, but uh, what the fuck. What are you gonna do? They blame everything else on us, anyway. They'll blame that one on us.

(GA 151-52). Gotti was not seriously considering having DiBono murdered at his house; he was merely sharing his frustration at the status of the "hit." [19]

---

[19] Locascio's suggestion on appeal that he may not have been present for this conversation (Locascio Br. at 9) is ridiculous. He was present in the Ravenite Apartment for the lengthy conversation preceding it about "making" new members. Moreover, he spoke the words immediately preceding the portion quoted above. (GA 152; see also GA 14-77). Indeed, at

24

During a later trip to the Ravenite Apartment, on January 24, 1990, Gotti, Locascio and Gravano -- the Gambino Family administration -- again referred to their plan to kill DiBono. Although the reference was brief, it was telling; it made it clear that "Jelly Belly" DiBono's refusal to "come in" was the type of "challenge" to the administration that warranted a death sentence.[20] Gotti made this observation while the administration was discussing the need to "whack" the "liaison guy" between captain John Gambino's crew and the crew of Sicilian drug dealers who were "ratting" on Gambino in his pending case:

> . . . the liaison, the liaison guy's getting whacked. Because . . . that's not, that don't belong to us. That's their fucking crew. And he's gotta get whacked! Because he's getting the same, for the same reason that "Jelly Belly's" getting it. You wanna, you wanna challenge the administration, we'll, we'll, you will meet the challenge. And you're going, you motherfucker!

(GA 156).[21]

Frustrated by Conte's inability to murder DiBono, Gotti added three more people to the job. However, DiBono still could not be lured to a place where he could be murdered. Finally, through his contacts in the construction field, Gravano learned that DiBono was working on a large job in the World Trade Center. Soon after he passed that information along to Gotti, DiBono was murdered in his car in an underground parking lot below the World Trade Center. (GA 1121-25).

---

trial, Locascio's attorney never suggested that Locascio was not present; rather, he incorrectly suggested that <u>Gravano</u> was not present. (GA 1356-58).

[20] Gravano testified that "Jelly Belly," an obvious allusion to DiBono's obesity (<u>see</u> GA 2394), was the code name that the administration used for DiBono once the decision was made to kill him. (GA 1120).

[21] Locascio again ignores the record in suggesting (Br. at 9) that he may not have been present for this conversation. (<u>See</u> GA 102, 103 (Locascio present for portions of January 24, 1990 conversation immediately before and after quoted passage); GA 1236 (Gravano's testimony that Locascio was present)).

POINT EIGHT

THERE WAS MORE THAN SUFFICIENT EVIDENCE
SUPPORTING LOCASCIO'S CONVICTION ON EACH COUNT

Locascio contends that there was insufficient evidence to support any of his convictions. This Court has often described the "very heavy burden" borne by an appellant raising this claim. A comprehensive statement of the standard of review in such cases is found in the Court's opinion in United States v. Skowronski, 968 F.2d 242 (2d Cir. 1992):

> In reviewing such a challenge, we must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor, . . . and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt . . . . In order to prove a charge of conspiracy, the government need not present evidence of an explicit agreement; proof of a tacit understanding will suffice. . . . The coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan. . . . The defendant's knowledge of the conspiracy and participation in it with the requisite criminal intent may be established through circumstantial evidence. . . . Any challenge to the weight of the evidence is for argument to the jury, not a ground for reversal on appeal.

Id. at 247 (citations omitted); see also United States v. Concepcion, 983 F.2d 369, 382 (2d Cir. 1992).

Further, "'[t]he government is not required to "preclude every reasonable hypothesis which is consistent with innocence."'" United States v. Rivera, 971 F.2d 876, 890 (2d Cir. 1992) (citations omitted). Finally, "'"[o]nce a conspiracy is shown to exist, the 'evidence sufficient to link another defendant to it need not be overwhelming.'"'" Rivera, 876 F.2d at 891 (citations omitted). Viewed under these standards, the evidence against Locascio was more than sufficient.

As a general matter, Locascio's involvement in all of the charged crimes was supported by two facts: first, that Locascio's role

as Gambino Family underboss was to advise and, where appropriate, "correct" Gotti in the formulation of plans for the Family's criminal activities (see, e.g., AA 1651 ("You're my . . . 'Underboss.' Correct me Frankie."); see also GA 905 (Gravano's testimony that as underboss, he "helped John run the Family")); and second, that Locascio was present in the Ravenite Apartment for discussions about every one of the crimes of which he was convicted.

This Court adopted this precise theory in United States v. Soto, 959 F.2d 1181 (2d Cir. 1992). In that case, appellant Vasquez claimed that evidence established nothing more than his "mere presence" in the apartment of co-defendant Soto, where drugs, guns and cash were found inside of some safes. In rejecting this contention, this Court wrote that "[t]he jury could also have reasonably determined that only trusted members of the operation would be permitted entry into the apartment, because allowing outsiders to have access to an apartment with large quantities of narcotics in plain view could compromise the security of the operation." Id. at 1185.

Here, as in Soto, the jury could reasonably have determined that only very few people had access to the apartment above the Ravenite, and only for very limited purposes: to discuss crimes in which they were participating. Gotti, Locascio and Gravano could always be present because, as the Gambino Family's administration, they comprised the group that had to approve and oversee all of the Family's crimes. Others were allowed up to the apartment only to the extent that their participation in the planning of other crimes was necessary.96/ Thus, Helbig and Corrao appeared in the apartment only to discuss the particular bribery scheme in which they were involved; Coiro was allowed access to the

---

96/ The evidence clearly showed that Locascio in particular was extremely careful about security in the apartment. For example, during a conversation there on January 17, 1990, Locascio advised Gotti to turn on a radio to guard against eavesdropping, and expressed his concern that on January 4, 1990, he had been able to hear what Gotti was saying from outside the apartment door. (GA 80-81).

apartment only to discuss the particular obstruction of justice in which his assistance was needed; and John D'Amato was admitted into the apartment only when his presence was needed to further the plan to kill Corky Vastola.[97/]

Since the jury could infer from this evidence that the only persons allowed into the apartment were individuals who were participating in the crimes under discussion when they were present, the jury could rationally conclude that anyone present in the apartment when a particular crime was being discussed was in fact participating not just in the general affairs of the Gambino Family, but in the particular crime under discussion. In other words, the evidence supported a finding by the jury that nobody -- let alone an underboss -- could be "merely present" in the Ravenite Apartment when a crime was being discussed.

In addition, with respect to each crime charged against Locascio, the evidence showed that Locascio's participation went beyond simply being present for discussions. As demonstrated below, there was evidence that Locascio had participated in each of the crimes of which he was convicted.

A. The DiBono Murder and Murder Conspiracy
   (Racketeering Act Six; Counts Seven and Eight)

On December 12, 1989, Gotti told Locascio that Louis DiBono would be killed because he had violated Gambino Family protocol by failing to "come in" when called. As soon as Gotti said this, Locascio reminded Gotti of a meeting that Gotti was going to have with DiBono, and predicted that DiBono would come to the meeting with money for Gotti. From this a jury could reasonably infer that Locascio was trying to make the conspiracy to kill DiBono succeed by helping Gotti plan for unexpect-

---

[97/] Indeed, members of the administration would send people out of the apartment when their presence was no longer necessary and send messages down from the apartment to the club to have the appropriate persons come up when they were ready to turn from discussing one crime to the next. (See, e.g., GA 85).

ed contingencies at the meeting. In particular, the jury could infer that Locascio wanted Gotti to decide in advance what would happen if, as Locascio expected, DiBono offered Gotti $50,000 to persuade Gotti not to kill him.[98/] Gotti decided that although he should take DiBono's $50,000 "and more," he would not; DiBono would be killed. (AA 1675).

A subsequent conversation, which included Locascio, explicitly established that the reason for the murder was to punish DiBono's "challenge" to the "administration," of which Locascio was indisputably a member. (GA 513). Indeed, Locascio himself, during a conversation about who would become "made," emphasized the importance of made members being "there when you need them." (GA 22). He and the rest of the administration killed DiBono for violating that rule.

Locascio thus joined the conspiracy and reasonably foresaw that it would result in DiBono being killed.[99/] The jury was plainly entitled to find Locascio guilty of both conspiracy to murder DiBono and the substantive murder charge.

B. <u>The Vastola Murder Conspiracy (Racketeering Act Seven; Count Nine)</u>

On January 24, 1990, Gotti, Locascio and Gravano held an extended discussion about how to help the DeCavalcante Family kill one of its soldiers, Corky Vastola. The only way to do so was to secure the permission of the Genovese Family's boss, Vincent "Chin" Gigante, to have Barry Nicholo, a Genovese associate, commit the murder. The Gambino Family administration realized, however, that Gigante would not want to do anything to help the DeCavalcante Family, and in particular, its boss, John Riggi. Accordingly, they decided that Gravano would try to persuade

---

[98/] DiBono was not the first person to try to buy his way out of trouble for failing to "come in." (<u>See</u> GA 483 (Gotti discussing whether Tommy DeBrizzi would "offer anything" when confronted about not coming in)).

[99/] Locascio was also present in the apartment on January 4, 1990 when the Gambino Family Administration further discussed the plan to kill DiBono. <u>See</u> p. 23-24 n.19, <u>supra</u>.